## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| LAKEWOOD HEALTH SYSTEM and NORTHWEST MEDICAL CENTER,<br><br>　　　　　　Plaintiffs,<br>v.<br><br>TRIWEST HEALTHCARE ALLIANCE CORP.,<br><br>　　　　　　Defendant. | Civil Action No. 07-69 - GMS |

## OPENING BRIEF OF DEFENDANT TRIWEST HEALTHCARE ALLIANCE CORP. IN SUPPORT OF ITS MOTION TO DISMISS

OF COUNSEL

Robert S. Ryland
Robert R. Gasaway
Ashley C. Parrish
Scott M. Abeles
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W., Suite 1200
Washington, D.C. 20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200

Lewis H. Lazarus (#2374)
Matthew F. Lintner (#4371)
Katherine J. Neikirk (#4129)
MORRIS JAMES LLP
500 Delaware Avenue, Suite 1500
Wilmington, Delaware 19801-1494
Telephone: (302 ) 888-6800
Facsimile: (302) 571-1750
llazarus@morrisjames.com
mlintner@morrisjames.com
kneikirk@morrisjames.com

*Attorneys for Defendant*
*TriWest Healthcare Alliance Corp.*

Dated: March 16, 2007

## TABLE OF CONTENTS

NATURE AND STAGE OF PROCEEDINGS ................................................................1

SUMMARY OF ARGUMENT .................................................................................2

STATEMENT OF FACTS .....................................................................................5

    A.    The TRICARE Program ..........................................................5

    B.    TRICARE's Payment Limitations ................................................8

    C.    The Administrative Appeal And Rehearing Process ...................10

    D.    The Hospitals' Complaint ........................................................11

STANDARD OF REVIEW ...................................................................................14

ARGUMENT ..................................................................................................15

I.    The Complaint Should Be Dismissed Because The Plaintiff Hospitals Have Filed The Wrong Claims Against The Wrong Party In The Wrong Forum. ...............................................................................................15

    A.    The Hospitals' Claims Are Expressly Preempted.....................15

    B.    The Hospitals Have Not Sued The Real Party In Interest. .........19

    C.    This Case Cannot Go Forward Without The Government. ..........22

        1.    The Government Is An Indispensable Party. ...............22

        2.    Without The Government, The Plaintiffs Lack Standing. .............26

    D.    The TRICARE Management Activity Has Primary Jurisdiction. .............28

II.    The Complaint Should Be Dismissed Because The Plaintiff Hospitals Have Failed To Exhaust Their Administrative Remedies. ...................29

    A.    The Hospitals' Claims Raise Appealable Issues Under The TRICARE Regulations. ..........................................................31

    B.    Participation In The Federal Administrative Appeals Process Is Not "Futile." ...........................................................................34

    C.    The Hospitals Have Not Pleaded Facts Showing That This Case Falls Within A Limited Exception To Exhaustion. ...................35

III.    The Complaint Should Be Dismissed Because The Plaintiff Hospitals Have Failed To State Claims Upon Which Relief Can Be Granted. .....................36

       A.    The Complaint Fails To State A Claim For Breach Of Implied Contract...................................................................................................37

       B.    The Complaint Fails To State A Claim For Unjust Enrichment................39

CONCLUSION.............................................................................................................40

## TABLE OF AUTHORITIES

### Cases

*1975 Salaried Retirement Plan for Eligible Employees of Crucible, Inc. (Nobers),*
    968 F.2d 401 (3d Cir. 1992)..................................................................... 17

*A&M Gregos, Inc. v. Robertory,*
    384 F. Supp. 187 (E.D. Pa. 1974) ...................................................... 14

*Acierno v. Preit-Rubin, Inc.,*
    199 F.R.D. 157 (D. Del. 2001) .......................................... 14, 23, 24, 25

*Allegheny Gen. Hosp. v. Philip Morris, Inc.,*
    228 F.3d 429 (3d Cir. 2000)................................................................. 39

*Allen v. Wright,*
    468 U.S. 737 (1984)............................................................................. 27

*Angst v. Royal Maccabees Life Ins. Co.,*
    77 F.3d 701 (3d Cir. 1996)............................................................ 23, 24

*Baker v. United States,*
    50 Fed. Cl. 483 (2001) ........................................................................ 39

*Baltimore & Ohio R.R. Co. v. United States,*
    261 U.S. 592 (1923)............................................................................. 37

*Baptist Physician Hospital Org., Inc. v. Humana Military*
    *Healthcare Services, Inc.,*
    368 F.3d 894 (6th Cir. 2004) .............................................................. 20

*Barnett v. Weinberger,*
    818 F.2d 953 (D.C. Cir. 1987) .............................................................. 5

*Bd. of Trustees of Bay Med. Ctr. v. Humana Military,*
    447 F.3d 1370 (Fed. Cir. 2006)........................................................... 20

*Beidleman v. Stroh Brewery Co.,*
    182 F.3d 225 (3d Cir. 1999)................................................................ 18

*Bennett v. Spear,*
    520 U.S. 154 (1997)............................................................................. 27

*Boles v. Greeneville Housing Auth.,*
    468 F.2d 476 (6th Cir. 1972) ........................................................ 14, 25

*Britell v. United States,*
    372 F.3d 1370 (Fed. Cir. 2004)...................................................... 22, 26

*Bynum v. Aetna Gov't Health Plan,*
 907 F. Supp. 320 (S.D. Cal. 1995) ............................................................... 16, 17, 36

*Capraro v. United Parcel Service Co.,*
 993 F.2d 328 (3d Cir. 1993) ....................................................................... 18, 19

*Carpet Group Int'l v. Oriental Rug Importers Ass'n Inc.,*
 227 F.3d 62 (3d Cir. 2000) ............................................................................ 14

*Chavez v. United States,*
 18 Cl. Ct. 540 (1989) ..................................................................................... 38

*Christman v. Grays,*
 No. 1:05-CV-192, 2005 WL 3088529 (S.D. Ohio Nov. 17, 2005) ...................... 19

*City of El Centro v. United States,*
 922 F.2d 816 (Fed. Cir. 1990) ................................................................... 37, 40

*Communications Workers of Amer. v. AT & T,*
 40 F.3d 426 (D.C. Cir. 1994) ......................................................................... 34

*Curay-Cramer v. Ursuline Academy of Wilmington, Delaware, Inc.,*
 450 F.3d 130 (3d Cir. 2006) ........................................................................... 15

*Davel Communication, Inc. v. Qwest Corp.,*
 460 F.3d 1075 (9th Cir. 2006) ........................................................................ 28

*Davenport v. Harry N. Abrams, Inc.,*
 249 F.3d 130 (2d Cir. 2001) ........................................................................... 34

*Davis ex rel. Davis v. United States,*
 343 F.3d 1282 (10th Cir. 2003) ...................................................................... 25

*Dawavendewa v. Salt River Project Agric. Improvement & Power Dist.,*
 276 F.3d 1150 (9th Cir. 2002) ................................................................... 24, 25

*Dellums v. U.S. Nuclear Regulatory Com'n,*
 863 F.2d 968 (D.C. Cir. 1988) ........................................................................ 26

*Dugan v. Rannk,*
 372 U.S. 609 (1963) ...................................................................................... 19

*Duquesne Light Co. v. EPA,*
 166 F.3d 609 (3d Cir. 1999) ........................................................................... 27

*Enza, Inc. v. We the People, Inc.,*
 838 F. Supp. 975 (E.D. Pa. 1993) ................................................................... 15

*Ercole v. Conectiv and Coventry Health Care of Delaware, Inc.*,
   No. Civ.A. 03-186,
   2003 WL 21104926 (D. Del. May 15, 2003) ........................................................ 17

*F&M Distribs., Inc., v. American Hardware Supply Co., F/K/A Servistar Corp.*,
   129 F.R.D. 494 (W.D. Pa. 1990) ........................................................ 25

*Fallick v. Nationwide Mut. Ins. Co.*,
   162 F.3d 410 (6th Cir. 1998) ........................................................ 34

*Far East Conference v. United States*,
   342 U.S. 570 (1952) ........................................................ 29

*Farmer v. United Bhd. of Carpenters & Joiners*,
   430 U.S. 290 (1977) ........................................................ 18

*First Jersey Securities, Inc. v. Bergen*,
   605 F.2d 690 (3d Cir. 1979) ........................................................ 30

*Fluent v. Salamanca Indian Lease Authority*,
   928 F.2d 542 (2d Cir. 1991) ........................................................ 25

*Gardiner v. Virgin Island Water & Power Auth.*,
   145 F.3d 635 (3d Cir. 1998) ........................................................ 37

*Gould Elecs. Inc. v. United States*,
   220 F.3d 169 (3d Cir. 2000) ........................................................ 14

*Grabski v. Aetna, Inc.*,
   43 F. Supp. 2d 521 (E.D. Pa. 1999) ........................................................ 17

*Green Hosp. v. United States*,
   23 Cl. Ct. 393 (1991) ........................................................ 11, 12, 22

*H.F. Allen Orchards v. United States*,
   749 F.2d 1571 (Fed. Cir. 1984) ........................................................ 37, 38

*Haitian Refugee Center v. Gracey*,
   809 F.2d 794 (D.C. Cir. 1987) ........................................................ 26

*Hercules, Inc. v. United States*,
   516 U.S. 417 (1996) ........................................................ 37

*Hofmann v. Hammack*,
   82 F. Supp. 2d 898 (N.D. Ill. 2000) ........................................................ 20, 36

*Holton v. Blue Cross and Blue Shield of South Carolina,*
  56 F. Supp. 2d 1347 (M.D. Ala. 1999) ..................................................... 21, 35, 36

*Huss v. Green Spring Health Services, Inc.,*
  18 F. Supp. 2d 400 (D. Del. 1998) ......................................................... 17

*Idaho AIDS Found., Inc. v. Idaho Housing & Finance Ass'n,*
  422 F. Supp. 2d 1193 (D. Idaho 2006) .................................................... 24

*In re Shelby County Healthcare Services of AL, Inc.,*
  80 B.R. 555 (Bankr. N.D. Ga. 1987) ...................................................... 29

*In re WTC Disaster Site,*
  414 F.3d 352 (2d Cir. 2005)................................................................... 15

*Ingersoll-Rand Co. v. McClendon,*
  498 U.S. 133 (1990)........................................................................ 17, 18

*Interfaith Comty. Org. v. Honeywell Intern., Inc.,*
  399 F.3d 248 (3d Cir. 2005)................................................................... 26

*Jeremy H. by Hunter v. Mount Lebanon School Dist.,*
  95 F.3d 272 (3d Cir. 1996)..................................................................... 34

*Jossi v. Derwinski,*
  993 F.2d 883 (9th Cir. 1993) ................................................................. 37

*Jurimex Kommerz Transit G.m.b.H. v. Case Corp.,*
  201 F.R.D. 337 (D. Del. 2001) ............................................................... 14

*Kickapoo Tribe of Indians of Kickapoo Reservation in Kansas v. Babbitt,*
  43 F.3d 1491 (D.C. Cir. 1995)................................................................ 25

*Kramer Assocs., Inc. v. Ikam, Ltd.,*
  888 A.2d 247 (D.C. 2005) ..................................................................... 39

*Laker Airways, Inc. v. British Airways, PLC,*
  182 F.3d 843 (11th Cir. 1999) ............................................................... 26

*Marine Dev. Corp. v. Kodak,*
  300 S.E.2d 763 (Va. 1983).................................................................... 39

*McCowen v. Jamieson,*
  724 F.2d 1421 (9th Cir. 1984) ............................................................... 24

*MCI Commc'n Corp. v. AT & T,*
  496 F.2d 214 (3d Cir.1974).................................................................... 29

vi

*MCI Telecommunications Corp. v. Teleconcepts, Inc.*,
    71 F.3d 1086 (3d Cir. 1995) .................................................................. 28, 29

*McKart v. United States*,
    395 U.S 185 (1969) ............................................................................. 30

*McMahon v. McDowell*,
    794 F.2d 100 (3d Cir. 1986) ................................................................. 17

*Medtronic, Inc. v. Lohr*,
    518 U.S. 470 (1996) ........................................................................... 16

*Merritt v. United States*,
    267 U.S. 338 (1925) ........................................................................... 22

*Metropolitan Life Ins. Co. v. Taylor*,
    481 U.S. 58 (1987) ............................................................................. 17

*Minehan v. United States*,
    No. 05-924T, 2007 WL 489224 (Fed. Cl. Jan. 26, 2007) ....................... 39

*Morse v. Lower Merion Sch. Dist.*,
    132 F.3d 902 (3d Cir. 1997) ................................................................. 15

*Murray v. Northrop Grumman Info. Tech.*,
    444 F.3d 169 (2d Cir. 2006) ................................................................. 38

*Myers v. Bethlehem Shipbuilding Corp.*,
    303 U.S. 41 (1938) ............................................................................. 30

*Panola Land Buyers Assoc. v. Shuman*,
    762 F.2d 1550 (11th Cir. 1985) ............................................................ 19

*Paton v. La Prade*,
    524 F.2d 862 (3d Cir. 1975) ................................................................. 27

*Pennhurst State Sch. & Hospital v. Halderman*,
    465 U.S. 89 (1984) ............................................................................. 19

*Pilot Life Ins. Co. v. Dedeaux*,
    481 U.S. 41 (1987) ............................................................................. 17

*Provident Tradesmens Bank & Trust Co. v. Patterson*,
    390 U.S. 102 (1968) ........................................................................... 25

*Pulitzer-Polster v. Pulitzer*,
    784 F.2d 1305 (5th Cir. 1986) .............................................................. 14

*R.B. Ventures, Ltd. v. Shane,*
　112 F.3d 54 (2d Cir. 1997) ....................................................................... 39

*Reiter v. Cooper,*
　507 U.S. 258 (1993) ................................................................................. 28

*Republic Indus. Inc. v. Cent. Pennsylvania Teamsters Pension,*
　693 F.2d 290  (3d Cir. 1982) .................................................................... 30

*Richman Bros. Records, Inc. v. U.S. Sprint Communications Co.,*
　953 F.2d 1431 (3d Cir. 1991) .................................................................... 28

*Robinson v. Dalton,*
　107 F.3d 1018 (3d Cir. 1997) .................................................................... 31

*Scholl v. QualMed, Inc.,*
　103 F. Supp. 2d 850 (E.D. Pa. 2000) ........................................................ 35

*Sellers v. Brown,*
　633 F.2d 106 (8th Cir. 1980) .................................................................... 22

*Spanish Tiles Ltd. v. Hensey,*
　C.A. No. 05C-07-025, 2005 WL 3981740
　(Del. Super. Ct. Mar. 30, 2005) ................................................................ 39

*Trauma Service Group v. Keating,*
　907 F. Supp. 110 (E.D. Pa. 1995) ....................................................... 29, 36

*United States ex rel. Atkinson v. P.A. Shipbuilding Co.,*
　473 F.3d 506 (3d Cir. 2007) ..................................................................... 14

*United States v. Mitchell,*
　463 U.S. 206 (1983) ................................................................................. 22

*United States v. Testan,*
　424 U.S. 392 (1976) ................................................................................. 21

*United States v. White Mountain Apache Tribe,*
　537 U.S. 465 (2003) ................................................................................. 21

*Vanderberg v. Carter,*
　523 F. Supp. 279 (N.D. Ga. 1981) ...................................................... 20, 21

*Wichita & Affiliated Tribes of Oklahoma v. Hodel,*
　788 F.2d 765 (D.C. Cir. 1986) .................................................................. 26

*Wilson v. Globe Specialty Prods.,*
　117 F. Supp. 2d 92 (D. Mass. 2000) ......................................................... 35

*Wilson v. MVM, Inc.,*
    475 F.3d 166 (3d Cir. 2007).................................................................. 31

*Youngblood v. Vistronix, Inc.,*
    No. 05-21, 2006 WL 2092636 (D.D.C. July 27, 2006) ......................... 38

*Your Home Visiting Nurse Services v. Shalala,*
    525 U.S. 449 (1999)........................................................................... 31

## Statutes and Rules

10 U.S.C. § 1071 ............................................................................................ 5

10 U.S.C. § 1079 ......................................................................................... 5, 7

10 U.S.C. § 1097 ............................................................................................ 5

10 U.S.C. § 1103 ....................................................................... 2, 15, 16, 18

28 U.S.C. § 1346 .......................................................................................... 21

28 U.S.C. § 1491 .......................................................................................... 21

32 C.F.R. § 199.1 .............................................................................. 6, 7, 9, 21

32 C.F.R. § 199.10 ...................................................................... 10, 11, 31, 32

32 C.F.R. § 199.14 ........................................................................ 8, 9, 12, 33

32 C.F.R. § 199.17 ............................................................................... 2, 5, 16

32 C.F.R. § 199.2 ............................................................................. 7, 8, 9, 12

32 C.F.R. § 199.6 ........................................................................................ 7, 9

32 C.F.R. § 199.7 ........................................................................................ 8, 9

Fed. R. Civ. P. 12 .................................................................................... 14, 15

## Other Authorities

Lord, Richard A.,
    Williston on Contracts (4th ed. 2006)...................................... 37, 38, 39

S. Rep. No. 57,
    100th Cong., 1st Sess. (1987) ............................................................. 16

TRICARE Operations Manual,
    DoD Directive 6010.51-M (August 1, 2002, Version 45) .............. 9, 10, 31, 32, 33

### NATURE AND STAGE OF PROCEEDINGS

This lawsuit marks the culmination of a multi-year effort conducted by certain hospitals and their collection agency to extract money from the United States treasury. The plaintiffs — Lakewood Health System ("Lakewood") and Northwest Medical Center ("Northwest") (collectively, the "hospitals") — are two hospitals that have voluntarily participated in the federal government's TRICARE program, a comprehensive health care program for active duty and retired uniformed service members and their families. The TRICARE program has been established by the federal government. It is pervasively regulated by the federal government. And it is funded in its entirety by the federal government.

The gist of the hospitals' complaint is that they do not like the government-mandated reimbursement rates for medical services under the TRICARE program and believe the government should be paying — and they should be receiving — more money for the medical health care services and supplies they provide. But rather than avail themselves of their right to approach the government and directly contend for higher government payments; and rather than suing the government under their disputed interpretation of the government's regulatory requirements; and rather than living within the rules the government has unambiguously laid down, the hospitals have brought litigation against TriWest Healthcare Alliance Corp. ("TriWest").

On February 7, 2007, the hospitals filed this putative class action against TriWest, which is one of the government contractors that serves on the government's behalf, at the government's direction and under its supervision. Although the government, in response to earlier inquiries made by Northwest and other hospitals, had already stated in writing that TriWest is *not* violating regulatory requirements, the hospitals allege that TriWest

1

has failed to pay a certain type of charge, known as a "facility charge," in accordance with the government's TRICARE regulations, policies, and directives.  Pleading claims for breach of implied-in-fact contract and unjust enrichment, the hospitals seek a windfall recovery in excess of $100 million by end-running the agency's specific administrative processes for handling disputes and bringing their claims directly to court.

TriWest denies that it has improperly paid claims submitted by the hospitals, and urges the Court to dismiss the complaint under Federal Rules of Civil Procedure 12(b)(1), 12(b)(6), and 12(b)(7).  As described in more detail below, the hospitals have filed the wrong claims (common law claims for alleged federal law violations), against the wrong party (TriWest as opposed to the government), in the wrong forum (in federal district court, not before the government agency or, ultimately, in the Court of Federal Claims). Moreover, the hospitals have failed to exhaust their administrative remedies, and the allegations in their complaint fail to state even the most basic elements of a claim upon which relief could be granted.   The hospitals' complaint should be dismissed with prejudice.

## SUMMARY OF ARGUMENT

1.      The complaint should be dismissed because the hospitals have brought the wrong claims, against the wrong party, in the wrong forum.

1.1     This Court should dismiss the complaint because the hospitals' claims are expressly preempted by federal law.  The federal statute, along with the federal regulations, preempt "any laws" "relating to" the subjects covered by the statute in order to preserve "important federal interests" and ensure the uniform administrative of the federal TRICARE program.  *See* 10 U.S.C. § 1103; 32 C.F.R. § 199.17(a)(7)(ii).  The

hospitals claims fall squarely within TRICARE's broad preemptive scope. (*See* Section I.A., below.)

       1.2     Even if the hospitals' claims were not preempted, the Court lacks jurisdiction because the real party in interest, the United States, is immune from suit in this forum. The applicable Department of Defense regulations provide that the money used to pay hospitals under TRICARE is federal money drawn from the federal treasury. Because all monies paid to the plaintiff hospitals are reimbursed using federal funds, the federal government is the real party in interest. (*See* Section I.B., below.)

       1.3     Alternatively, if the United States is not the real party in interest, at a minimum, it is a necessary, indispensable party to this litigation. Allowing this litigation to proceed in the government's absence would undoubtedly and unduly prejudice the government's interests and interfere with the performance of its obligation to administer a uniform TRICARE program. The complaint should therefore be dismissed under Rule 12(b)(7). (*See* Section I.C., below.)

       1.4     The United States government has established the TRICARE Management Activity ("TMA") to oversee the TRICARE program. Because the administration of the TRICARE program falls within the specialized knowledge and expertise of TMA, that government agency has primary jurisdiction over challenges to the interpretation and implementation of the federal TRICARE regulations. The Court should dismiss this case and refer the administrative interpretation issues raised by the complaint to TMA. It is TMA, not this Court, that should be in the business of setting TRICARE reimbursement rates. (*See* Section I.D., below.)

       2.     Even if the hospitals could challenge the administration of the TRICARE program in a suit against TriWest in this forum, their complaint should be dismissed

because they have failed to exhaust their administrative remedies. The government has developed an elaborate reconsideration and appeals process for hospitals dissatisfied with payments under TRICARE. The plaintiffs have not, and cannot, claim to have exhausted these remedies. Instead, they assert that they should be excused from the ordinary exhaustion requirements because the issues raised in their complaint supposedly are not appealable and because exhaustion would be "futile." Neither of those assertions is correct; hence, no exception to the exhaustion requirement applies. (*See* Section II, below.)

       3.     The complaint should be dismissed because the hospitals have failed to allege even the most basic elements of their claims for breach of an implied-in-fact contract and for unjust enrichment.

       3.1     The hospitals conjure up an "implied contract" from whole-cloth, disclosing no contractual terms except the self-serving provision that they should be paid as they demand, coupled with a claim that TriWest has breached this supposed "contract." There are no allegations indicating a meeting of the minds, consideration, or even an offer and acceptance; nor is there any allegation that TriWest's conduct constitutes a breach. (*See* Section III.A., below.)

       3.2.    The hospitals argue in the alternative that, even if there is no implied-in-fact contract, TriWest has been unjustly enriched because it did not pay the hospitals at a rate they demand, as opposed to the rate mandated by the government. But the hospitals do not allege that TriWest has received a benefit to which it was not entitled. At best, the hospitals state a claim for unjust enrichment against an absent party — namely, the federal government. (*See* Section III.B., below.)

4

## STATEMENT OF FACTS

### A.    The TRICARE Program

More than thirty years ago, Congress established the Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS"), a comprehensive, civilian-based health care program for active duty and retired uniformed service members and their families. *See* Compl. ¶ 10 (D.I. 1); *see also* 10 U.S.C. § 1071. Until CHAMPUS, members of the uniformed services and their dependents received unpredictable care. *See Barnett v. Weinberger*, 818 F.2d 953, 956-57 (D.C. Cir. 1987). Congress enacted CHAMPUS to mend the disparities, *see id.* at 957, and to create "an improved and uniform program of medical care." 10 U.S.C. § 1701. To this end, CHAMPUS authorizes the Department of Defense to obtain private services to supplement health care available from military clinics, physicians, and other providers at military treatment facilities. *See id.* § 1079(n). It also authorizes the Department to "enter into contracts" for "managed health care networks" for the purpose of obtaining health care services on a "discounted basis." *Id.* § 1079(n); *see also id.* § 1097.

In the 1990s, exercising its authority under CHAMPUS, the Department of Defense implemented a comprehensive "managed health care program" known as TRICARE. *See* Compl. ¶ 13. TRICARE is administered by the government "primarily through managed care support contracts that include special arrangements with civilian sector health care providers." 32 C.F.R. § 199.17(a)(1). The program has three principal participants: (1) the government, which runs the program and provides the money to pay claims submitted by participating hospitals; (2) the managed care support contractors (such as TriWest) that process and pay claims under the TRICARE program; and (3) the

health care providers (such as the plaintiff hospitals) that supply health care services to TRICARE's beneficiaries.

The TRICARE Management Activity ("TMA") is the government entity that supervises and administers TRICARE and enters into agreements with managed care support contractors to provide "claims processing services." 32 C.F.R. § 199.1(c)(iv)(A) and (A)(5); *id.* § 199.1(f) (TMA's director is "responsible for making such arrangements as are necessary to adjudicate and process CHAMPUS claims worldwide"); *see also* Compl. ¶¶ 13-14.    TMA promulgates, interprets, and enforces TRICARE rules and regulations; selects contractors to process claims for the government; adjudicates disputes arising between contractors and health-care providers; and, ultimately, provides the federal funds to pay for claims for health care services.  *See* DoD Directive 5136.12 (May 31, 2001) (available at http://www.dtic.mil/whs/directives) (A2-15).[1]

To fulfill these obligations, TMA prepares and distributes highly detailed, legally binding Manuals covering every aspect of the TRICARE system, including reimbursement rates for providers like the hospitals.  *See* http://manuals.tricare.osd.mil. TMA also prepares Provider Handbooks that apply to each of the Managed Care Support

---

[1] "TRICARE Management Activity (TMA)," DoD Directive 5136.12 (May 31, 2001) is an official directive issued by the Department of Defense and is available on the Department's website at http://www.dtic.mil/whs/directives.  A true and correct copy of this directive is included in the Appendix to this motion, at A2-A15.  Similarly, true and correct copies of excerpts from the "TRICARE Operations Manual," DoD Directive 6010.51-M (August 1, 2002, version as of March 9, 2007) (available at http://manuals.tricare.osd.mil) are included in the Appendix to this motion, at A16-A56.  The Appendix also includes the Affidavit of Lawrence J. Haggerty and attached correspondence at A57-A74.

All of the material in the Appendix is offered for the Court's review in connection with TriWest's motions under Rules 12(b)(1) and 12(b)(7).  For purposes of considering whether the Court has subject matter jurisdiction, and whether this case should be dismissed for failure to join a necessary party, the Court may consider evidence outside the pleadings. *See Gould Elecs. Inc. v. United States*, 220 F.3d 169, 178 (3d Cir. 2000); *Jurimex Kommerz Transit G.m.b.H. v. Case Corp.*, 201 F.R.D. 337, 340 (D. Del. 2001).

Contractors with which the Department of Defense has contracted in the Nation's three TRICARE regions (the North, South, and West). *See* http://www.tricare.mil/provider. aspx ("TRICARE Provider Handbook by Region").

TriWest is the Managed Care Support Contractor ("MCSC") for TRICARE's West Region. *See* Compl. ¶ 20. Under its contract with the government, TriWest is required to establish a network of hospitals and other health-care providers ("Network Providers") willing to offer services to TRICARE beneficiaries at pre-negotiated, contracted rates. *See* Compl. ¶ 25. TriWest is responsible for processing all claims for TMA in the West Region. *See* Compl. ¶ 24-26; 10 U.S.C. § 1079(p)(2).

Hospitals that offer TRICARE services but are not part of TriWest's network ("Non-Network Providers") are classified as either "participating" or "non-participating" providers. Participating providers voluntarily "participate" in the TRICARE program by offering health care services and supplies in return for the assignment of benefits from TRICARE beneficiaries. *See* Compl. ¶ 26-27. Participating providers are required to enter into a "participation agreement" with the Department of Defense, or to "elect to be a participating provider on a claim-by-claim basis by indicating 'accept assignment' on each claim form for which participation is elected." 32 C.F.R. § 199.6(a)(8)(i-ii). If a hospital chooses to participate in the TRICARE program on a claim-by-claim basis, it "must be a participating provider for all claims." *Id.* § 199.6(a)(8)(i). By contrast, "non-participating" providers do not accept the assignment of TRICARE benefits; instead, they send their bills directly to the TRICARE beneficiaries, who in turn may seek reimbursement from the government. *See id.* § 199.2(b).

Hospitals and other health care providers that choose to become "participating providers" must accept TMA's reimbursement rates. The regulations make clear that a

7

non-network hospital, by participating in the TRICARE program, must "accept the CHAMPUS-allowable amounts as the ***maximum total charge*** for a service or item rendered to a CHAMPUS beneficiary ...." *Id.* (emphasis added).

Lakewood and Northwest (and all the putative class members) are "Non-Network Participating Hospitals." *See* Compl. ¶¶ 26-27, 32. This case accordingly does not concern payments to network hospitals, TRICARE beneficiaries, or non-participating hospitals. The case is limited to circumstances in which TRICARE beneficiaries have assigned their program benefits to non-network hospitals, which have accepted assignment and agreed to submit claims and accept payment in accordance with the government's TRICARE regulations. *See* Compl. ¶ 26.

## B.    TRICARE's Payment Limitations

TMA "is responsible for ensuring that benefits under CHAMPUS are paid only to the extent described in" the CHAMPUS regulations. 32 C.F.R. § 199.7(a). The regulations generally provide that approved payments on claims submitted by non-network hospitals will be made on the basis of rates established under the Medicare program, or a rate set by the Department of Defense, or, in limited circumstances, the charges "as billed" by the hospital. *See id.* § 199.14(a)(3).

The Department of Defense has "set rates" for hospital outpatient services at the amount of government-determined "allowable charges" for ten categories of outpatient services. *See id.* § 199.14(a)(5)(i)–(x). These ten categories, which establish a fixed, "allowable" charge as the maximum amount payable to hospitals, include laboratory services, rehabilitation therapy services, veni-puncture, radiology services, diagnostic services, ambulance services, durable medical equipment and supplies, oxygen and

8

related supplies, drugs administered by non-oral methods, and professional provider services. *See id.*

Apart from these ten categories, only two types of payment are specified for outpatient services provided to TRICARE beneficiaries: "facility charges" and "ambulatory surgery services." *See id.* § 199.14(a)(5)(xi), (xii). The regulations define "facility charge" as "the charge, either inpatient or outpatient, made by a hospital or other institutional provider to cover the overhead costs of providing the service." *Id.* § 199.2(b). These costs include building costs, such as "depreciation and interest; staffing costs; drugs and supplies; and overhead costs, *i.e.*, utilities, housekeeping, maintenance, etc." *Id.* The regulations also establish the level of payments for "ambulatory surgery services" using a "prospective payment" system "similar to that used by the Medicare program for ambulatory surgery." *Id.* § 199.14(d)(1).

As Lakewood and Northwest recognize, participating hospitals must submit claims in accordance with TRICARE's requirements. *See* Compl. ¶ 32. Participating hospitals have a general "duty to familiarize themselves with, and comply with, the program requirements." 32 C.F.R. § 199.6(a). Moreover, to ensure compliance with the TRICARE program, they are required to submit claims with "sufficient information as to … the medical services and supplies provided … to permit proper, accurate, and timely adjudication of the claim by the … contractor or [TMA]." *Id.* § 199.7(a).

Payments under the TRICARE program are made using federal funds. *See id.* § 199.1(e). In fact, TMA's Operations Manual mandates that the following statement accompany every TRICARE payment: "This payment is made with Federal funds." TRICARE Operations Manual, DoD Directive 6010.51-M (August 1, 2002, revised as of March 9, 2007) ("Ops. Man.") Ch. 3, § 6, ¶ 1.0 (A17).

### C.     The Administrative Appeal And Rehearing Process

The government anticipated that, from time to time, disputes might arise between the contractors that pay claims and the hospitals that submit claims for payment. TMA accordingly established a detailed, step-by-step appeal and rehearing process. *See* 32 C.F.R. § 199.10. These procedures are set forth in the TRICARE Operations Manual. *See* Ops. Man. Ch. 13, § 1 (A19-24).

The appeals process begins with an "initial determination" by the Managed Care Support Contractor regarding what payment is allowed for a claim under the TRICARE regulations. That determination is typically provided on a standard form Explanation of Benefits. *See* 32 C.F.R. § 199.10(a)(1)(i)(A), (D). On the form, the participating hospital is informed of its right to appeal an adverse decision and the procedures for seeking an appeal. *See id.* § 199.10(a)(1)(i)(F); Ops. Man. Ch. 13, § 1, ¶ 8.1 (A22). The initial determination becomes final unless appealed. *See* 32 C.F.R. § 199.10(a)(1)(ii).

The contractor's initial determination is reviewable if a timely appeal (1) is brought by a "proper appealing party," (2) involves an "appealable issue," and (3) contains an "amount in dispute." *Id.* § 199.10(a)(5), (6), (7); Ops. Man. Ch. 13, § 2, ¶¶ 1.1, 3.1, 3.2, 3.3., 4.0 (A26, A30-31). Non-network participating providers, like Lakewood and Northwest, are "proper appealing parties" under TRICARE procedures. *See* Ops. Man. Ch. 13, § 2, ¶ 1.1, 1.4 (A26, A28). An "appealable issue" is any issue regarding a claim for payment in which "services ... have been rendered by a ... provider, the denial of which raises a disputed question of fact which, if resolved in favor of the appealing party, would result in an extension of TRICARE benefits ..." *Id.* Ch. 13, § 2, ¶ 3.2 (A30). The required "amount in dispute" depends on the level of review. *See id.* Ch. 13, § 2, ¶ 4.0.

10

The regulations establish four levels of administrative review:

*Request for reconsideration*: The first step in the TRICARE appeal procedure is a written request, submitted within 90 days, seeking reconsideration of the contractor's initial determination. 32 C.F.R. § 199.10(b)(1)-(5); *see also id.* § 199.10(b), (b)(1)(iii).

*Formal review*: The next step involves a "formal review" of the contractor's decision by TMA. *Id.* § 199.10(c). Any party to a reconsideration determination "may request formal review" by TMA if "dissatisfied with the ... reconsideration determination," the amount in dispute is $50 or more, and the party timely requests formal review. *Id.* § 199.10(c), (c)(3), (b)(4)(v).

*Hearing*: The third level of review involves a hearing before a TMA hearing officer. Any party "may request a hearing" if it "is dissatisfied with the formal review determination," the amount in dispute is more than $300, the issue is appealable, and the party requests a hearing by submitting a written request within 60 days. *Id.* § 199.10(d), (d)(1)(ii)(c)(5), (d)(3). Participating providers have the opportunity for discovery, witness examination, evidence presentation, oral argument, and the submission of formal briefs. *See id.* § 199.10(d)(10)-(11). After an on-the-record hearing, the hearing officer issues a written statement of findings, statement of reasons, and recommended decision. *See id.* § 199.10(d)(12).

*Final Decision*: A final level of administrative review is afforded by the TMA Director. He is empowered to adopt or reject the recommended decision of the hearing officer, or may refer it to the Assistant Secretary of Defense in cases where the issue "involves the resolution of CHAMPUS policy and issuance of a final decision which may be relied on, used, or cited as precedent in the administration of CHAMPUS." *Id.* § 199.10(e)(1)(ii). The decision becomes final if adopted, rejected in favor of a decision by the Director, or reviewed by the Assistant Director who in turn issues a decision. *Id.* § 199.10(e)(1)(i)-(ii).

After exhausting the administrative appeal process, a lawsuit challenging a final decision by TMA may be brought in federal court. *See, e.g., Green Hosp. v. United States*, 23 Cl. Ct. 393 (1991) (hospital challenge to agency final decision).

**D.    The Hospitals' Complaint**

On February 7, 2007, Lakewood and Northwest filed a two-count complaint against TriWest as the federal government's Managed Care Support Contractor for TRICARE's West Region. Both counts assert common law claims grounded on

TriWest's alleged failure to follow federal law, including TRICARE regulations, policies, and directives. The hospitals allege that TriWest (i) breached an "implied-in-fact" contract and/or (ii) was unjustly enriched, through a failure to honor a purported, unstated, "implied" common law duty owed plaintiffs. *See* Compl. ¶¶ 51-60. Lakewood and Northwest seek $100 million for this alleged offense.

Lakewood and Northwest allege that TriWest has "failed to pay, and continues to fail to pay" Facility Charges on certain claims. Compl. ¶ 54 (Count I) and ¶ 59 (Count II). Specifically, they allege that TriWest has violated federal regulations requiring that "Facility Charges" be "paid as billed," *id.* ¶ 29, unlike most other types of outpatient charges, which are paid according to TRICARE's allowable charge determinations. *See* 32 C.F.R. §§ 199.14(a)(5), 199.2(b).

The complaint, however, fails to allege that either of the two named hospitals or any members of the purported class ever submitted any claims for "Facility Charges." Its carefully parsed allegations instead aver that Lakewood and Northwest submitted "Subject Claims" — defined as "claims for *outpatient services*" — to TriWest for payment under the TRICARE program rules. Compl. ¶ 35 (emphasis added). But as noted above, there are 12 recognized categories of "outpatient services," only one of which is the category for "Facility Charges." *See* 32 C.F.R. § 199.14(a)(5)(xi). The complaint fails to allege that any such "Facility Charges" met the reimbursement requirements and definitions applicable to claims under the TRICARE program.

Equally significant, the complaint fails to allege that TriWest has ever denied payment of a "Facility Charge" submitted by either Lakewood or Northwest. Instead, the complaint merely asserts that the hospitals "have provided *outpatient services* ... and have duly submitted claims for *outpatient services*" and "have been ... underpaid for the

*outpatient services* they have provided." Compl. ¶¶ 32-35 (emphasis added). Of course, outpatient services and facility charges are not coterminous; the latter is a small subset of the former. It appears, then, that the hospitals' objection is that most outpatient charges are subject to regulatory limits, rather than limits imposed at their own internally-set "billed charge." Lakewood and Northwest apparently believe they should be paid both the "allowable charge" for services within the ten listed categories plus a "facility charge" as an additional amount for "overhead" costs.

This is not the first time the hospitals have lobbied for additional reimbursement. Before filing this litigation, representatives for one of the hospitals contacted TriWest raising the same policy arguments made now via complaint, but without regard to any specific claims. *See* Affidavit of Lawrence J. Haggerty, Exh. A (Ltr. M. Tobin to McIntyre (Sept. 8, 2005)) (A61-65). TriWest forwarded this letter to TMA's contracting officer to determine if plaintiffs' argument had any merit. *Id.*, Exh. B (Ltr. D. McIntyre to B. Mitterer (Sept. 28, 2005)) (A67-68). TMA's contracting officer responded in unambiguous terms, stating "we *disagree* with the argument put forth by [the hospitals] and believe that *TriWest has paid the hospitals in question appropriately*, as required by 32 CFR 199 and the TRICARE Manuals." *Id.*, Exh. C (Ltr. B. Mitterer to D. McIntyre (Dec. 21, 2005)) (A70-71) (emphasis added). This guidance from TMA was consistent with earlier guidance requested by TriWest and provided by TMA on the same subject. *Id.*, Exh. D (Ltr. C. Blomberg to S. Montplaisir (Jan. 25, 2001)) (A73-74).

**STANDARD OF REVIEW**

Under Rule 12(b)(1), the Court should dismiss if it lacks subject matter jurisdiction over the plaintiffs' complaint. Fed. R. Civ. P. 12(b)(1). Where, as here, a motion to dismiss addresses not merely "an alleged pleading deficiency," but a failure to comply with jurisdictional prerequisites, *United States ex rel. Atkinson v. PA. Shipbuilding Co.*, 473 F.3d 506, 514 (3d Cir. 2007), "the court may consider and weigh evidence outside the pleadings to determine if it has jurisdiction." *Gould Elecs. Inc. v. United States*, 220 F.3d 169, 178 (3d Cir. 2000). In such circumstances, "no presumptive truthfulness attaches" to the complaint's allegations and the plaintiffs have the burden "of proving the existence of subject matter jurisdiction." *Carpet Group Int'l v. Oriental Rug Importers Ass'n Inc.*, 227 F.3d 62, 69 (3d Cir. 2000).

Under Rule 12(b)(7), the Court should dismiss if the plaintiffs have failed to join an indispensable party. Fed. R. Civ. P. 12(b)(7). If the government is a necessary party, but joinder is infeasible, the Court must consider "whether in equity and good conscience the action should proceed" or "should be dismissed." *Acierno v. Preit-Rubin, Inc.*, 199 F.R.D. 157, 162 (D. Del. 2001). In making these determinations, the Court is permitted to look outside the pleadings. *Jurimex Kommerz Transit G.m.b.H. v. Case Corp.*, 201 F.R.D. 337, 340 (D. Del. 2001); *A&M Gregos, Inc. v. Robertory*, 384 F. Supp. 187, 193, 194 n.16 (E.D. Pa. 1974)). If it appears the government is "arguably indispensable," the burden "devolves" to the plaintiffs "to negate the unjoined party's indispensability to the satisfaction of the court." *Boles v. Greeneville Housing Auth.*, 468 F.2d 476, 478 (6th Cir. 1972); *Pulitzer-Polster v. Pulitzer*, 784 F.2d 1305, 1309 (5th Cir. 1986). The plaintiffs thus have the burden of showing that the government is a dispensable party and that the case may continue without its involvement. *See, e.g., Harris v. S.C. Madison*,

14

No. Civ. A. 97-7532, 1998 WL 518181, at *2 (E.D. Pa. July 24, 1998) (citing *Enza, Inc. v. We the People, Inc.*, 838 F. Supp. 975, 978 (E.D. Pa. 1993)).

Finally, under the familiar Rule 12(b)(6) standard, the Court should dismiss if the plaintiffs have failed to state a claim upon which relief may be granted. *See* Fed. R. Civ. P. 12(b)(6). Although this Court "must accept as true all well-pled allegations," it should not credit a complaint's "bald assertions," "conclusions of law," or "unreasonable factual inferences." *Curay-Cramer v. Ursuline Academy of Wilmington, Delaware, Inc.*, 450 F.3d 130, 133 (3d Cir. 2006); *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d. Cir. 1997).

## ARGUMENT

**I.    The Complaint Should Be Dismissed Because The Plaintiff Hospitals Have Filed The Wrong Claims Against The Wrong Party In The Wrong Forum.**

The hospitals' complaint should be dismissed because it pleads claims that are expressly preempted by the federal CHAMPUS statute. To the extent the claims are not preempted, they are improperly brought against TriWest, because it is the government, not the government's claims processor, that is responsible for the hospitals' alleged injury. Moreover, the courts should refer any disputes over payment rates to TMA, which has primary jurisdiction over the issues raised in the complaint.

**A.    The Hospitals' Claims Are Expressly Preempted.**

The CHAMPUS statute includes a broad preemption provision targeting "any" state law "relating to" the subjects covered by the statute to ensure that idiosyncratic state requirements do not interfere with the comprehensive federal scheme. 10 U.S.C. § 1103; *see also In re WTC Disaster Site*, 414 F.3d 352, 376 (2d Cir. 2005) (provision of federal law preempting state law claims for damages "resulting from or relating to" airline

15

crashes on 9/11 is "clearly expansive"). In particular, Congress provided that any law "*relating to* health insurance, prepaid health plans, or other health care delivery or financing methods shall not apply to any" contract pursuant to CHAMPUS "to the extent" the Department of Defense determines that it "is inconsistent with a specific provision of the contract or a regulation promulgated by the Secretary of Defense," or that preemption is "necessary to implement or administer the provisions of the contract or to achieve any other important Federal interest." 10 U.S.C. § 1103 (emphasis added).

The Department of Defense has specifically determined that "*any* State or local law *relating to* health insurance, prepaid health plans, or other health care delivery or financing methods is preempted and does not apply in connection with TRICARE regional contracts." 32 C.F.R. § 199.17(a)(7)(ii) (emphasis added); *cf. Medtronic, Inc. v. Lohr*, 518 U.S. 470, 504 (1996) (Breyer, J., concurring) ("the effects of the state agency regulation and the state tort suit are identical" for preemption purposes). In the Department's judgment, such preemption "is necessary to achieve important Federal interests, including ... uniform national health programs ... and the operation of such programs at the lowest possible cost to" the government. *Id.* § 199.17(a)(7)(i).

Against this regulatory backdrop, the only court that appears to have examined the preemptive scope of the TRICARE regime has held that the federal statute and regulations are "specifically intended" to displace state common law claims. *Bynum v. Aetna Gov't Health Plan*, 907 F. Supp. 320, 322 (S.D. Cal. 1995) (citing S. REP. NO. 57, 100th Cong., 1st Sess., 150-51 (1987)). In *Bynum*, the court examined the statutory scheme and found "ample evidence" that it "preempted state law claims against private CHAMPUS contractors ... in their provision of administrative services." 907 F. Supp. at 321-22 (emphasis added). Emphasizing the "government's interest in uniformity in the

16

administration of CHAMPUS claims and in the provision of CHAMPUS services," the court found that the "plaintiff's state-law causes of action for intentional tort and breach of contract" were preempted. *Id.* at 322.

That conclusion is consistent with a long line of authority construing preemption clauses with similar language as preempting related state law causes of action. *See, e.g., Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 48, 57 (1987) (breach of contract claims preempted under ERISA statute), *rev'd in part,* 123 S. Ct. 1471 (2003); *Metropolitan Life Ins. Co. v. Taylor,* 481 U.S. 58, 64 (1987); *1975 Salaried Retirement Plan for Eligible Employees of Crucible, Inc.* (*Nobers*), 968 F.2d 401, 406 (3d Cir. 1992); *Ercole v. Conectiv and Coventry Health Care of Delaware, Inc.,* No. Civ.A. 03-186, 2003 WL 21104926, at *2 (D. Del. May 15, 2003) (unpublished disposition); *Huss v. Green Spring Health Services, Inc.,* 18 F. Supp. 2d 400, 406 (D. Del. 1998); *Grabski v. Aetna, Inc.,* 43 F. Supp. 2d 521, 527 (E.D. Pa. 1999). Courts have not hesitated to find in favor of preemption where, as here, a statute includes a broad preemption provision and a plaintiff's alleged state law claims depend on the construction of federal law. *See McMahon v. McDowell,* 794 F.2d 100, 106 (3d Cir. 1986) (preempting claims where "the very existence of liability … is, in the first instance, a result of the federal scheme"); *Nobers,* 968 F.2d at 406 (state law claims preempted where "the calculation of damages would involve construction of ERISA plans"); *Grabski,* 43 F. Supp. 2d at 527 (state law claims preempted where court "would need to review" the ERISA plan "to determine whether defendant is liable").

In *Ingersoll-Rand Co. v. McClendon,* 498 U.S. 133 (1990), for example, the plaintiff filed a wrongful discharge action under state law, alleging that he had been terminated because his employer sought to avoid contributing to a pension fund. The

17

Supreme Court unanimously held the action was preempted because the existence of a federal ERISA plan was a critical factor in establishing liability. *See id.* at 139. Similarly, in *Capraro v. United Parcel Service Co.*, 993 F.2d 328 (3d Cir. 1993), the Third Circuit considered breach of contract and other claims brought by a former pilot terminated by UPS and held that the pilot's state law claims were preempted. As the court explained, under the Railway Labor Act, Congress mandated that certain employment-related disputes were to be brought before a Board of Adjustment and resolved under the applicable collective bargaining agreement (construed under federal labor law). *See id.* at 331. Rejecting plaintiff's attempt to dress a federal labor claim in contract law garb, the court held that the plaintiff's state common law claims were preempted because they arose "from the allegedly wrongful discharge" and could not "be resolved without consideration of the collective bargaining agreement," a federal concern. *Id.* at 333-34 (citing *Farmer v. United Bhd. of Carpenters & Joiners*, 430 U.S. 290, 305 (1977)); *see also Beidleman v. Stroh Brewery Co.*, 182 F.3d 225, 232 (3d Cir. 1999).

The hospitals' common law claims in this case are preempted for similar reasons. There can be no dispute that the hospitals' claims "relate to" TriWest's administration of the TRICARE program according to its contract with the Department of Defense. *See* 10 U.S.C. § 1103(a). Indeed, the hospitals' claims are a special breed — their very essence concerns TriWest's alleged failure to administer the TRICARE program in accordance with federal law and to provide appropriate payment to the plaintiff hospitals. *See* Compl. ¶ 9 (TriWest's failure to pay "for services rendered to TRICARE beneficiaries … is improper under the TRICARE regulations and has given rise" to claims "for breach of contract implied-in-fact and unjust enrichment"). The hospitals have thus dressed up an

18

alleged failure to follow TRICARE regulations as common law breach of contract and unjust enrichment claims. Because the federal TRICARE regulations alone determine the rights and obligations of the parties, resolving these claims would necessarily require interpretation of the TRICARE law and regulations. Moreover, adjudicating the hospitals' claims would "easily" thwart the purposes and administrative process established by law and regulation to govern the TRICARE program. *See Capraro*, 993 F.2d at 333.

**B.      The Hospitals Have Not Sued The Real Party In Interest.**

Even if the hospitals' claims were not preempted, this Court should dismiss under Rule 12(b)(1) because the hospitals have failed to sue the real party in interest. Because the hospitals are challenging payments of federal funds under TMA's interpretation of the federal regulations, their claims must be brought against the United States in the Court of Federal Claims.

It is well settled that a suit brought against a government agent should be dismissed if the government is the real party in interest and immune from suit. The government is the real party in interest if "the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration, or if the effect of the judgment would be to restrain the Government from acting, or to compel it to act." *Pennhurst State Sch. & Hospital v. Halderman*, 465 U.S. 89, 102 n. 11 (1984) (quoting *Dugan v. Rannk*, 372 U.S. 609, 620 (1963)); *Panola Land Buyers Assoc. v. Shuman*, 762 F.2d 1550, 1555 (11th Cir. 1985). Applying these principles, courts have consistently held that the government is the real party in interest in cases involving CHAMPUS/TRICARE benefit determinations. *See, e.g., Christman v. Grays*, No. 1:05-CV-192, 2005 WL 3088529 (S.D. Ohio Nov. 17, 2005) (United States was the real party

19

in interest in a suit brought by a nonparticipating provider against a TRICARE beneficiary to enforce an oral contract under state law); *Hofmann v. Hammack*, 82 F. Supp. 2d 898 (N.D. Ill. 2000) (United States, rather than its contractor, was the real party in interest in a suit brought by a CHAMPUS claimant because government funds would be expended to satisfy the claim); *Vanderberg v. Carter*, 523 F. Supp. 279, 285 (N.D. Ga. 1981) (CHAMPUS fiscal intermediary was immune from suit where the funds sought by the claimant would be paid from the public treasury), *aff'd without opinion*, 691 F.2d 510 (11th Cir. 1982).

This line of precedent is both controlling here and readily distinguished from *Bay Medical Center*, in which the Federal Circuit held that the government was not the real party in interest to a breach of contract claim against Humana, TRICARE's contractor in the South region. In that case, unlike here, the court recognized that Humana had *expressly* agreed to pay the hospitals at a rate that was not limited to the government-approved rates. *See Bd. of Trustees of Bay Med. Ctr. v. Humana Military*, 447 F.3d 1370, 1375 (Fed. Cir. 2006); *Baptist Physician Hospital Org., Inc. v. Humana Military Healthcare Services, Inc.*, 368 F.3d 894 (6th Cir. 2004) (holding that the United States was not the real party in interest where Humana expressly contracted to pay the provider in excess of the government-approved rates). In effect, Humana had entered a compound contract with the relevant providers — an agreement to provide government funds dictated by the federal government, plus additional private funds based on an express contract with Humana. Because Humana had privately contracted to reimburse the hospitals in a manner *inconsistent* with the federal TRICARE regulations, the government was not the real party in interest to the plaintiff's suit for breach of contract.

20

Here, in stark contrast, the hospitals allege that TriWest owes them an *implied* duty to pay claims in a manner that they argue (incorrectly) would be *consistent* with the TRICARE regulations. *See* Compl. ¶¶ 8, 9, 52. The hospitals are seeking federal funds allegedly owed to them under the federal regulations. *See* 32 C.F.R. § 199.1(e) (the "funds expended for CHAMPUS benefits are federal funds provided CHAMPUS fiscal intermediaries solely to pay CHAMPUS claims"); Ops. Man. Ch. 3, § 6, ¶ 1.0 (TRICARE payments are made with the statement: "This payment is made with Federal funds") (A17). In these circumstances, because TriWest is processing TRICARE claims from the non-network hospitals on the government's behalf, the Court cannot grant relief without affecting the federal treasury and interfering with TMA's administration of its TRICARE program.

Because the government is the real party in interest, TriWest is immune from suit to the same extent the United States is immune. *See Holton v. Blue Cross and Blue Shield of South Carolina*, 56 F. Supp. 2d 1347, 1352 (M.D. Ala. 1999); *Vanderberg*, 523 F. Supp at 285. The United States, as a sovereign, may not be sued without its consent. *United States v. Testan*, 424 U.S. 392, 399 (1976). Accordingly, for a court to exercise jurisdiction there must be a "clear statement from the United States waiving sovereign immunity" and the plaintiffs' claims must fall "within the terms of the waiver." *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 472 (2003). In this case, the hospitals' claims do not fall with the terms of any clear waiver of sovereign immunity.

As for Count I (for breach of implied-in-fact contract), the United States has made only a limited waiver of sovereign immunity, vesting exclusive jurisdiction in the Court of Federal Claims to hear claims involving an amount in controversy in excess of $10,000. *See* 28 U.S.C. § 1491(a)(1); *see also id.* § 1346(a)(2). As courts have

recognized, the Court of Federal Claims has exclusive jurisdiction over claims seeking to enforce the government's CHAMPUS regulations. *See, e.g., Britell v. United States*, 372 F.3d 1370, 1378-79 (Fed. Cir. 2004) (claims seeking to enforce the CHAMPUS regulations are "money-mandating" such that claims may be brought under the Tucker Act); *Sellers v. Brown*, 633 F.2d 106, 108 (8th Cir. 1980) (Court of Claims has exclusive jurisdiction over plaintiff's CHAMPUS claim exceeding $10,000); *Green Hospital*, 23 Cl. Ct. at 399 (Court of Claims has jurisdiction over a claim for CHAMPUS benefits under the Tucker Act). The Court therefore has no jurisdiction over Count I of the complaint.

As for Count II (for unjust enrichment), the government has not waived sovereign immunity. *See United States v. Mitchell*, 463 U.S. 206, 218 (1983) ("although the Tucker Act refers to claims founded upon any implied contract with the United States ... the Act does not reach claims based on contracts implied in law, as opposed to those implied in fact"); *Merritt v. United States*, 267 U.S. 338, 341 (1925) (there is no "right of action against the United States" in cases "where, if the transaction were between private parties, recovery could be had upon a contract implied in law"). Accordingly, Count II should be dismissed as well.

## C.    This Case Cannot Go Forward Without The Government.

Even if the hospitals' claims were not preempted, and even if the government were not the real party in interest, the Court should dismiss under Rule 12(b)(7) because the government is a necessary and indispensable party to the litigation.

### 1.    The Government Is An Indispensable Party.

Whether a party is indispensable is a question of federal law analyzed under a two-step process. The first step is to determine if the missing party is necessary and,

22

therefore, should be joined if joinder is feasible. If the party is necessary, but joinder is not feasible, the Court should determine whether "in equity and good conscience the action" may proceed or should be dismissed. *Acierno*, 199 F.R.D. at 162.

In this case, the government is a necessary party because, absent the government's participation, the Court cannot grant "complete relief." *See Angst v. Royal Maccabees Life Ins. Co.*, 77 F.3d 701, 705 (3d Cir. 1996). The hospitals contend that they deserve more of the government's money, alleging that "TriWest has failed, ***and continues to fail***, to pay the Facility Charges for the Subject Claims." Compl. ¶ 54 (emphasis added). The hospitals are thus asking the Court to grant prospective relief and require TriWest to pay future "Subject Claims" in accordance with the hospitals' interpretation of TMA's rules. But to "fashion" such a "remedy," the Court would "have to review" TMA's interpretation of the federal requirements, order TMA to change its regulatory interpretation, and direct TriWest to pay charges in accordance with the hospitals' preferred regulatory approach. *Acierno*, 199 F.R.D. at 163. Such relief cannot be awarded unless the government participates in the litigation.

The government is also a necessary party because any judgment by the Court would, "as a practical matter," impair or impede the government's ability to protect its regulatory interests. *Angst*, 77 F.3d at 705. It bears remembering that the hospitals appear to be challenging regulatory interpretations regarding handling of claims for "Facility Charges." *See* Haggerty Aff., Exh. C (letter to TriWest from TMA's contracting officer rejecting hospitals' general argument regarding payment for Facility Charges) (A70-71); *see also Acierno*, 199 F.R.D. at 163. The hospitals' complaint reflects their disappointment with TMA's interpretation of its own rules and prior assessment of objections made by hospitals regarding payments for "Facility Charges."

23

*See* Haggerty Aff., Exh. A (A61-65). Without the government before the Court to defend its regulatory interpretation now under challenge, any judgment rendered on the basis of the complaint could infringe on important agency prerogatives and wrongly reward the hospitals for evading the normal process of regulatory rulemaking and administrative review. *See Acierno,* 199 F.R.D. at 164; *McCowen v. Jamieson*, 724 F.2d 1421, 1423 (9th Cir. 1984).

Moreover, litigating this suit without the government would subject TriWest to a substantial risk of multiple, "inconsistent obligations." *Angst*, 77 F.3d at 705. As the hospitals repeatedly assert, TriWest is obligated to adhere to TMA's regulations, policy, and guidance when paying claims submitted by "Non-Network Participating Hospitals." Compl. ¶¶ 33, 36, 37. But the hospitals seek to force TriWest to pay claims in a manner *contrary* to those regulations, policies, and guidance documents. They seek payment in accordance with their own interpretation of TMA's rules, not TMA's interpretation. *See* Haggerty Aff., Exh. C and D (A70-71, A73-74). If they obtain a judgment in this lawsuit, TriWest could be obliged to pay the hospitals' claims at their preferred rate, while at the same time violating a conflicting legal and contractual obligation owed to the government to pay those same claims at the government-mandated rate. *See, e.g., Dawavendewa v. Salt River Project Agric. Improvement & Power Dist.*, 276 F.3d 1150, 1157-58 (9th Cir. 2002) (finding inconsistent obligations to a contractual party sufficient to render the absent contractual party indispensable); *Idaho AIDS Found., Inc. v. Idaho Housing & Finance Ass'n*, 422 F. Supp. 2d 1193, 1208 (D. Idaho 2006) (federal agency is a necessary party when defendant would be required to comply either with court's order or agency's order).

24

Because TMA is a "necessary" party, the hospitals have the burden of showing that the case should continue "in equity and good conscience" without the government's involvement. *See Boles*, 468 F.2d at 478. In considering the hospitals' arguments, the Court should consider (1) the extent of prejudice to the absent and present parties; (2) the extent to which the prejudice may be lessened or avoided; (3) the adequacy of a judgment rendered in the government's absence; and (4) the adequacy of the hospital's remedy if the action is dismissed. *See Acierno*, 199 F.R.D. at 164.

In weighing these factors, courts have recognized that some interests are sufficiently "compelling by themselves" to justify dismissal. *Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 119 (1968). When a necessary party enjoys sovereign immunity, there is "very little room" for balancing any other factors. *Kickapoo Tribe of Indians of Kickapoo Reservation in Kansas v. Babbitt*, 43 F.3d 1491, 1496-97 (D.C. Cir. 1995); *Dawavendewa*, 276 F.3d at 1162; *Davis ex rel. Davis v. United States*, 343 F.3d 1282, 1293 (10th Cir. 2003); *Fluent v. Salamanca Indian Lease Authority*, 928 F.2d 542, 547 (2d Cir. 1991). Unless the hospitals can prove that TMA is not immune from suit, the Court "in equity and good conscience" should not allow the case to proceed.

Even if the hospitals could prove that TMA lacks immunity, the Court should recognize that allowing this case to proceed would not advance equity. As noted above, litigation would prejudice and unduly interfere with TMA's interests and obligations to administer a uniform TRICARE program. *See, e.g., F&M Distribs., Inc., v. American Hardware Supply Co., F/K/A Servistar Corp.*, 129 F.R.D. 494, 499 (W.D. Pa. 1990) (prejudice under Rule 19(b) overlaps the Rule 19(a) analysis). Moreover, there is no possible means of shaping the remedy to avoid prejudice to TMA. *See, e.g., Laker*

*Airways, Inc. v. British Airways, PLC*, 182 F.3d 843, 849 (11th Cir. 1999) (finding an award of money damages could not be shaped to avoid prejudice because the award must be based on determining the absentee acted improperly). In TMA's absence, the Court cannot award complete relief because no judgment could bind TMA and, as explained above, TMA is the only entity that can change the TRICARE regulations to allow payment to the hospitals. *Wichita & Affiliated Tribes of Oklahoma v. Hodel*, 788 F.2d 765, 777 (D.C. Cir. 1986) (a party is indispensable if "the efficacy" of the court's "judgment would be at the cost of the absentee" party's right to "participate in litigation that critically affect[s] [its] interest"). Finally, the hospitals have other adequate remedies available to them because they may bring their implied-in-fact contract claim against the government in the Court of Federal Claims. *See Britell,* 372 F.3d at 1378-79.

### 2.    Without The Government, The Plaintiffs Lack Standing.

Because the hospitals have not joined the government, they lack standing to litigate their claims in this Court. To demonstrate standing, plaintiffs must show (1) an injury in fact that is (2) fairly traceable to the challenged action of the ***defendant***, not some ***third party*** not before the court, along with (3) a substantial likelihood that the requested relief will remedy the alleged injury. *See Interfaith Comty. Org. v. Honeywell Intern., Inc.*, 399 F.3d 248, 254-55 (3d Cir. 2005). The "traceability" and "redressability" requirements "are closely related," *Haitian Refugee Center v. Gracey*, 809 F.2d 794, 801 (D.C. Cir. 1987), and are "often treated interchangeably by the Supreme Court." *Dellums v. U.S. Nuclear Regulatory Com'n*, 863 F.2d 968, 971 (D.C. Cir. 1988). To the extent there is a difference between the two requirements, traceability "examines the causal connection between the assertedly unlawful conduct and the alleged injury," whereas

redressability "examines the causal connection between the alleged injury and the judicial relief requested." *Allen v. Wright*, 468 U.S. 737, 753 n. 19 (1984).

Whether or not plaintiffs meet the test for standing is determined by the pleadings alone. *See Paton v. La Prade*, 524 F.2d 862, 867 (3d Cir. 1975) ("existence of a legally cognizable injury should be determined from the pleadings"). It is therefore the hospitals' burden to allege facts sufficient to establish standing. They have failed to do so here. Assuming, *arguendo*, that the hospitals have met the low threshold for stating an injury-in-fact, that injury is neither fairly traceable to TriWest nor redressable by a decision of this Court.

As noted above, TMA approved TriWest's interpretation of the TRICARE regulations in the context of the hospitals' earlier efforts to seek payment of "facility charges" on an "as billed" basis. The hospitals' grievance is therefore "fairly traceable" to TMA and its interpretation of federal regulations, not to TriWest — a contractor duty-bound to follow those regulations. *Duquesne Light Co. v. EPA*, 166 F.3d 609, 613 (3d Cir. 1999) (injury devolving from "the independent action of some third party not before the court" does not give rise to standing) (citing *Bennett v. Spear*, 520 U.S. 154, 167 (1997)).

Moreover, because TriWest is not permitted to pay the claims in a manner at variance with TMA's directives, it is unclear how the hospitals' alleged injury could be redressed by a favorable decision. The hospitals allege that they, and the putative class members "have been, *and continue to be*, underpaid for the outpatient services they have provided, *and continue to provide* to TRICARE beneficiaries in TriWest's TRICARE region." Compl. ¶ 34 (emphasis added). To remedy this alleged injury going forward, the Court would need either (1) to enjoin TMA to alter its present cause, or (2) to order

27

TriWest to disregard TMA's binding directives. Either option raises insuperable problems that prevent any effective redress so long as TMA is absent from these proceedings.

### D.    The TRICARE Management Activity Has Primary Jurisdiction.

If the Court does not find that the hospitals' claims are preempted or dismiss on grounds that the wrong party has been sued, it should refer the administrative questions raised in the complaint to TMA under the doctrine of primary jurisdiction.

Primary jurisdiction "requires a court to transfer an issue within a case that involves expert administrative discretion to the federal administrative agency charged with exercising that discretion for initial decision." *Richman Bros. Records, Inc. v. U.S. Sprint Communications Co.*, 953 F.2d 1431, 1435 n.3 (3d Cir. 1991); *MCI Telecommunications Corp. v. Teleconcepts, Inc.*, 71 F.3d 1086, 1103 (3d Cir. 1995) (issues "placed within the special competence of an administrative body" are part of agency's primary jurisdiction). When such issues arise, the district court either stays proceedings, or dismisses without prejudice, so the parties may pursue their administrative remedy. *See Davel Communication, Inc. v. Qwest Corp.*, 460 F.3d 1075, 1087 (9th Cir. 2006) (invoking primary jurisdiction of FCC); *see also Reiter v. Cooper*, 507 U.S. 258, 268 (1993). Even in cases in which the "agency cannot provide … complete redress to the complaining party," the issue should be referred if "better resolved in the first instance by the administrative agency charged with regulating the subject matter of the dispute." *Teleconcepts*, 71 F.3d at 1105. The doctrine promotes respect among the branches by creating a workable relationship between them "wherein, in appropriate circumstances, the courts can have the benefit of the agency's views on issues within the agency's competence." *Id.*; *MCI Commc'n Corp. v. AT & T*, 496 F.2d

214, 220 (3d Cir.1974) (expert agencies "'should not be passed over'" in cases that raise "'issues of fact not within the conventional experience of judges'") (quoting *Far East Conference v. United States*, 342 U.S. 570, 574 (1952)). The doctrine also promotes efficiency and uniformity by making agency determinations "binding upon the court and the parties." *Teleconcepts*, 71 F.3d at 1103.

This case is a textbook candidate for a primary jurisdiction referral. The hospitals claim that, under TRICARE's reimbursement regulations, TriWest is paying what should be a "billed charge" as an allowable charge. Whether the hospitals have submitted "facility charges" to TriWest according to TRICARE regulations, and whether TriWest is complying with TRICARE regulations and appropriately paying charges, are questions falling within TMA's competence and special expertise. *See In re Shelby County Healthcare Services of AL, Inc.*, 80 B.R. 555, 562 (Bankr. N.D. Ga. 1987) (referring matter to HHS agency where "the Medicare reimbursement issues, the specialized knowledge, experience, and expertise of HHS and the need for uniformity in Medicare matters" rendered this "an appropriate case for application of the doctrine of primary jurisdiction"). The need for uniform administration within TRICARE's nationwide regime further confirms that the TMA has primary jurisdiction over the hospitals' claims.

## II.    The Complaint Should Be Dismissed Because The Plaintiff Hospitals Have Failed To Exhaust Their Administrative Remedies.

The complaint also should be dismissed because the hospitals have failed to exhaust their administrative remedies. TMA has established a specific set of administrative appellate procedures for resolving disputes over the payment of TRICARE claims. *See Trauma Service Group v. Keating,* 907 F. Supp. 110, 113 (E.D. Pa. 1995) ("the CHAMPUS regulations provide an extensive administrative appeal procedure" that

29

"provides for a detailed adjudication of these claims by a tribunal more familiar with the interworkings and requirements of CHAMPUS"). The law requires that the hospitals avail themselves of these procedures before filing litigation.

Requiring parties to exhaust their administrative remedies honors the "long settled rule ... that no one is entitled to judicial relief ... until the prescribed administrative remedy has been exhausted." *Republic Indus. Inc. v. Cent. Pennsylvania Teamsters Pension*, 693 F.2d 290, 293 (3d Cir. 1982) (quoting *Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41, 50-51 (1938)). This "exhaustion doctrine" serves three important purposes: (1) "deference" to Congress' selection of the "initial forum for dispute resolution," and due regard for the doctrine of separation of powers; (2) "respect for administrative autonomy," achieved "by forbidding unnecessary judicial interruption of the administrative process"; and (3) "judicial economy both by permitting the administrative tribunal to vindicate a complaining party's rights in the course of its proceedings, thereby obviating judicial intervention, and by encouraging the tribunal to make findings of fact on which courts can later rely in their decision-making." *Id.* As the Third Circuit has explained, "[f]or administrative procedure to operate effectively, it is essential that courts refrain from interfering with the process unnecessarily." *First Jersey Securities, Inc. v. Bergen*, 605 F.2d 690, 696 (3d Cir. 1979); *see also McKart v. United States*, 395 U.S 185, 195 (1969). Exceptions to the exhaustion doctrines therefore apply in this Circuit only in the most "extraordinary circumstances." *Republic Indus.*, 693 F.2d at 294 (citing *First Jersey Securities*, 605 F.2d at 696).

There are no allegations in the complaint establishing that the plaintiffs have exhausted their administrative remedies. The hospitals instead suggest that exhaustion is not required because, first, "TriWest's failure to pay the Facility Charges for the Subject

Claims … is not appealable under the regulations governing TRICARE," Compl. ¶ 37, and, second, "further efforts by Plaintiffs or any Class member to resolve this dispute without litigation would be futile." *Id.* ¶ 38. Whether these legal arguments justify the hospitals' failure to exhaust their administrative remedies is properly resolved at the motion to dismiss stage. *See Robinson v. Dalton*, 107 F.3d 1018, 1022 (3d Cir. 1997) ("[t]imeliness of exhaustion requirements are best resolved under Rule 12(b)(6)"). A court should not "pass upon the merits of a plaintiff's substantive claim[s] until it satisfies itself that … the plaintiff [has] properly exhausted" its administrative remedies. *Wilson v. MVM, Inc.*, 475 F.3d 166, 173 (3d Cir. 2007).

### A. The Hospitals' Claims Raise Appealable Issues Under The TRICARE Regulations.

To bring an appeal before TMA, an "appealable issue is required." 32 C.F.R. § 199.10(a)(6). TMA's Operations Manual explains that an "appealable issue" is one in which "services … have been rendered by a … provider, the denial of which raises a disputed question of fact which, if resolved in favor of the appealing party, would result in an extension of TRICARE benefits." Ops. Man. Ch. 13, § 2, ¶ 3.2 (A30).

The hospitals assert that the issues raised in their complaint are not appealable, but they plead no facts supporting this bare legal conclusion. *See* Compl. ¶ 37. To the contrary, the complaint's allegations and the relief sought make clear that they have in fact asserted claims based on issues that are "appealable" as defined by the TRICARE regulations and TMA's Manuals. *See Your Home Visiting Nurse Services v. Shalala*, 525 U.S. 449, 453-54 (1999) (it is within the duty and discretion of an agency to determine whether an issue is "appealable" under its own regulations).

31

There are only two even arguably relevant categories of "non-appealable" issues: (1) disputes regarding a requirement of the law or regulation; and (2) the amount of the CHAMPUS-determined allowable cost or charge. *Id.* § 199.10(a)(6)(i), (ii); *see also* Ops. Man., Ch. 13, § 3, ¶ 1.3.2 (A37) (listing non-appealable issues).

The first potential exception — a dispute regarding a requirement of the law or regulation — does not apply. The hospitals do not challenge the promulgation, application, or legality of any TRICARE rule. To the contrary, the complaint itself is premised on allegations of "TriWest's failure to pay the Facility Charges for the Subject Claims, despite (1) the regulations governing TRICARE, (2) TMA's longstanding policy, and (3) the DoD's letter of April 14, 2006 directly addressing this issue." Compl. ¶ 37. At most, then, the hospitals' allegations boil down to two disputed questions: first, have the hospitals properly submitted facility charges for payment to TriWest according to TRICARE regulations, and second, if the hospitals have properly submitted such charges, should TriWest have paid them "as billed"? The hospitals' carefully parsed allegations deliberately avoid these core issues. *See* Compl. ¶¶ 32-35 (generically alleging that they "have provided outpatient services ... and have duly submitted claims for outpatient services" and "have been ... underpaid for the outpatient services they have provided," but not alleging submission of any "facility charges" to TriWest); Compl. ¶ 35 (defining "Subject Claims" as "claims for outpatient services," not "facility charges."). There is no allegation that plaintiffs have sought payment "as billed" for any facility charges. Nor are their any allegations addressing TMA's approval of TriWest's payment of charges.

The second potential exception bars appeals concerning "the amount of the TRICARE-determined allowable cost or charge for services or supplies." 32 C.F.R. § 199.10(a)(6)(ii). But the hospitals are not challenging the amount allegedly due on the

32

basis of "TRICARE-determined allowable charges." The complaint does not allege the hospitals submitted a charge subject to TRICARE-determine allowable charges, or that TriWest has refused to pay, or underpaid, any claim on that basis. Rather, the essence of the complaint appears to be that facility charges *are not subject* to TRICARE's allowable cost methodology — that is, no TMA-determined maximum charge is applicable, and that their facility charges instead must be paid "as billed." *See* Compl. ¶ 33 ("TriWest has ... declined to pay the Facility Charges ... as prescribed by 32 C.F.R. § 199.14(a)(5)(xi)," *i.e.*, "as billed"); *id.* ¶ 36 (Plaintiffs "reasonably expected to be reimbursed their Facility Charges ... at the full amount billed"). In other words, the hospitals are not challenging the *quantum* of allowable payment received, but the *type* of payment received — a "billed" versus an "allowable" charge.

The TRICARE "allowable charge review" process confirms the reviewable nature of the hospitals' complaint. Under this process (which is separate and distinct from the appeals process), "[b]eneficiaries and providers have the right to question the amount *allowed* for services received or rendered for non-network care." Ops. Man. Ch. 12, § 8, ¶ 1.0 (A54) (emphasis added). Moreover, "[i]f the inquiry is in writing and the issue is not clearly a question of allowable charge, any doubt must be resolved in favor of *handling the case as an appeal*." *Id.* Ch. 12, § 8, ¶ 2.1 (A54) (emphasis added). Based on their own allegations, plaintiffs could not have sought an allowable charge review for any alleged denial of payment of facility charges "as billed," because payment methodologies distinct from the allowable charge method are outside the scope of the "allowable charge review" process and are therefore appealable. Even if plaintiffs' claims *were* subject to the allowable charge review, this only compounds their failure to

33

exhaust because they have not alleged that they have availed themselves of this allowable charge review process either.

**B.      Participation In The Federal Administrative Appeals Process Is Not "Futile."**

The other means by which plaintiffs seek to sidestep the appeals process is their assertion that participation in the federal government's carefully crafted appeals process would be "futile." Compl. ¶ 38.

To invoke an exception to exhaustion, the plaintiffs' allegations must demonstrate a "clear and positive ***showing*** of futility." *Wilson*, 475 F.3d at 175  (emphasis added); *Jeremy H. by Hunter v. Mount Lebanon School Dist.*, 95 F.3d 272, 283-84 (3d Cir. 1996) (affirming dismissal where court was "not persuaded by plaintiffs' conclusionary averment that their pursuit of administrative remedies would be a futile gesture"). Doubt as to the utility of an administrative process does not suffice. *See Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410, 419 (6th Cir. 1998) ("plaintiff must show that 'it is certain that his claim will be denied on appeal, not merely that he doubts that an appeal will result in a different decision'"). The futility exception is "quite restricted and has been applied only when resort to administrative remedies is clearly useless." *Communications Workers of Amer. v. AT & T*, 40 F.3d 426, 432 (D.C. Cir. 1994).

The hospitals have not satisfied this heavy burden.  In lieu of a proper factual basis, they allege "discussions and correspondence with TriWest, to cause TriWest to pay the Facility Charges for their Subject Claims." Compl. ¶ 38.  But these bare allegations are not enough. *See Davenport v. Harry N. Abrams, Inc.*, 249 F.3d 130, 133 (2d Cir. 2001) (exhaustion not satisfied by "correspondence with employer" where correspondence did not show "further administrative review would be futile'"); *Scholl v.*

*QualMed, Inc.*, 103 F. Supp. 2d 850, 854 (E.D. Pa. 2000) (futility not shown where plaintiff was "unhappy" with coverage limitation, but did not "directly appeal"). Although the hospitals complain that "TriWest has been steadfast in its unwillingness to make such payment," Compl. ¶ 38, the Third Circuit recently deemed similar claims to be insufficient. *See Wilson*, 475 F.3d at 176 (affirming dismissal; fact that plaintiffs received "poor response" does not render attempts to resolve claims futile); *Wilson v. Globe Specialty Prods.*, 117 F. Supp. 2d 92, 99 (D. Mass. 2000) (requiring exhaustion; refusing to "predict" how administrator would decide claim on review).

### C.   The Hospitals Have Not Pleaded Facts Showing That This Case Falls Within A Limited Exception To Exhaustion.

Because they have not offered any allegations that could justify circumventing the ordinary exhaustion requirements, the hospitals' case, like many cases presenting virtually identical failures to exhaust under CHAMPUS/TRICARE, should be dismissed.

In *Holton v. Blue Cross and Blue Shield*, for example, a provider filed a breach of contract claim against Blue Cross, a CHAMPUS/TRICARE fiscal intermediary, alleging underpayment of claims, and Blue Cross moved to dismiss on exhaustion grounds. 56 F. Supp. 2d at 1353-55. The court observed the "detailed administrative procedure for participating providers … to follow," and the absence of any allegation that the plaintiff provider followed them. *Id.* at 1353-54. Rejecting Holton's "futility," claim, the court noted that the exhaustion doctrine's policy rationale would be advanced because the administrative process was "the most appropriate forum" and "resort to [it]… [could] reveal that Holton is entitled to coverage, which would … provide Holton with coverage without expending more judicial resources." *Id.* at 1354. The court saw no reason "to set a precedent for CHAMPUS plaintiffs to circumvent the administrative process." *Id.*

35

*Trauma Service Group v. Keating* likewise involved a disgruntled CHAMPUS provider seeking to sidestep TRICARE's administrative process. Observing that "[t]he CHAMPUS regulations provide an extensive administrative appeal procedure," the court dismissed the claim for failure to exhaust. 907 F.Supp. at 113-14 ("[r]equiring exhaustion of administrative remedies is entirely appropriate under this statutory framework"). *Hofmann v. Hammack* reached a similar result. There, the plaintiff sought contract and tort damages against a CHAMPUS fiscal intermediary for failure to pay claims. 82 F. Supp. 2d at 899. After the federal government intervened on the express grounds that *it* was the real party in interest, the government moved to dismiss for failure to exhaust. *Id.* The court granted the motion, noting that "[a]dministrative remedies exist so that an aggrieved person can first seek relief within the agency before involving the courts," that the agency "is the expert" and "letting the agency handle the problem … lightens the dockets of the courts." *Id.* at 900-01.

Finally, in *Bynum*, the plaintiff sued a CHAMPUS fiscal intermediary for intentional tort and breach of contract. 907 F. Supp. at 321. The court found plaintiff's *state* law claims for breach of contract and tort preempted by CHAMPUS. *Id.* at 322. As for any *federal* claims under CHAMPUS, the plaintiff argued that futility excused her failure to exhaust. *Id.* The court rejected this argument and dismissed the case, observing that "plaintiff has failed to put forth any evidence to show that it would have been futile for her to exhaust her administrative remedies." *Id.*

### III.    The Complaint Should Be Dismissed Because The Plaintiff Hospitals Have Failed To State Claims Upon Which Relief Can Be Granted.

For reasons explained above, the hospitals' claims cannot be adjudicated in this Court. But even if they could litigate their claims, the Court should dismiss under Rule

12(b)(6). Under any conceivable corpus of law in the Anglo-American tradition, the hospitals have failed to allege even the basic elements of an "implied-in-fact" contract or a claim for unjust enrichment.

### A. The Complaint Fails To State A Claim For Breach Of Implied Contract.

Count I should be dismissed under Rule 12(b)(6) because TriWest's *legal* obligation to follow federal law does not create an additional implied-in-fact *contractual* obligation.

An implied-in-fact contract is one "founded upon a meeting of the minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding." *Baltimore & Ohio R.R. Co. v. United States*, 261 U.S. 592, 597 (1923); *Hercules, Inc. v. United States*, 516 U.S. 417, 424 (1996). The elements of an implied-in-fact contract are the same as the elements of an express contract; only the manner of proof differs. To state a claim for breach of an implied-in-fact contract the plaintiff must allege: (1) mutuality of intent; (2) consideration; and (3) lack of ambiguity in offer and acceptance. *See* Richard A. Lord, Williston on Contracts, § 1:5 (4th ed. 2006); *City of El Centro v. United States*, 922 F.2d 816, 820 (Fed. Cir. 1990); *see also Gardiner v. Virgin Island Water & Power Auth.*, 145 F.3d 635, 644-45 (3d Cir. 1998); *Jossi v. Derwinski*, 993 F.2d 883 (9th Cir. 1993); *H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1575 (Fed. Cir. 1984). The hospitals allege none of these required elements. *See* Compl. ¶¶ 51-55.

The hospitals' claim is instead grounded in the view that because TriWest has a *legal* duty to adhere to TMA regulations, policy, and guidance, TriWest is bound by an additional, *contractual* duty to TRICARE participants to adhere to the very same rules.

37

*See id.*  But that theory directly conflicts with a recent Second Circuit decision holding that a government program administrator does *not* have an implied-in-fact contract with program beneficiaries to follow program regulations because no consideration exists when there is a preexisting legal duty to follow federal regulations.  *See Murray v. Northrop Grumman Info. Tech.*, 444 F.3d 169, 177-78 (2d Cir. 2006).  The death knell of the hospitals' claim is the fundamental principle that a pre-existing legal or contractual duty cannot serve as contractual consideration.  *See* 3 Williston, § 7:41 (if a "promisee is already bound by official duty to render a service, it is … no benefit to the promisor beyond what the law requires … for him to do or agree to do the service on request"); Rest. 2d: Contracts § 73 ("[p]erformance of a legal duty owed to a promisor which is neither doubtful nor the subject of honest dispute is not consideration"); *Youngblood v. Vistronix, Inc.*, No. 05-21, 2006 WL 2092636 at *4 (D.D.C. July 27, 2006) (government contractor had no implied-in-fact contract with employee to abide by federal regulations under employment handbook because contractor "had a pre-existing duty to abide by federal government regulations").  In short, a party cannot offer as consideration a duty that the party is already obliged to perform.

In addition, the hospitals allege no conduct by TriWest that indicates assent to pay claims for facility charges "as billed."  *See Chavez v. United States*, 18 Cl. Ct. 540, 544 (1989) ("an implied-in-fact contract arises when an express offer and acceptance are missing but the parties' conduct indicates mutual assent").  In fact, the hospitals have alleged the opposite: that the longstanding practice of TriWest has been ***not to pay*** claims for facility payments "as billed."  Compl. ¶¶ 52-55.  The alleged refusal to pay these charges — dating to the beginning of this so-called "contract" — confirms that any mutuality of intent is lacking.

Likewise, the hospitals fail to allege a contract's most basic elements — an offer by TriWest and acceptance by the hospitals. The TRICARE statute, regulations, procedures, and reimbursement system were enacted by the government, not TriWest, and therefore do not constitute an offer (or any action) by TriWest. Moreover, even if the TRICARE rules constituted an "offer," any such "offer" was made by the government, not by TriWest. *See, e.g., Minehan v. United States*, No. 05-924T, 2007 WL 489224, at *11-13 (Fed. Cl. Jan. 26, 2007); *Baker v. United States*, 50 Fed. Cl. 483 (2001) (analyzing federal law as the foundation for an implied-in-fact contract between plaintiffs and the government).

**B.     The Complaint Fails To State A Claim For Unjust Enrichment.**

Under any conceivably applicable law, a proper claim for unjust enrichment must allege: (1) a benefit conferred on the defendant by the plaintiff; (2) an appreciation or knowledge by the defendant of the benefit; and (3) the acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without payment. *See, e.g.,* 26 Williston, § 68:5; *Allegheny Gen. Hosp. v. Philip Morris, Inc.,* 228 F.3d 429, 447 (3d Cir. 2000); *Spanish Tiles Ltd. v. Hensey*, C.A. No. 05C-07-025, 2005 WL 3981740, at *3 n.9 (Del. Super. Ct. Mar. 30, 2005); *Marine Dev. Corp. v. Kodak,* 300 S.E.2d 763, (Va. 1983).

The hospitals' complaint fails to plead these essential elements. The hospitals allege neither a cognizable benefit, nor unlawful retention of such a benefit, sufficient to give rise to unjust enrichment. *See, e.g., Allegheny*, 228 F.3d at 447; *R.B. Ventures, Ltd. v. Shane*, 112 F.3d 54, 60 (2d Cir. 1997); *Kramer Assocs., Inc. v. Ikam, Ltd.,* 888 A.2d 247, 254 (D.C. 2005). The only "benefit" alleged is the treatment of TRICARE beneficiaries by the hospitals. But the legal duty to care for the TRICARE beneficiaries,

39

if one exists, belongs to the government, not TriWest.  Accordingly, if medical treatment confers a benefit it is conferred on the TRICARE beneficiaries and the government, not on TriWest.  *See City of El Centro*, 922 F.2d at 823 (no benefit conferred on government by hospital's treatment of illegal aliens because the aliens were not in custody and the government's obligation to provide medical care had not arisen).

Nor does the complaint allege that TriWest unlawfully retained a cognizable benefit.  The hospitals allege that TriWest has underpaid them for services rendered, but they do not allege that TriWest has receive any benefit from the government to which it was not entitled.  At best, the hospitals allege unjust enrichment against the government, asserting that TriWest has paid them fewer federal dollars than required.  Even if true, this would prove merely that it is the government, not TriWest, that has been "enriched" by the alleged underpayments.

## CONCLUSION

For the foregoing reasons, the complaint should be dismissed with prejudice.

Respectfully submitted,

OF COUNSEL

Robert S. Ryland
Robert R. Gasaway
Ashley C. Parrish
Scott M. Abeles
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W., Suite 1200
Washington, D.C.  20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200

Lewis H. Lazarus (#2374)
Matthew F. Lintner (#4371)
Katherine J. Neikirk (#4129)
MORRIS JAMES LLP
500 Delaware Avenue, Suite 1500
Wilmington, Delaware  19801-1494
Telephone: (302 ) 888-6800
Facsimile: (302) 571-1750
llazarus@morrisjames.com
mlintner@morrisjames.com
kneikirk@morrisjames.com

*Attorneys for Defendant*
*TriWest Healthcare Alliance Corp.*

Dated: March 16, 2007

40

## CERTIFICATE OF SERVICE

I, Katherine J. Neikirk, hereby certify that on March 16, 2007, I caused:

(1) Defendant TriWest Healthcare Alliance Corp.'s Motion to Dismiss; (2)

Proposed Order; (3) Opening Brief of Defendant TriWest Healthcare Alliance

Corp. in Support of its Motion to Dismiss; (4) Appendix in Support of the

Opening Brief of Defendant TriWest Healthcare Alliance Corp. in Support of its

Motion to Dismiss; (5) Compendium of Unreported Cases Cited in Opening Brief

of Defendant TriWest Healthcare Alliance Corp. in Support of its Motion to

Dismiss; (6) Defendant TriWest Healthcare Alliance Corp.'s Rule 7.1 Disclosure

Statement; and (7) this Certificate of Service to be served electronically and by

hand delivery upon the following counsel of record:

> Matt Neiderman, Esquire
> DUANE MORRIS LLP
> 1100 North Market Street, Suite 1200
> Wilmington, DE 19801
> mneiderman@duanemorris.com

Katherine J. Neikirk (# 4129)

1541389

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| LAKEWOOD HEALTH SYSTEM and NORTHWEST MEDICAL CENTER, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 07-69 - GMS |
| v. | ) ) | |
| TRIWEST HEALTHCARE ALLIANCE CORP., | ) ) ) | |
| Defendant. | ) ) ) | |

**COMPENDIUM OF UNREPORTED CASES CITED IN OPENING BRIEF OF
DEFENDANT TRIWEST HEALTHCARE ALLIANCE CORP. IN SUPPORT OF
ITS MOTION TO DISMISS**

OF COUNSEL

Robert S. Ryland
Robert R. Gasaway
Ashley C. Parrish
Scott M. Abeles
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W., Suite 1200
Washington, D.C.  20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200

Lewis H. Lazarus (#2374)
Matthew F. Lintner (#4371)
Katherine J. Neikirk (#4129)
MORRIS JAMES LLP
500 Delaware Avenue, Suite 1500
Wilmington, Delaware  19801-1494
Telephone: (302 ) 888-6800
Facsimile: (302) 571-1750
llazarus@morrisjames.com
mlintner@morrisjames.com
kneikirk@morrisjames.com

*Attorneys for Defendant
TriWest Healthcare Alliance Corp.*

Dated: March 16, 2007

**CASE**                                                                                                          **TAB**

*Christman v. Grays,*
    No. 1:05-CV-192, 2005 WL 3088529 (S.D. Ohio Nov. 17, 2005) ....................1

*Ercole v. Conectiv and Coventry Health Care of Delaware, Inc.,*
    No. Civ.A. 03-186, 2003 WL 21104926 (D. Del. May 15, 2003)......................2

*Harris v. S.C. Madison,*
    No. Civ. A. 97-7532, 1998 WL 518181 (E.D. Pa. July 24, 1998)......................3

*Minehan v. United States,*
    No. 05-924T, 2007 WL 489224 (Fed. Cl. Jan. 26, 2007)...................................4

*Spanish Tiles, Ltd. v. Hensey,*
    No. 05C-07-025, 2005 WL 3981740 (Del. Super. Ct. Mar. 30, 2005)...............5

*Youngblood v. Vistronix, Inc.,*
    No. 05-21, 2006 WL 2092636 (D.D.C. July 27, 2006) .......................................6

1541422

TAB 1

Not Reported in F.Supp.2d
(Cite as: 2005 WL 3088529 (S.D.Ohio))

Page 53

Only the Westlaw citation is currently available.

United States District Court,
S.D. Ohio, Western Division.

**Kenneth D. CHRISTMAN, M.D., Plaintiff,**
v.
**William A. GRAYS, Defendant.**

**No. 1:05-CV-192.**

Nov. 17, 2005.

Steven Charles Katchman, Dayton, OH, for Plaintiff.

Donetta Donaldson Wiethe, U.S. Department of Justice, Cincinnati, OH, for Defendant.

ORDER

WEBER, Senior J.

***1** This matter is before the Court upon defendant William A. Grays's motion for summary judgment (doc. 2), plaintiff's response (doc. 7), and defendant's reply (doc. 9). Also before the court is plaintiff's motion to remand (doc. 8), and defendant's response to that motion (doc. 11). The Court has ascertained the disputed and undisputed facts from the parties' briefs and affidavits. Additionally, the Court has determined that the United States is the real party in interest in this action and substitutes the United States as the defendant.

I. Factual allegations

The facts are undisputed unless otherwise noted. William Grays sustained injuries in an automobile accident on November 16, 2002. His injuries included multiple facial lacerations. Grays was brought to the emergency room at Sycamore Hospital in Miamisburg, Ohio for treatment. Although the hospital had physicians and other medical staff on duty, the nature of Grays's injuries demanded the attention of a plastic surgeon. The hospital contacted the plaintiff, Dr. Kenneth Christman, M.D., the plastic surgeon on call at the time.

At the time of the accident, Grays was a Staff

Sergeant in the United States Army Ohio National Guard, serving on active duty. He was covered by the TRICARE [FN1] medical benefits program. Before administering treatment, Dr. Christman asked Grays whether he had medical insurance. Grays stated that he was covered by the TRICARE program, and presented his TRICARE identification card to Dr. Christman.

> FN1. TRICARE is a supplement to the older CHAMPUS medical benefits program for service members, intended to reduce costs through contractor underwriting and a network provider arrangement. Baptist Physician Hosp. Org., Inc. v. Humana Military Healthcare Svcs., 368 F.3d 894, 895-96 (6th Cir.2004). Since William Grays was a member of TRICARE, the Court uses that designation to refer to the military medical benefits program.

Dr. Christman informed Grays that he did not participate in the TRICARE program and would not submit a claim to the program for reimbursement. Dr. Christman allegedly further explained that Grays would be personally responsible for the cost of the care he was about to provide. Dr. Christman argues that Grays orally agreed to assume responsibility for the charges. Grays denies agreeing to pay out-of-pocket costs in the emergency room. Dr. Christman treated Grays's injuries.

Subsequently, Dr. Christman billed Grays a total of $5,542 for five medical procedures. After receiving this bill, Grays submitted a claim under the Supplemental Health Care Program ("SHCP"), which provides benefits to covered servicemembers who receive treatment from civilian medical facilities. 32 C.F.R. § 199.16(a)(2). The SHCP, while not part of TRICARE, employs the TRICARE reimbursement scheme and related regulations, subject to some special rules. Id. at (a)(1), (2).

Grays's claim was handled by Palmetto Government Benefits Administrators ("PGBA"), the TRICARE claims contractor for Grays's region. PGBA sent Grays a check for $746.10 in fulfillment of the claim, along with the following explanation of benefits detailing the procedures performed by Dr. Christman and the billed and allowable amounts for each:

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.2d
**(Cite as: 2005 WL 3088529, \*1 (S.D.Ohio))**

**Page  54**

| Procedure | Amount Billed | TRICARE Approved |
| --- | --- | --- |
| Repair of wound or lesion | $ 1,779.00 | $ 437.07 |
| Repair of wound or lesion | $ 1,779.00 | $ 0.00 |
| Repair wound/lesion add-on | $ 1,516.00 | $ 138.51 |
| Repair superficial wound(s) | $ 338.00 | $ 73.20 |
| Medical services at night | $ 130.00 | $ 0.00 |
| TRICARE Approved: | | $ 648.78 |
| Paid to beneficiary (115 % of approved amount): | | $ 746.10 |

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Westlaw.

**\*2** PGBA determined that the charges for one of the two "repair of wound or lesion" procedures was a duplicate charge and the charge for "medical services at night" was not a covered charge under the TRICARE program, and denied payment for those services. Neither party has disputed PGBA's determination of which services were covered and which were not.

Grays forwarded the TRICARE check to Dr. Christman's collection agency, which credited it against the bill, leaving a balance of $4,795.90. Dr. Christman sued Grays to recover this balance, alleging that he and Grays had entered into an oral contract prior to treatment, whereby Grays assumed personal liability for all charges. He also argues that imposing the TRICARE reimbursement scheme on non-participating providers amounts to an unconstitutional taking under the Fifth Amendment.

The United States argues that there was no such agreement, that Dr. Christman's recovery is limited to the TRICARE allowable amount, and that Grays was unable to waive the SHCP billing limits by agreement. Additionally, the government argues that Dr. Christman's claim is barred by the doctrine of sovereign immunity because the United States is the real party in interest.

## II. Procedural posture

The plaintiff, Dr. Christman, brought this action in the Municipal Court of Lebanon, Ohio. Prior to judgment in those proceedings, the United States Attorney substituted itself as counsel for defendant Grays. Grays then removed the action to this Court under 28 U.S.C. § 1442a (providing for the removal of state court actions against members of the armed forces under certain circumstances) (doc. 1). The United States filed a motion for summary judgment in its favor and requested that it be substituted as defendant in the action (doc. 2). The plaintiff Dr. Christman filed an opposing memorandum and a motion to remand the action to state court (docs.7, 8).

## III. Motion to Remand

Dr. Christman moves to remand this action back to the state court for resolution of the alleged oral agreement between the parties. The United States opposes the motion to remand, pointing to its arguments in support of its motion for summary judgment. The United States argues that removal to this Court was proper under 28 U.S.C. § 1442a. The Court finds that plaintiff Dr. Christman does not expressly challenge the removal under § 1442a in either his opposition to the United States's motion for summary judgment (doc. 7) or his motion to remand (doc. 8), and he asserts no basis for remand to the state court. Accordingly, the plaintiff's motion to remand is denied.

## IV. Subject Matter Jurisdiction

The federal defendant and Grays base the subject matter jurisdiction of the Court in this action upon 28 U.S.C. § 1346 and § 1442a.

Plaintiff does not challenge the substitution of the United States as the defendant in this case. The United States is the real party in interest in actions where the federal treasury might ultimately be liable. See Dugan v. Rank, 372 U.S. 609, 620, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963). Here, the United States concedes that the federal treasury is ultimately responsible for any judgment against Grays under 32 C.F.R. § 199.16(d)(1). This section states that the SHCP must not impose beneficiary cost sharing, and that "all amounts due to be paid to the provider shall be paid by the program." The United States concludes that if Grays is held liable to Dr. Christman in excess of the amount already paid by the SHCP, the United States must pay the judgment.

**\*3** Plaintiff Christman does not refute the United States's assertion that it is the real party in interest. The Court finds the substitution of the United States as the defendant is proper and this Court has subject matter jurisdiction over this action.

## V. Sovereign immunity

The United States argues that sovereign immunity bars Dr. Christman's suit. It is well-established that the United States, as sovereign, "may not be sued without its consent." United States v. Testan, 424 U.S. 392, 399, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976). The Court has already found that the United States is the real party in interest. There is no evidence or allegation that the United States has expressly consented to this action. Further, plaintiff Christman does not refute the United States's assertion of immunity, nor does he offer evidence

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



that immunity has been waived. Accordingly, the United States is entitled to summary judgment on this ground. Even if a waiver can be shown, the United States is entitled to summary judgment on Dr. Christman's claim for the reasons stated below.

## VI. Summary Judgment

In its motion for summary judgment, the United States argues that Dr. Christman has already been fully reimbursed under the SHCP and therefore is not entitled to further recovery for the medical services he provided to Grays. In response, Dr. Christman claims that he did not participate in the SHCP or TRICARE and therefore was not bound by their reimbursement provisions, and that Grays entered into an oral agreement to pay for the services personally. Plaintiff Christman attempts to establish the existence of a genuine issue of material fact by presenting his own affidavit attesting to such an agreement.

In reply, the United States concedes that there may have been "some agreement" made between Grays and Christman in the emergency room but argues that the existence of such an agreement is immaterial. It asserts that the SHCP regulations encompass all medical providers, whether they participate in the program or not, limiting the reimbursement to which they are entitled. Finally, the United States argues that Grays was unable to circumvent the operation of the SHCP by private agreement.

If the SHCP precludes Dr. Christman from further recovery, no genuine issue of material fact remains, and the United States is entitled to summary judgment. If the SHCP does not fully resolve Grays's liability for the medical services Dr. Christman provided, a genuine issue of material fact exists. For the reasons stated below, the Court finds that no issues of material fact remain and that the United States is entitled to summary judgment.

### A. Summary judgment standard

Fed R. Civ. P. 56 allows summary judgment to secure a just and efficient determination of an action. This Court may only grant summary judgment as a matter of law when the moving party has identified, as its basis for the motion, an absence of any genuine issue of material fact. Celotex Corp.

v. Catrett, 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

**\*4** The party opposing a properly-supported motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (quoting First Nat'l Bank of Arizona v. Cities Serv. Co., 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)). The evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. Anderson, 477 U.S. at 255 (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)).

The court is not to weigh the evidence and determine the truth of the matter but is to decide whether there is a genuine issue for trial. Anderson, 477 U.S. at 249. There is no genuine issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. Id. at 249 (citing Cities Serv., 391 U.S. at 288-89). If the evidence is merely colorable, Dombrowski v. Eastland, 387 U.S. 82, 84, 87 S.Ct. 1425, 18 L.Ed.2d 577 (1967), or is not significantly probative, Cities Serv., 391 U.S. at 290, judgment may be granted. Anderson, 477 U.S. at 249.

### B. Applicable law

The SHCP [FN2] reimburses private sector medical service providers for charges arising from the treatment of active duty members of the armed forces. 32 C.F.R. § 199.16. Reimbursement is limited to the allowable amount as defined under the TRICARE program. Id. at (b), (d)(5). This reimbursement limitation applies to all providers.

> FN2. Though the SHCP is distinct from TRICARE, it incorporates by reference certain TRICARE provisions. 32 C.F.R. § 199.16(a)(2), (b). The TRICARE references that follow serve only to explain the SHCP, which governs this action.

(1) Dr. Christman is an authorized, non-participating provider

(a) Authorized providers

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Only TRICARE-authorized providers are eligible for reimbursement under the SHCP. 32 C.F.R. § 199.6(a)(7). Section 199.6(c) establishes an individual professional provider class. Subsection (c)(3)(i)(A) specifies that, subject to the standards of the SHCP participation provisions, Doctors of Medicine are among the individual professional providers authorized to provide services to TRICARE beneficiaries. Conditions of authorization for this class of providers include a professional license requirement or a professional certification requirement. Id. at (c)(2)(i),(ii). Thus, all licensed physicians (with limited exceptions that are not material to this case) are authorized providers, subject to the SHCP participation provisions.

There is no dispute that Dr. Christman is an M.D. and a plastic surgeon and that the procedures he performed on defendant Grays were within the scope of his training. Based on this record, the Court finds that Dr. Christman is an "authorized provider" within the meaning of the SHCP. As an authorized provider, Dr. Christman must either hold participating or non-participating status.

(b) Participating v. Non-participating

A TRICARE-authorized individual provider is a participating provider if either (1) he or she voluntarily enters into a participation agreement or (2) he or she chooses not to enter into a participation agreement but instead elects to participate on a claim-by-claim basis by submitting a signed claim form on behalf of the beneficiary. 32 C.F.R. § 199.6(a)(8)(ii), (iii). An individual provider who takes neither of these actions is a non-participating provider.

*5 Dr. Christman maintains that he is a non-participating provider and asserts that he informed Grays of this fact in the emergency room before treatment. No evidence has been presented that Dr. Christman entered into a voluntary agreement to participate. Likewise, there is no evidence that he elected to participate with respect to Grays's claim. Rather, Grays submitted his own claim. Accordingly, the Court finds that Dr. Christman is a non-participating provider under the SHCP.

B. Reimbursement under the SHCP

Under the SHCP "no provider may bill an active

duty member any amount in excess of the ... allowable amount." 32 C.F.R. § 199.16(d)(5). By its language, this restriction is not limited to participating providers, so it applies to all authorized providers. Thus, a non-participating provider may not bill an active duty service member beyond the allowable amount for services without the authorization of the SHCP administrator. Id. The allowable amount is defined in 32 C.F.R. § 199.14(j). The parties have not disputed the PGBA's determination that the allowable amounts for the services at issue total $648.78.

Because Dr. Christman is an authorized provider and defendant Grays's claim was made under the SHCP, he is only entitled to the allowable amount for the services he provided. Accordingly, Dr. Christman is not entitled to payment beyond the amount already disbursed in satisfaction of Grays's claim.

VII. Fifth Amendment

Dr. Christman also argues that the SHCP regulations constitute a taking in violation of the Fifth Amendment to the United States Constitution to the extent they preclude the payment he seeks for his services. The basis of this argument is that the time and skills of a physician are property that is taken without just compensation by the SHCP program due to the allegedly low reimbursement rates the program provides. In support, plaintiff Christman cites Supreme Court authority recognizing Fifth Amendment protection for the holder of trade secrets confronted with a federal statute mandating public release of that information. Ruckelhaus v. Monsanto Co., 467 U.S. 986, 1001-03, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984). The United States counters with a barrage of authority denying takings claim brought by medical professionals in response to Medicare billing limitations. See e.g., Garelick v. Sullivan, 987 F.2d 913 (2d. Cir.1993); Whitney v. Heckler, 780 F.2d 963 (11th Cir.1986); Metrolina v. Sullivan, 767 F.Supp. 1314 (W.D.N.C.1989).

Plaintiff Christman's Fifth Amendment claim is without merit. The weight of authority dictates that medical billing restrictions imposed by Medicare do not work an unconstitutional taking. The present circumstances, involving SHCP billing restrictions, are not materially distinguishable from the Medicare

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.2d
**(Cite as: 2005 WL 3088529, \*5 (S.D.Ohio))**

Page  58

context. The authority plaintiff Christman cites--allowing Fifth Amendment protection for trade secrets--is far too tenuous to support the dramatic departure from existing Fifth Amendment jurisprudence that he advocates. Accordingly, the plaintiff cannot establish a Fifth Amendment violation.

### VIII. Conclusion

**\*6** For the foregoing reasons, the United States is substituted for William A. Grays as defendant. The plaintiff's motion to remand is DENIED. The United States's motion for summary judgment is GRANTED as to plaintiff's claim for recovery of unpaid medical charges and plaintiff's claim under the Fifth Amendment. The plaintiff's complaint is DISMISSED with prejudice. This case is terminated on the docket of this Court.

IT IS SO ORDERED.

2005 WL 3088529 (S.D.Ohio)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



# TAB 2

Not Reported in F.Supp.2d

**Page   73**

30 Employee Benefits Cas. 2841
**(Cite as: 2003 WL 21104926 (D.Del.))**

United States District Court,
D. Delaware.

**Jennifer L. ERCOLE, Plaintiff**
v.
**CONECTIVE AND COVENTRY HEALTH
CARE OF DELAWARE, INC., Defendants.**

**No. Civ.A. 03-186 GMS.**

May 15, 2003.

MEMORANDUM AND ORDER

SLEET, J.

I. INTRODUCTION

**\*1** On February 10, 2003, the plaintiff, Jennifer
L. Ercole ("Ercole"), filed a complaint and a motion
for a temporary restraining order ("TRO") against
Coventry Health Care of Delaware, Inc.
("Coventry") and Conectiv ("Conectiv"), alleging
violations of the Employee Retirement Income
Security Act ("ERISA"), 29 U.S.C. § 1001 et seq.
The complaint also contains a claim for breach of
contract in connection with the denial of
authorization for a medical procedure under Ercole's
health plan. The court held a hearing on the motion
for TRO on February 12, 2003. On February 13,
2003, the court denied the motion for TRO without
prejudice.

Presently before the court is Coventry's motion to
dismiss Ercole's breach of contract and bad faith
claim on the basis that it is preempted by ERISA.
For the following reasons, the court will grant this
motion.

II. BACKGROUND

Ercole is a participant in an employee welfare
benefit plan called the Coventry Point of Service
Plan (the "Plan"), sponsored by Conectiv. The Plan
provides coverage for authorized medical services,
but excludes, among other things, "experimental
procedures or treatments."

In 2002, Ercole's treating oncologist, Dr. S. Eric
Martin ("Dr.Martin") diagnosed her with Chronic
Lymphocytic Leukemia ("CLL"). He then sought

authorization from Coventry for a pre-transplant
evaluation to determine whether a bone marrow
transplant would be appropriate. On December 4,
2002, Coventry authorized "evaluation services for
an allogenic bone marrow transplant."

Following the pre-transplant evaluation, Dr.
Martin recommended that Ercole undergo an
allogenic bone marrow transplant. Before she could
do so, however, the Plan required her to seek pre-
authorization from Coventry. Coventry denied pre-
authorization for the requested transplant because it
determined that the procedure was experimental and,
therefore, not a covered benefit under the Plan.

Ercole appealed the denial of authorization
through the internal appeals procedure provided for
in the Plan. Once again, her request for
authorization was denied on the basis that the
procedure was experimental. Ercole then appealed to
the Conectiv Benefits Committee ("the Committee").
On January 31, 2003, the Committee upheld
Coventry's determination that the procedure was
experimental and thus excluded under the terms of
the Plan.

Having exhausted her rights of appeal under the
Plan, Ercole filed the above-captioned action.

III. STANDARD OF REVIEW

A motion to dismiss under Federal Rule of Civil
Procedure 12(b)(6) should be granted when,
accepting all well-pleaded factual allegations as true,
the plaintiff is not entitled to relief as a matter of
law. See In re Burlington Coat Factory Sec. Litig.,
114 F.3d 1410, 1420 (3d Cir.1997). While the court
must accept the factual allegations in the complaint
as true, it "need not credit a complaint's 'bald
assertions' or 'legal conclusions.' " Id. at 1429
(citation omitted). Therefore, "[a] complaint which
consists of conclusory allegations unsupported by
factual assertions fails even the liberal standard of
Rule 12(b)(6)." De Jesus v. Sears, Roebuck & Co.,
87 F.3d 65, 70 (2d Cir.1996).

IV. DISCUSSION

**\*2** Coventry contends that Ercole's common law
claim for breach of contract and bad faith is
preempted by ERISA. In response, Ercole contends

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.2d
(Cite as: 2003 WL 21104926, *2 (D.Del.))

that her bad faith breach of contract claim is saved from preemption because it concerns a "state law regulating insurance." As such, Ercole maintains that ERISA's Savings Clause, 29 U.S.C. § 1144(b)(2)(A), applies. [FN1] For the following reasons, the court concludes that this claim is preempted by ERISA.

> FN1. Section 1144(b)(2)(A) states that, "[e]xcept as provided in subparagraph (B), nothing in this subchapter shall be construed to exempt or relieve any person from any law of any State which regulates insurance, banking, or securities."

ERISA includes an express provision that preempts state law claims for benefits. That clause provides that:

> [e]xcept as provided in subsection (b) of this section, the provisions of this subchapter and subchapter III of this chapter shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan....

29 U.S.C. § 1144(a). Additionally, courts have recognized that ERISA's preemption clause was drafted deliberately for broad application. See e.g. FMC Corp. v. Holliday, 498 U.S. 52, 58 (1990) (noting that the "preemption clause is conspicuous for its breadth"); Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 45-46 (1987), rev'd in part, 123 S.Ct. 1471 (2003) (finding that "the express preemption provisions of ERISA are deliberately expansive"); Huss v. Green Spring Health Svcs., Inc., 18 F.Supp.2d 400, 403 (D.Del.1998).

The Supreme Court of the United States recently clarified the test to determine whether a state law may be deemed a "law which regulates insurance" under Section 1144(b)(2)(A). See Kentucky Assoc. of Health Plans, Inc. v. Miller, 123 S.Ct. 1471 (2003). First, the state law must be "specifically directed toward entities engaged in insurance." Id. at 1479. Second, the state law must substantially affect the risk pooling arrangement between the insurer and the insured. See id.

Applying the Miller test to the facts presently before the court, it is clear that the bad faith breach of contract claim alleged in Count Two of Ercole's complaint does not fall under a state law regulating insurance for purposes of the Savings Clause. Count Two alleges that Coventry acted in bad faith and in breach of the implied duty of good faith and fair

dealing when it denied coverage for her bone marrow transplant after having authorized pre-transplant testing. In support of her position, Ercole maintains that Delaware law only recognizes such a bad faith claim based on an insurance contract. The Supreme Court of Delaware, however, permits claims for breach of the implied covenant of good faith and fair dealing in the employment context as well. [FN2] See e.g. Schuster v. Derocili, 775 A.2d 1029 (Del.2001). Accordingly, Count II of Ercole's complaint fails to meet the first prong of the Miller test.

> FN2. Relying on DuPont de Nemours and Co. v. Pressman, Ercole claims that an action for punitive damages for bad faith and breach of the covenant of good faith and fair dealing are permitted only under insurance contracts. 679 A.2d 436 (Del.1996). Although it is true that Pressman rejected a claim for punitive damages for breach of the covenant of good faith and fair dealing in the employment context, the unavailability of punitive damages in bad faith actions outside of the insurance context does not compel the conclusion that Ercole's claim here is one specifically directed to the insurance industry. Indeed, while Count II of Ercole's complaint seeks punitive damages, it also seeks other relief which is undeniably available outside of the insurance context. Additionally, in Pilot Life, the Supreme Court of the United States struck down a state law which allowed the recovery of punitive damages because the law conflicted with ERISA by allowing an additional ERISA remedy. In so holding, the Court noted that, "[t]he policy choices reflected in the inclusion of certain remedies and the exclusion of others under the federal scheme would be completely undermined if ERISA plan participants and beneficiaries were free to obtain remedies under state law that Congress rejected in ERISA." 481 U.S. at 54. .Thus, to the extent Ercole seeks to save this claim by virtue of her request for punitive damages, this argument must fail.

Moreover, assuming arguendo that Ercole's bad faith claim is "specifically directed to entities engaged in insurance," her claim nevertheless fails part two of the Miller test. There can be little dispute that the Delaware state bad faith cause of action does not substantially affect risk pooling between insurer and insured. Rather, it simply provides extra-contractual damages not permitted by ERISA. As such, the court concludes that the

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.2d
**(Cite as: 2003 WL 21104926, \*2 (D.Del.))**

Delaware bad faith statute does not spread a policyholder's risk. See Rosenbaum v. UNUM Life Ins. Co., 2002 WL 1769899, \*2 (E.D.Pa. July 29, 2002) (finding that Pennsylvania's bad faith in insurance claims statute did not spread a policy-holder's risk); Sprecher v. Aetna U.S. Healthcare, Inc., 2002 WL 1917711, \* 7 (E.D.Pa. Aug. 19, 2002) (holding that, because the Pennsylvania bad faith in insurance claims statute primarily allowed tort claims for relief not provided for by ERISA, such as punitive damages, it was preempted by ERISA). Having failed both prongs of the Miller test, Ercole's claim for bad faith breach of contract is thus preempted.

## IV. CONCLUSION

\*3 For the foregoing reasons, IT IS HEREBY ORDERED that:

1. Coventry's Motion to Dismiss Count II of the Complaint (D.I.16) is GRANTED.

2003 WL 21104926 (D.Del.), 30 Employee Benefits Cas. 2841

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



TAB 3

Not Reported in F.Supp.2d
(Cite as: 1998 WL 518181 (E.D.Pa.))

Page  88

Only the Westlaw citation is currently available.

United States District Court, E.D. Pennsylvania.

Wayne HARRIS d/b/t/a W.W. Harris and Sons,
Inc., Plaintiff,
v.
S.C. MADISON, Bishop, Individually and as
Agent for the United House of Prayer
for All People, United Building Contractors, Inc.,
Jim Myers, Individually, and
as Agent for United Building Contractors, Inc.,
Defendants.

No. CIV. A. 97-7532.

July 24, 1998.

Oscar N. Gaskins, Phila, for Wayne Harris,
Individually Individually and D/B/T/A W.W. Harris
and Sons, Inc., Plaintiff.

Elizabeth J. Feeney, Piper & Marbury, L.L.P.,
Peter J. Mooney, White and Williams, Phila, for
S.C. Madison, Bishop, Individually and Agent for
the United House of Prayer for All People, United
Building Contractors, Inc., Jim Myers, Individually,
and Agent for and Trading as United Building
Contractors, Inc., Defendants.

MEMORANDUM

GAWTHROP, J.

*1 Before the court in this diversity action is
Defendants' Motion to Dismiss Plaintiff's
Complaint. [FN1] Plaintiff, a building contractor
and developer, has filed suit against Bishop S.C.
Madison, the sole Trustee and Chief Executive
Officer of the United House of Prayer for All
People of the Church on the Rock of the Apostolic
Faith (the "United House of Prayer"), to recover for
services that plaintiff allegedly performed on behalf
of that organization. The suit also names as
defendants the construction company and its agent
which was awarded the construction contract at
issue. Plaintiff's complaint asserts claims against
defendants for breach of contract, conspiracy to
deprive plaintiff of pay, and quantum meruit.

FN1. Although Bishop S.C. Madison was the only
defendant to file the Motion to Dismiss, the
remaining defendants, United Building Contractors,
Inc., and Jim Myers, later adopted and joined in the
Motion. See Joinder of Defs. in Mot. of Def.
Bishop S.C. Madison to Dismiss Pl.'s Compl.

The defendants have moved to dismiss plaintiff's
complaint pursuant to Fed.R.Civ.P. 12(b)(1) and
12(b)(7), for plaintiff's failure to join an
indispensable party, inclusion of which would
destroy this court's subject matter jurisdiction, and
pursuant to Fed.R.Civ.P. 12(b)(6), for plaintiff's
failure to state a claim upon which relief can be
granted. Because I find, under Fed.R.Civ.P. 19,
that the United House of Prayer is an indispensable
party whose joinder would destroy diversity
jurisdiction, I shall dismiss the Complaint pursuant
to Fed.R.Civ.P. 12(b)(7).

I. Background

According to the Complaint, in March 1993,
defendants were engaged in rehabilitating houses in
Philadelphia and allegedly induced the plaintiff to
assist them in obtaining the required permits for
plumbing and electrical work and to supervise the
construction. In return, the plaintiff claims the
defendants promised him that he would be paid for
his services and awarded a substantial contract to
develop a tract of land in Philadelphia into low-
income housing units. In May 1994, plaintiff claims
the defendants told him that his services were no
longer needed and that the contract for construction
would be awarded to defendant United Building
Contracting, Inc. Plaintiff claims that he performed
substantial services in furtherance of his contract
with defendants without receiving any payment or
other benefit. Defendants dispute this version of
events. Additionally, defendants contend that
plaintiff has not named the United House of Prayer
itself as a party, for the reason that joinder of this
organization would destroy diversity of citizenship
and defeat subject matter jurisdiction over this
action.

A corporation is deemed a citizen of any state by
which it has been incorporated and of the state
where it has its principal place of business. 28
U.S.C. § 1332(c)(1). The United House of Prayer is
incorporated in the Commonwealth of Pennsylvania.
Defs.' Ex. E, F. Thus, it is a citizen of
Pennsylvania for jurisdictional purposes.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.2d

**Page 89**

(Cite as: 1998 WL 518181, *1 (E.D.Pa.))

II. Discussion

The critical issue here is whether the United House of Prayer is an indispensable party such that the court "in equity and good conscience" cannot proceed with the action in its absence. Fed.R.Civ.P. 19. The determination of indispensability under Rule 19 is a two-step process. First, a court should decide whether the person in question is a necessary party who should be joined if "feasible" under Rule 19(a). If the person should be joined, but joinder is not feasible, a court should take the second step of evaluating whether that person is "indispensable" under Rule 19(b). If the court finds the party is indeed indispensable, then it should dismiss the action. See, e.g., H.B. General Corp. v. Manchester Partners, L.P., 95 F.3d 1185, 1190 (3d Cir.1996).

**\*2** Federal Rule of Civil Procedure 19(a) provides for joinder when either

(1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest.

Fed.R.Civ.P. 19(a). Bishop S.C. Madison avers that any alleged dealings that he had with plaintiff related to his role as sole Trustee and CEO of the United House of Prayer and were undertaken exclusively on the behalf of that organization. Defs.' Ex. C. As support for this argument, defendants point to the three state court complaints filed by plaintiff which involve the same subject matter as the present action, but name the United House of Prayer as a party. Defs.' Ex. D. Moreover, plaintiff names Bishop S.C. Madison as a defendant both individually and as agent for the United House of Prayer. If defendant Madison was acting in his role as agent for the corporation, then it follows that the corporation has an interest in the alleged contract. "Generally, in breach of contract actions, all parties to a contract should be joined." Rashid v. Kite, 957 F.Supp. 70, 74 (E.D.Pa.1997) (citations omitted) (dismissing action for lack of subject matter jurisdiction where nondiverse party was indispensable to breach of contract claim). Thus, the

United House of Prayer is a necessary party which should be joined if feasible. Its joinder, however, would destroy diversity jurisdiction pursuant to 28 U.S.C. § 1332 because the plaintiff, Wayne Harris, and the United House of Prayer are both citizens of Pennsylvania. Thus, joinder is not feasible.

Because joinder of the United House of Prayer is not feasible, the court must next consider whether it is indispensable. Since the plaintiff has the burden of demonstrating federal jurisdiction in this case, it is his burden to establish that the United house of Prayer is a dispensable party. Enza Inc. v. We The People, Inc., 838 F.Supp. 975, 978 (E.D.Pa.1993) (dismissing action after finding corporation was indispensable party in breach of contract action and so could not be dismissed to preserve diversity jurisdiction). By failing to respond, plaintiff has not met his burden. Nevertheless, I shall examine the indispensability arguments raised in the defendants' motion.

In a breach of contract action, the general rule is that a corporate officer who negotiates a contract on behalf of a corporation may not ordinarily be held personally liable for contract damages. See Bala Corporation v. McGlinn, 295 Pa. 74, 144 A. 823, 824 (Pa.1929) (citations omitted) (holding no individual officer liability within context of breach of contract action where plaintiff knew officers contracted on behalf of corporation). Here, plaintiff claims liability against Bishop S.C. Madison for the breach of a contract allegedly made in his role as agent of the United House of Prayer. However, in this context, "the breach of the contract is the breach of a promise made by the corporation, and not the breach of any promise extended by the corporate officer. It follows that only the corporation may ordinarily be held liable for contract damages." Loeffler v. McShane, 372 Pa.Super. 442, 539 A.2d 876, 879 (Pa.Super.1988). Nor, on the record before the court, does there appear any reason to subject Bishop S.C. Madison to individual liability. See, e.g., The Village at Camelback Property Owners Ass'n v. Carr, 371 Pa.Super. 452, 538 A.2d 528, 534 (Pa.Super.1988) (finding plaintiff had pled "sufficient ultimate facts" for claim against individual for breach of warranties personally extended by officer "completely apart from his position as agent for a corporation"). Thus, under this well settled doctrine, the United House of Prayer clearly is indispensable.

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.2d
(Cite as: 1998 WL 518181, *3 (E.D.Pa.))

*3 An examination of the factors enumerated in Fed.R.Civ.P. 19(b) also leads to the conclusion that the United House of Prayer is indispensable. [FN2] Those factors have been interpreted by the Supreme Court as: (1) the plaintiff's interest in having a forum; (2) the defendant's interest in avoiding multiple litigation, inconsistent relief, or sole responsibility for a shared liability; (3) the extent to which a judgment may hinder the outsider's ability to protect his interest in the subject matter; and (4) the courts' and public interest in complete, consistent, and efficient settlement of controversies. Provident Tradesmen's Bank & Trust Co. v. Patterson, 390 U.S. 102, 109-111, 88 S.Ct. 733, 19 L.Ed.2d 936 (1968). Here, although the plaintiff has an interest in having a forum, this forum need not be federal. Indeed, the plaintiff has already brought three related actions in state court. Two of these cases ended in dismissal for non-prosecution; in the third case, the court sustained the defendants' preliminary objections and dismissed the complaint. Defs .' Ex. D. Still, the doors of the state courthouse remain open to him. Defendant Bishop S.C. Madison has an interest in avoiding liability for a contract to which, he would argue, he was not a party and that any damages should be paid by the United House of Prayer, if anyone. Further, the absence of the United House of Prayer would hinder its ability to protect its interests. Finally, the interest in complete, consistent, and efficient settlement of controversies weighs in favor of dismissing this action. State litigation regarding this contract has already been brought.

> FN2. The factors to be considered by the court when determining whether a party is indispensable include: first, to what extent a judgment rendered in the person's absence might be prejudicial to the person or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder. Fed.R.Civ.P. 19(b).

III. Conclusion

In sum, I find that the United House of Prayer is an indispensable party under Fed.R.Civ.P. 19(b). Because its joinder would destroy this court's diversity jurisdiction under 28 U.S.C. § 1332, I shall dismiss this action pursuant to Fed.R.Civ.P. 12(b)(7). Accordingly, I find it unnecessary to reach defendants' other ground for dismissal.

An order follows.

ORDER

AND NOW, this 22nd day of July, 1998, upon the reasoning in the attached Memorandum, the Motion to Dismiss (Doc. No. 5) Plaintiff's Complaint is GRANTED, and Plaintiff's Complaint is DISMISSED.

1998 WL 518181 (E.D.Pa.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



TAB 4

2007 WL 489224
--- Fed.Cl. ---
(Cite as: 2007 WL 489224 (Fed.Cl.))

Only the Westlaw citation is currently available.

United States Court of Federal Claims.

**Susan Helene MINEHAN, Pro se, Plaintiff,**
v.
**The UNITED STATES, Defendant.**

**No. 05-924T.**

Jan. 26, 2007.

Background: Taxpayer filed suit against the United States, alleging that the Internal Revenue Service (IRS) wrongfully denied her request for an income tax refund. Defendant moved to dismiss.

Holdings: The United States Court of Federal Claims, Bush, J., held that: (1) taxpayer's verbal contact with personnel of the IRS regarding possibility of obtaining a refund did not qualify as an informal refund claim for purposes of statute of limitations, absent some evidence of a writing submitted to the IRS; (2) jurisdiction was lacking over taxpayer's tort claim for money damages based on allegation that the IRS violated regulation by failing to include information regarding protective claims in its literature; and (3) taxpayer failed to state claim based on quasi-contract.

Motion granted in part and denied in part.

**[1] Internal Revenue    4963**
220k4963
An informal tax refund claim must include a written component placed in the possession of the Internal Revenue Service (IRS) prior to the expiration of the limitations period. 26 U.S.C.A. § 6511(a).

**[2] Internal Revenue    4963**
220k4963
Taxpayer's verbal contact with personnel of the Internal Revenue Service (IRS) regarding possibility of obtaining a refund did not qualify as an informal refund claim for purposes of statute of limitations, absent some evidence of a writing submitted to the IRS. 26 U.S.C.A. § 6511(a).

**[3] Internal Revenue    5004**
220k5004
Statute of limitations on filing of income tax refunds may not be equitably tolled. 26 U.S.C.A. § 6511(a).

**[4] Federal Courts    1083**
170Bk1083

**[4] Federal Courts    1086**
170Bk1086
Court of Federal Claims lacked jurisdiction over taxpayer's claim for money damages based on allegation that the Internal Revenue Service (IRS) violated regulation by failing to include information regarding protective claims in its literature, as claim sounded in tort of fraud or bad faith and was an attempt to rescue an untimely refund request by recharacterizing it as a tort claim. 28 U.S.C.A. § 1491(a).

**[5] Contracts    27**
95k27
A "quasi-contract," or a "contract implied-in-fact," is one which is founded upon a meeting of minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding.

**[6] Contracts    27**
95k27
An implied-in-fact contract typically requires: (1) mutuality of intent to contract; (2) consideration; and (3) a lack of ambiguity in offer and acceptance.

**[7] United States    69(1)**
393k69(1)
When the United States is a party to an alleged contract implied-in-fact, the government representative whose conduct is relied upon must have actual authority to bind the government in contract.

**[8] United States    125(20)**
393k125(20)
Taxpayer failed to state a claim for money arising from a quasi-contract between the United States and taxpayer based on mission statement of the Internal Revenue Service (IRS) to "[p]rovide America's taxpayers top quality service by helping them understand and meet their tax responsibilities and by applying the tax law with integrity and fairness to all," as language did not evince a clear intent to contract on part of government.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



2007 WL 489224
(Cite as: 2007 WL 489224 (Fed.Cl.))

**[9] Federal Courts    1071**
170Bk1071
Court of Federal Claims was without authority to grant plaintiff a statutory waiver of sovereign immunity, as that power lies solely with the Congress.

**[9] United States    125(2)**
393k125(2)
Court of Federal Claims was without authority to grant plaintiff a statutory waiver of sovereign immunity, as that power lies solely with the Congress.

Susan Helene Minehan, pro se.

Karen Servidea, United States Department of Justice, with whom were Steven I. Frahm, David Gustafson, and Eileen J. O'Connor, Assistant Attorney General, Washington, D.C., for defendant.

OPINION

Bush, Judge.

**\*1** This matter comes before the court on defendant's motion to dismiss for lack of subject matter jurisdiction. For the reasons set forth herein, the court concludes that jurisdiction over this matter is absent. Defendant's motion to dismiss is granted, and the case is dismissed.

BACKGROUND

This opinion follows briefing by the parties on a number of issues which affect the jurisdiction of the United States Court of Federal Claims. Before examining the contours of this court's jurisdiction, however, a brief summary of the facts which led to the current dispute is appropriate. The parties agree on the facts of this case, as recited herein, for purposes of this motion only.

In this lawsuit, plaintiff Susan Helene Minehan claims that the United States Internal Revenue Service (IRS) wrongfully denied her request for an income tax refund. The facts which led to the rejected claim are as follows. At some time before the start of tax year 1998, Ms. Minehan suffered a work-related illness while employed by the federal government. Because that illness left plaintiff unable to work, the United States Department of Labor (DOL, the Department) granted non-taxable workers' compensation benefits to her. See 26 U.S.C. § 104(a)(1) (2000). In November 1996, however, after plaintiff had received those benefits for a number of months, the Department informed Ms. Minehan that her formal claim for workers' compensation had been denied. From that point forward, the United States Office of Personnel Management (OPM) issued taxable retirement benefits to plaintiff in lieu of non-taxable workers' compensation. See Def.'s App. B at 20-21. As early as November 19, 1997, Ms. Minehan disputed the DOL's decision. On December 10, 1999, plaintiff formally appealed the denial of her workers' compensation claim to the DOL Employees' Compensation Appeals Board (the Board).

While her appeal was pending, Ms. Minehan filed a federal income tax return for the 1998 tax year. [FN1] That return was dated May 30, 2000, and thus was submitted more than one year past its April 15, 1999 due date. On the tax return, Ms. Minehan identified the payments she had received from the federal government during 1998 as taxable retirement benefits. Plaintiff did not, however, include information regarding her pending dispute with the DOL, or her quest to have the retirement payments converted to non-taxable workers' compensation benefits. Nor did Ms. Minehan file a protective claim with the IRS, to alert the agency that the characterization of those benefits, for tax purposes, might change in the future. [FN2] Shortly thereafter, the IRS processed Ms. Minehan's return based on the information she had provided, and refunded to her the amount in overpayment that she had requested.

On March 25, 2002, Ms. Minehan received a favorable decision on her workers' compensation appeal. On that date, the Board overturned DOL's denial of benefits and awarded workers' compensation payments to plaintiff retroactive to November 22, 1996. On July 14, 2003, more than three years after her first filing, plaintiff amended her 1998 tax return accordingly. In an IRS Form 1040X Amended U.S. Individual Income Tax Return, Ms. Minehan requested an additional refund on her 1998 return, on the ground that the workers' compensation benefits which she had been awarded retroactively during that year were nontaxable. The

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



2007 WL 489224                                                        **Page 123**
**(Cite as: 2007 WL 489224, *1 (Fed.Cl.))**

Form 1040X requested that the $11,517 in retirement payments Ms. Minehan had received from OPM, which had initially been reported as taxable income, be treated as tax-exempt workers' compensation benefits and excluded from plaintiff's gross income. [FN3] See Def.'s App. B at 18-20. Taking into account the changes to her 1998 return, plaintiff's Form 1040X requested an additional tax refund in the amount of $4,044. On September 8, 2003, however, the IRS sent a notice of disallowance to plaintiff, informing her that the refund claim had been rejected. Def.'s App. B at 23-25. The notice explained that the Form 1040X had been filed outside the applicable period of limitations.

*2 On August 24, 2005, plaintiff filed suit in the Court of Federal Claims, arguing that she was, in fact, entitled to a tax refund of $4,044 plus interest from the IRS. In response, the government moved to dismiss Ms. Minehan's refund claim for lack of subject matter jurisdiction, on the ground that it was untimely. The United States argued that no exception to the Internal Revenue Code's (IRC) timeliness rule was permissible, and that, had Ms. Minehan wished to preserve her right to a refund on the workers' compensation income, she should have filed a protective claim with the IRS in advance of the filing deadline set forth in the Code.

Rather than responding directly to the United States' motion to dismiss, plaintiff amended her complaint. In her new pleadings, which are now pending before the court, Ms. Minehan does not seek a refund from the IRS. Instead, plaintiff requests damages in the same amount as her former refund claim, based on the IRS' "failure to make taxpayer information applicable to Protective Claims readily available to the taxpayer in a written publication." Am. Compl. ¶ 2 (emphasis in original). Following a stay in which plaintiff was given an opportunity to retain counsel, the United States renewed its motion to dismiss Ms. Minehan's suit for lack of subject matter jurisdiction. [FN4] Because plaintiff has been afforded ample time to respond to defendant's arguments and has filed several pleadings related to this matter, resolution of the government's motion is now appropriate. [FN5]

DISCUSSION

I. Jurisdiction

The Tucker Act delineates this court's jurisdiction. 28 U.S.C. § 1491 (2000). That statute "confers jurisdiction upon the Court of Federal Claims over [ ] specified categories of actions brought against the United States...." Fisher v. United States, 402 F.3d 1167, 1172 (Fed.Cir.2005) (en banc ). These include claims founded upon the Constitution, an act of Congress, a regulation promulgated by an executive department, any express or implied contract with the United States, or any claim for liquidated damages in cases not sounding in tort. Id. (citing 28 U.S.C. § 1491(a)(1)). The Tucker Act concurrently "waives the Government's sovereign immunity for those actions." Fisher, 402 F.3d at 1172. The statute does not, however, create a substantive cause of action or right to recover money damages in the Court of Federal Claims. Id.; see also Ky. Bridge & Dam, Inc. v. United States, 42 Fed.Cl. 501, 516 (1998) (citing United States v. Mitchell, 445 U.S. 535, 538, 100 S.Ct. 1349, 63 L.Ed.2d 607, reh'g denied, 446 U.S. 992, 100 S.Ct. 2979, 64 L.Ed.2d 849 (1980); United States v. Testan, 424 U.S. 392, 398-99, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976); United States v. Connolly, 716 F.2d 882, 885 (Fed.Cir.1983) (en banc )). Instead, "to come within the jurisdictional reach and the waiver of the Tucker Act, a plaintiff must identify a separate source of substantive law that creates the right to money damages." Fisher, 402 F.3d at 1172. In other words, the source must be money-mandating, in that it " 'can fairly be interpreted as mandating compensation by the Federal Government....' " Testan, 424 U.S. at 400, 96 S.Ct. 948 (quoting Eastport S.S. Corp. v. United States, 178 Ct.Cl. 599, 372 F.2d 1002, 1009 (1967) and citing Mosca v. United States, 189 Ct.Cl. 283, 417 F.2d 1382, 1386 (1969)); Khan v. United States, 201 F.3d 1375, 1377-78 (Fed.Cir.2000). If the provision relied upon is found to be money-mandating, the plaintiff need not rely upon a waiver of sovereign immunity beyond the Tucker Act. Huston v. United States, 956 F.2d 259, 261 (Fed.Cir.1992) (citing United States v. Mitchell, 463 U.S. 206, 218, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983)).

II. Standard of Review: Motion to Dismiss for Lack of Subject Matter Jurisdiction, RCFC 12(b)(1)

*3 Jurisdiction may be challenged by the parties or by the court on its own initiative at any time, and if jurisdiction is found to be lacking, this court must

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



dismiss the action. Rule 12(h)(3) of the Rules of the United States Court of Federal Claims (RCFC). The court's determination of jurisdiction begins with an examination of the complaint, "which must be well-pleaded in that it must state the necessary elements of the plaintiff's claim, independent of any defense that may be interposed." Holley v. United States, 124 F.3d 1462, 1465 (Fed.Cir.1997). In rendering a decision on a motion to dismiss for lack of subject matter jurisdiction, under RCFC 12(b)(1), this court must presume all undisputed factual allegations to be true, and construe all reasonable inferences in favor of the plaintiff. Scheuer v. Rhodes, 416 U.S. 232, 236-37, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 747 (Fed.Cir.1988). The court should not grant a motion to dismiss "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Nonetheless, the non-movant bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence. Cubic Def. Sys., Inc. v. United States, 45 Fed.Cl. 239, 245 (1999) (citing Cedars-Sinai Med. Ctr. v. Watkins, 11 F.3d 1573, 1583 (Fed.Cir.1993)).

It is important to recognize that, as a pro se litigant, plaintiff is entitled to certain leniencies which are afforded to parties proceeding in that capacity. This is particularly true when ruling on a motion to dismiss, as "[i]t is settled law that the allegations of ... a [pro se] complaint, however inartfully pleaded[,] are held to less stringent standards than formal pleadings drafted by lawyers[.]" Hughes v. Rowe, 449 U.S. 5, 9, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980) (internal quotations omitted); Troutman v. United States, 51 Fed.Cl. 527, 531 (2002). Indeed, in such cases, courts have "strained [their] proper role in adversary proceedings to the limit, searching ... [the] record to see if [the] plaintiff has a cause of action somewhere displayed." Ruderer v. United States, 188 Ct.Cl. 456, 412 F.2d 1285, 1292 (1969). However, while "[t]he fact that [a plaintiff] acted pro se in the drafting of his complaint may explain its ambiguities, ... it does not excuse its failures, if such there be." Henke v. United States, 60 F.3d 795, 799 (Fed.Cir.1995). In other words, the leniency afforded to a pro se litigant with respect to mere formalities does not relieve the burden to meet

jurisdictional requirements. Kelley v. Sec'y, U.S. Dep't of Labor, 812 F.2d, 1378, 1380 (Fed.Cir.1987); Biddulph v. United States, 74 Fed.Cl. 765 (2006). Similarly, "[t]here is no duty on the part of the trial court ... to create a claim which [the plaintiff] has not spelled out in his pleading...." Scogin v. United States, 33 Fed.Cl. 285, 293 (1995) (quoting Clark v. Nat'l Travelers Life Ins. Co., 518 F.2d 1167, 1169 (6th Cir.1975)).

## III. Merits

**\*4** In its current motion to dismiss, the United States argues that, at bottom, plaintiff's amended complaint does no more than renew an untimely tax refund request, and thus does not properly invoke the subject matter jurisdiction of this court. The government also contends that, to the extent plaintiff seeks equitable tolling of the statute of limitations which bars her refund claim, no such tolling is permissible or appropriate. Finally, defendant claims that Ms. Minehan's damages claim should be dismissed "[b]ecause there is no statutory waiver of sovereign immunity for claims that the IRS failed to provide certain information to taxpayers," and so, the court lacks jurisdiction over a request for such damages. Def.'s Mot. at 7.

### A. Timeliness of Tax Refund Claim

#### 1. Formal Refund Claim

Defendant argues first that Ms. Minehan has reasserted an income tax refund claim which is untimely and must be dismissed. To the extent that plaintiff's amended complaint does set forth a refund claim, the court agrees with the government.

There is no question, of course, that the Court of Federal Claims may exercise jurisdiction over tax refund suits. See 28 U.S.C. §§ 1346(a)(1), 1491(a)(1) (2000). As defendant correctly points out, however, certain prerequisites must be met before a plaintiff may properly invoke this court's jurisdiction in that area. Most importantly to this lawsuit, a tax refund suit may not be maintained by a plaintiff "unless a claim for refund of [the] tax has been filed [with the IRS] within the time limits imposed by § 6511(a)" of the Internal Revenue Code. United States v. Dalm, 494 U.S. 596, 602, 110 S.Ct. 1361, 108 L.Ed.2d 548 (1990); see 26 U.S.C. § 7422(a) (2000). Section 6511(a), in turn,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



requires that a tax refund request be filed within either: (1) three years from the date on which the return giving rise to the refund claim was filed; or (2) two years from the date on which the tax was paid, whichever is later. [FN6] 26 U.S.C. § 6511(a) (2000). Together, these statutes dictate that, before a plaintiff may pursue a tax refund suit, he or she must file a claim for a refund from the IRS within the window of time prescribed by § 6511(a). See Dalm, 494 U.S. at 602, 110 S.Ct. 1361 (stating that "unless a claim for refund of a tax has been filed within the time limits imposed by § 6511(a), a suit for refund, regardless of whether the tax is alleged to have been 'erroneously,' 'illegally,' or 'wrongfully collected,' may not be maintained in any court"); Wertz v. United States, 51 Fed.Cl. 443, 446 (2002). It is well-settled that satisfaction of that filing requirement is a jurisdictional prerequisite to suit in the Court of Federal Claims. Sun Chem. Corp. v. United States, 698 F.2d 1203, 1206 (Fed.Cir.1983) ("It is a well-established rule that a timely, sufficient claim for refund is a jurisdictional prerequisite to a refund suit."); Stelco Holding Co. v. United States, 42 Fed.Cl. 101, 104 (1998) ("It is firmly settled that a properly filed administrative claim for refund is the indispensable prerequisite to this court's exercise of jurisdiction over a taxpayer's suit for refund."). Strict compliance with § 6511(a)'s limitations period is essential because "[u]nder settled principles of sovereign immunity, the United States, as sovereign, is immune from suit, save as it consents to be sued ... and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit." Stelco Holding, 42 Fed.Cl. at 104 n. 5 (quoting Dalm, 494 U.S. at 608, 110 S.Ct. 1361 (internal quotations omitted)).

*5 Here, Ms. Minehan seeks a refund of taxes paid in conjunction with her 1998 income tax return. The record shows that this return was filed on May 30, 2000, and that plaintiff paid her 1998 income taxes through withholding credits. Under IRC § 6513, taxes paid via withholding credits are deemed to have been paid "on the 15th day of the fourth month following the close of [the] taxable year with respect to which such tax is allowable as a credit...." 26 U.S.C. § 6513(b)(1) (2000). Ms. Minehan's tax was deemed paid, therefore, four months and 15 days after the last day of 1998, or April 15, 1999. It follows that plaintiff was required to file a refund claim by the latter date of April 15,

2001 (two years after the date of payment) or May 30, 2003 (three years after the date of filing). The record is clear, however, that Ms. Minehan's Form 1040X was not filed until July 14, 2003, forty-five days after May 30, 2003. [FN7] Because the refund claim was untimely, plaintiff may not rely on it to satisfy the jurisdictional prerequisite to suit in this court.

2. Informal Refund Claim

In an effort to address this deficiency, Ms. Minehan also alleges that she filed an informal refund claim with the IRS in advance of the filing deadline, and that this informal claim creates jurisdiction over her suit. That argument is based on plaintiff's allegation that she spoke with an IRS employee on January 29, 1999 regarding the possibility of obtaining a refund after her workers' compensation appeal had been resolved. Defendant argues, however, that Ms. Minehan's verbal contact with IRS personnel does not qualify as an informal claim, even if it occurred before the filing deadline, because plaintiff has not alleged that she provided the agency with any written communication at that time. See Def.'s Mot. at 9-10. The United States insists that submission of a written document is a mandatory component of any informal refund claim.

As plaintiff correctly points out, the validity of the informal claim doctrine on which she relies was recognized by the United States Supreme Court in United States v. Kales, 314 U.S. 186, 195, 62 S.Ct. 214, 86 L.Ed. 132 (1941). In that case, a taxpayer submitted an informal letter to the IRS, within the limitations period, which claimed a tax refund. However, because the letter was not filed on the correct form, it did not comply with IRS regulations. Id. at 190-91, 62 S.Ct. 214; see also Computervision Corp. v. United States, 445 F.3d 1355, 1364 (Fed.Cir.2006). Later, the taxpayer filed an untimely amendment that did comply with the applicable regulations. Kales, 314 U.S. at 191, 62 S.Ct. 214. On review, the Supreme Court permitted the claim to go forward. The Court held that "a [timely] notice fairly advising the Commissioner of the nature of the taxpayer's claim ... will nevertheless be treated as a[n effective] claim, where formal defects ... have been remedied by amendment filed after the lapse of the statutory period." Id. at 194, 62 S.Ct. 214; see also Computervision, 445 F.3d at 1364.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



**\*6** The informal claim doctrine has been recognized by this court and its predecessor for more than forty years. See Computervision, 445 F.3d at 1364 (citing Arch Eng'g Co. v. United States, 783 F.2d 190, 192 (Fed.Cir.1986); Barenfeld v. United States, 194 Ct.Cl. 903, 442 F.2d 371, 374 (1971); Stuart v. United States, 131 Ct.Cl. 174, 130 F.Supp. 386, 388-90 (1955); Am. Radiator & Standard Sanitary Corp. v. United States, 162 Ct.Cl. 106, 318 F.2d 915, 920-22 (1963)); see also Silberman v. United States, 40 Fed.Cl. 895, 904 (1998) ("Caselaw does provide that, if the IRS is actually but 'informally' on notice of pertinent details of a taxpayers [sic] claim, the statute of limitations will be tolled, even if the official claim filed by the taxpayer was inadequate."); Stelco Holding, 42 Fed.Cl. at 109 ("Courts have long applied the informal claim doctrine in order to exercise jurisdiction over cases in which the taxpayer's formal administrative claim for refund is untimely filed, where the facts and circumstances transpiring prior to the expiration of the statute of limitations, viewed in their totality, demonstrate that the Commissioner was given timely and adequate informal notice that the taxpayer sought a refund of taxes overpaid."). Indeed, it is now well-settled that "a timely claim with purely formal defects is permissible if it fairly apprises the IRS of the basis for the claim within the limitations period." Computervision, 445 F.3d at 1364. Accordingly, in situations in which a valid informal claim has been made by a taxpayer, formal compliance with the timeliness statute is excused. Id.

[1] Regarding the conventions for filing an informal tax refund claim, this court and the United States Court of Appeals for the Federal Circuit have held that an informal claim must include a written component placed in the possession of the agency prior to the expiration of the limitations period. Arch Engineering, 783 F.2d at 192; Stelco Holding, 42 Fed.Cl. at 109 (stating that "the one indispensable element ... is a written component" (internal quotations omitted)); see also Wertz, 51 Fed.Cl. at 447. Beyond that requirement, however, no rigid guidelines exist for determining whether a taxpayer has made a valid informal refund claim. Stelco Holding, 42 Fed.Cl. at 109 (citing Arch Engineering, 783 F.2d at 192); see also Wall Indus., Inc. v. United States, 10 Cl.Ct. 82, 98 (1986) ("[T]he cases in this court emphasize that

there is no preconceived set of universal facts and circumstances which otherwise define an efficacious informal claim."). Generally, in order to demonstrate the existence of an informal claim, a plaintiff must show "that the IRS knew of the facts underlying the claim and understood that a claim was being based on them." Silberman, 40 Fed.Cl. at 904 (quoting Levitsky v. United States, 27 Fed.Cl. 235, 241 (1992)). In other words, the plaintiff bears the burden to notify the IRS of his or her intentions with respect to the facts on which the claim is based. Id. The informal claim must " 'put the Commissioner on notice that a right is being asserted with respect to an overpayment of tax.' " Furst v. United States, 230 Ct.Cl. 375, 678 F.2d 147, 151 (1982) (quoting Newton v. United States, 143 Ct.Cl. 293, 163 F.Supp. 614, 618 (1958)); Wertz, 51 Fed.Cl. at 447.

**\*7** [2] Here, to show that she lodged a timely informal refund claim, Ms. Minehan alleges that, on January 29, 1999, she visited the local IRS office in Wheaton, Maryland, and inquired about the viability of her refund claim after the applicable filing deadline. See Pl.'s Mot. to Request a Statutory Waiver of Sovereign Immunity at 2; see also Pl.'s Resp. to Def.'s Mot. of the United States to Dismiss the Complaint and Request for Oral Argument. Ms. Minehan does not claim, however, that she provided any written correspondence to the IRS on that date, or at any other time before the statute of limitations had run. Faced with this difficulty, plaintiff cites this court's opinion in Stelco Holding to argue that "[t]here are no hard and fast rules for determining the sufficiency of an informal claim...." Pl.'s Resp. to Def.'s Mot. of the United States to Dismiss the Complaint and Request for Oral Argument at 2 (quoting Stelco Holding, 42 Fed.Cl. at 109 (internal quotations omitted)). That contention is only correct, however, insofar as it relates to requirements other than the rule that all informal refund claims must include a writing. Indeed, the decision in Stelco Holding, like the others from this court, stated explicitly that "the one indispensable element of an informal claim for refund is a written component." Stelco Holding, 42 Fed.Cl. at 109 (internal quotations omitted).

Plaintiff also relies on United States v. Commercial National Bank of Peoria, 874 F.2d 1165 (7th Cir.1989). In that case, however, the United States Court of Appeals for the Seventh

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Circuit commented that "[v]irtually all courts agree that a taxpayer cannot rely solely upon oral communications to preserve his right to a refund claim." Id. at 1171. The Seventh Circuit's opinion also observes that courts "generally" agree that informal refund claims must include a written component. See id. at 1172. Plaintiff's effort to establish an exception to the writing requirement as a result of that phraseology is, however, untenable. In Commercial National Bank, the parties agreed that an informal written document had been submitted to the IRS in advance of the tax refund deadline. See id. For that reason, the court did not consider whether a valid informal claim could be made absent a writing. The decision thus does not support Ms. Minehan's proposition that she lodged a valid informal claim merely by speaking with an IRS employee.

Because plaintiff has not alleged that she submitted a writing to the IRS in advance of the deadline created by IRC § 6511, her attempt to avoid the statute of limitations by relying on the informal claim doctrine fails. See Wertz, 51 Fed.Cl. at 447; Stelco Holding, 42 Fed.Cl. at 109. Ms. Minehan has not satisfied the filing requirements which are prerequisite to suit in this forum, and the court lacks subject matter jurisdiction to consider her tax refund request.

B. Equitable Tolling

*8 [3] The United States argues next that, to the extent Ms. Minehan seeks equitable tolling of the statute of limitations which bars her refund claim, that request must be rejected. The government concedes that IRC § 6511 includes a limited number of exceptions to the period of limitation for tax refund claims. [FN8] Defendant argues, however, that plaintiff has alleged no facts that trigger any of the exceptions listed in § 6511. The United States argues further that there is no basis on which to equitably bar the government from raising a period of limitation defense to this suit.    Defendant disagrees with Ms. Minehan's claim that the government should be estopped from relying on the filing deadline because of DOL's slow processing of her workers' compensation claim and its purported contribution to her failure to meet the statute's filing deadline. Def.'s Mot. at 11. The United States also disputes plaintiff's contention that the IRS improperly failed to inform her about her right to

protect her potential refund by filing a protective claim during the pendency of her workers' compensation appeal. [FN9] To show that equitable relief would be improper, the government cites the Supreme Court's decision in United States v. Brockamp, 519 U.S. 347, 117 S.Ct. 849, 136 L.Ed.2d 818 (1997). Defendant points out that, in Brockamp, the Supreme Court held explicitly that "Section 6511's detail, its technical language, the iteration of the limitations in both procedural and substantive forms, and the explicit listing of exceptions, taken together, indicate to us that Congress did not intend courts to read other unmentioned, open-ended, 'equitable' exceptions into the statute that it wrote." Def.'s Mot. at 12 (quoting Brockamp, 519 U.S. at 352, 117 S.Ct. 849).

Defendant is undoubtedly correct that the applicable precedents bar equitable tolling of the statute of limitations set forth in IRC § 6511. The Supreme Court has stated clearly that no such tolling is permitted. Brockamp, 519 U.S. at 348, 117 S.Ct. 849 ("Can courts toll, for nonstatutory equitable reasons, the statutory time … limitations for filing tax refund claims set forth in § 6511 of the Internal Revenue Code of 1986? We hold that they cannot."). Further, this court and others have held repeatedly that, under the reasoning of Brockamp, § 6511(a)'s filing deadline may not be equitably tolled. [FN10] See Wadlington v. United States, 68 Fed.Cl. 145 (2005); Sullivan v. United States, 46 Fed.Cl. 480 (2000) (holding that Brockamp's bar on equitable tolling of § 6511's filing deadline blocked an untimely refund claim filed by a plaintiff in response to the Veterans Administration's award of non-taxable disability benefits retroactive to eight years before its decision); Brummett v. United States, 218 F.Supp.2d 1253, 1258-59 (D.Or.2002) (holding that, under Brockamp, no equitable tolling of the filing deadline set forth in § 6511 was permitted in a case in which a plaintiff had been awarded retroactive workers' compensation benefits by the DOL); see also John Doe 1 and John Doe 2 v. KPMG, LLP, 398 F.3d 686, 689 (5th Cir.2005). In light of these decisions, it is clear that no equitable extension of § 6511(a)'s deadline in Ms. Minehan's favor is permitted. Plaintiff's income tax refund claim is time-barred, and the court cannot, in equity, excuse that fact. [FN11]

*9   Furthermore, the sound public policy



considerations which underlie the federal taxation system reinforce the appropriateness of the statute of limitations which applies here. As this court explained in Sullivan, a contrary interpretation of the Code's timeliness deadlines would allow "taxpayers who disagree with and appeal" administrative decisions related to disability or other payments to "avoid payment of taxes while waiting for an adjustment of their [status], creating a deferral neither intended nor provided by Congress in the tax code." Sullivan, 46 Fed.Cl. at 488; see also Rothensies v. Elec. Storage Battery Co., 329 U.S. 296, 301, 67 S.Ct. 271, 91 L.Ed. 296 (1946) (stating that "a statute of limitation is an almost indispensable element of fairness as well as of practical administration of an income tax policy"); Computervision, 445 F.3d at 1363 ("The requirement for filing a proper refund claim is designed both to prevent surprise and to give adequate notice to the Service of the nature of the claim and the specific facts upon which it is predicated, thereby permitting an administrative investigation and determination."). Here, there is no question that Ms. Minehan failed to file her tax refund claim in a manner compliant with the terms of the IRC. For that reason, plaintiff's claim must be dismissed.

C. Alternate Bases for Jurisdiction

Ms. Minehan's recent filings acknowledge the government's position that her income tax refund claim is time-barred under 26 U.S.C. § 6511(a) and the Supreme Court's holding in Brockamp. Plaintiff has presented several alternative claims and arguments in an effort to show that jurisdiction in the Court of Federal Claims is appropriate, in the event that her refund claim is dismissed.

1. Tort Claim

[4] Plaintiff first hopes to pursue a claim for money damages under the Tucker Act. Ms. Minehan points out, correctly, that the Tucker Act creates jurisdiction in the Court of Federal Claims for actions against the United States which are based on "any regulation of an executive department." Pl.'s Resp. to Def.'s Resp. to Pl.'s Mot. to Request a Statutory Waiver of Sovereign Immunity (Pl.'s Reply) at 1 (quoting 28 U.S.C. § 1491(a)). Plaintiff contends that, here, she is entitled to recover based on a regulation promulgated by the IRS, which is a

branch of the Department of the Treasury, and that the Treasury is an "Executive Department of the United States Government." Pl.'s Reply at 1-2. In making that argument, plaintiff points to IRS Publication 17, Your Federal Income Tax for Individuals, which she claims "has been extracted from the Internal Revenue Code via IRS interpretation; therefore, it is regulatory." Id. at 2. Plaintiff relies, specifically, on the Publication's inside cover, which states as follows:

This publication covers some subjects on which a court may have made a decision more favorable to taxpayers than the interpretation by the IRS. Until these differing interpretations are resolved by higher court decisions or in some other way, this publication will continue to present the interpretation by the IRS.

*10 Pl.'s Reply at 3 (quoting IRS Publication 17).

Plaintiff recognizes that, in addition to relying on one of the Tucker Act's bases for jurisdiction, she must establish that her claim is one for money. To that end, Ms. Minehan argues that the IRS violated the policy embodied in Publication 17 when it failed to include information regarding protective claims in its literature for taxpayers, and that she is entitled to damages as a result of that violation. Plaintiff contends that the issue disputed here (that being the validity of protective claims) has, in fact, been resolved by the highest court in the United States. In support, plaintiff cites the Supreme Court's decision in United States v. Kales, 314 U.S. 186, 195, 62 S.Ct. 214, 86 L.Ed. 132 (1941), in which the Court recognized the validity of informal refund claims. Pl.'s Reply at 3-4. Ms. Minehan argues that "the IRS was unfair and lacking in integrity when it failed to consider the Kales Court decision which was monetarily favorable to the taxpayers; rather, the IRS decided to maintain its own interpretation which was monetarily favorable to the Federal government." Id. at 5 (emphasis in original). It appears that, through these allegations, plaintiff hopes to pursue a claim of fraud or bad faith against the government.

The court is not unsympathetic to plaintiff's belief that she is entitled to compensation for the difficulties she has encountered in dealing with the IRS. However, it is beyond dispute that the Court of Federal Claims has no jurisdiction over claims which lie in tort. [FN12] 28 U.S.C. § 1491(a)(1); Cottrell v. United States, 42 Fed.Cl. 144, 149

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



(1998) (stating that "[t]he Court of Federal Claims lacks jurisdiction over any and every kind of tort claim"); see also Berdick v. United States, 222 Ct.Cl. 94, 612 F.2d 533, 536 (1979); McCauley v. United States, 38 Fed.Cl. 250, 265 (1997) (holding that the court has no jurisdiction over claims for negligent or other wrongful conduct, or for breach of duty). Indeed, the Tucker Act itself explicitly limits its jurisdiction to those claims "not sounding in tort." 28 U.S.C. § 1491(a)(1). Thus, this court is without authority to consider a request for such damages. See and compare Brown v. United States, 105 F.3d 621, 622-23 (Fed.Cir.1997). This is true despite the fact that the amended complaint is somewhat ambiguous regarding Ms. Minehan's intent to pursue a tort claim. The law is clear that, even when a plaintiff characterizes a claim in terms which may fall outside the strict confines of tort law, the claim should be dismissed if it is, in essence, tort-based. See Brown, 105 F.3d at 623. In addition, the law is clear that allegations regarding bad faith or fraudulent actions by government officials or agencies do sound in tort. See Franklin Savings Corp. v. United States, 56 Fed.Cl. 720, 731 (2003) (stating that "to the extent that Franklin alleges the appointment of the conservator was made in bad faith, those claims were ones sounding in tort over which this court has no jurisdiction"); Richards v. United States, 20 Cl.Ct. 753, 758 (1990) (stating that "plaintiff's Complaint suggests that the District Court and other government employees acted fraudulently and in bad faith in their dealings with him ... such claims sound in tort and as such also are clearly outside the jurisdiction of the United States Claims Court").

**\*11** Further, previous opinions from this court make it clear that a plaintiff may not rescue an untimely refund request simply by recharacterizing it as a tort claim. In fact, this is not the first instance in which the Court of Federal Claims has encountered artful pleading by a claimant in an attempt to avoid the statute of limitations set forth in 26 U.S.C. § 6511(a). In Sullivan, two plaintiffs argued that an untimely refund claim, which came about as a result of a retroactive benefits award by the Department of Veterans Affairs, was not actually a refund claim, but instead a claim intended to "'fully effectuate' the administrative grant of increased disability compensation" from the agency. 46 Fed.Cl. at 486. The plaintiffs alleged that their lawsuit sought "to acquire the full benefit of the

entitlement awarded under Title 38 of the United States Code to plaintiff ... by the Department of Veterans Affairs," or "to claim full effectuation of pecuniary benefits." Id. at 486 (internal quotations omitted). The court rejected those contentions, explaining that the plaintiffs' attempt to characterize their claims as other than a tax refund suit did not permit them to "evade the effect of the clear and applicable statute of limitations contained in 26 U.S.C.A. § 6511(a)." Id. Under the persuasive reasoning of Sullivan, it is clear that despite Ms. Minehan's attempt to create a tort or damages claim based on the facts presented here, she has essentially reasserted an untimely refund request. Artful pleading will not permit Ms. Minehan to avoid the statute of limitations set forth in the Code. For these reasons, this court lacks subject matter jurisdiction to consider plaintiff's damages claim, and the claim must be dismissed.

### 2. Contract Claim

Plaintiff also argues that she may pursue a claim for money based on a quasi-contract between the United States and America's taxpayers. In support of that contention, Ms. Minehan relies on the IRS' mission statement to "[p]rovide America's taxpayers top quality service by helping them understand and meet their tax responsibilities and by applying the tax law with integrity and fairness to all." Pl.'s Reply at 4. Plaintiff asks the court to infer a contractual relationship between herself and the government as a result of that language, and to rely on that relationship as a means to remedy a situation in which the United States will be unjustly enriched if not required to compensate her. Id. at 5.

**[5][6][7]** It is well-settled that a quasi-contract, or a contract implied-in-fact, is one which is "founded upon a meeting of minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding." Lewis v. United States, 70 F.3d 597, 600 (Fed.Cir.1995) (quoting Baltimore & Ohio R.R. Co. v. United States, 261 U.S. 592, 597, 58 Ct.Cl. 709, 43 S.Ct. 425, 67 L.Ed. 816 (1923)). As with express contracts, an implied-in-fact contract typically requires (1) mutuality of intent to contract; (2) consideration; and (3) a lack of ambiguity in offer and acceptance. Id.; City of El Centro v. United States, 922 F.2d 816, 820 (Fed.Cir.1990),



cert. denied, 501 U.S. 1230, 111 S.Ct. 2851, 115 L.Ed.2d 1019 (1991). In addition, when the United States is a party to an alleged contract implied-in-fact, the government representative "whose conduct is relied upon must have actual authority to bind the government in contract." Id. (quoting City of El Centro, 922 F.2d at 820); see Baker v. United States, 50 Fed.Cl. 483, 489 (2001).

*12 [8] Here, in the court's view, plaintiff's allegations regarding a quasi-contract with the government are insufficient even to survive a motion to dismiss. It is clear that Ms. Minehan has failed to allege adequate facts regarding the first and third elements of a contract implied-in-fact. The language on which plaintiff relies, which is found in a widely distributed IRS publication, does not evince a clear intent to contract on the part of the federal government, nor is it unambiguous in its purported character as an offer to create a contractual relationship. See Lewis, 70 F.3d at 600. To the contrary, the IRS's mission statement is aspirational, and it makes no specific promise or offer which could be deemed the basis for a contract. That fact is critical, as there is no question that a mere expression of intention does not constitute an offer which is sufficient to create a contractual relationship. See Fed. Group, Inc. v. United States, 67 Fed.Cl. 87, 104 (2005); Estate of Bogley v. United States, 206 Ct.Cl. 695, 514 F.2d 1027, 1032 (1975) (both stating that "[a]n expression of intention is not an offer"); see also Cutler-Hammer, Inc. v. United States, 194 Ct.Cl. 788, 441 F.2d 1179, 1182 (1971) (stating that "[i]n general, the obligation of the Government, if it is to be held liable, must be stated in the form of an undertaking, not as a mere prediction or statement of opinion or intention"). In other words, "[a] gratuitous and unsolicited statement of policy or intention which receives the concurrence of the party to whom it is addressed, does not constitute a contract." Bogley, 514 F.2d at 1033 (quoting Beverage Distribs., Inc. v. Olympia Brewing Co., 440 F.2d 21, 29 (9th Cir.), cert. denied, 403 U.S. 906, 91 S.Ct. 2209, 29 L.Ed.2d 682 (1971)); see also Baker, 50 Fed.Cl. at 493 (explaining that "where a plaintiff claims a contractual obligation on the part of the Government stemming solely from a statute or regulation, the requirements of mutuality of intent to contract and lack of ambiguity require that the statute or regulation make an explicit promise--sufficient to justify another person in understanding that his

assent to that bargain will conclude it and sufficient for the courts to determine the existence of a breach and give an appropriate remedy").

The insufficiency of Ms. Minehan's allegations in this regard is obvious when the facts as alleged are viewed in light of Barseback Kraft AB v. United States, 121 F.3d 1475, 1481 (Fed.Cir.1997). In that case, the Federal Circuit examined two phrases: "DOE intends to serve as a reliable long-term supplier of uranium enrichment services at predictable prices while providing the most competitive prices possible through technological innovation" and "DOE desires to operate the enrichment complex on a sound business basis without Government subsidy." Id. Addressing an argument that the government was bound by those statements, the court held that the statements did not create legal obligations because "facially these clauses express only desires, not binding commitments." Id.; see also Federal Group, 67 Fed.Cl. at 104. Here, as in Barseback, Ms. Minehan bases her contract claim on a general statement of intent only. While the cited language expresses a desire by the IRS to treat taxpayers with fairness and efficiency, it does not evoke a binding commitment on the part of the government. Plaintiff's attempt to base a quasi-contract claim on that language undoubtedly fails.

*13 Further, it is significant to note that this court has already considered and rejected a similar contention that language contained in an IRS publication could be sufficient to create a quasi-contract. In Girling Health Systems, Inc. v. United States, 22 Cl.Ct. 66 (1990), a plaintiff corporation filed a breach of contract suit based on language in an IRS Form. The form, which addressed the manner in which companies could file elections to change their tax status, stated that

IRS will notify you if your election is accepted and when it will take effect. You should generally receive determination on your election within 60 days after you have filed Form 2553.... If you are not notified of acceptance or non-acceptance of your election within 3 months of the date of filing (date mailed), you should take follow-up action by corresponding with the service center where the election was filed.

22 Cl.Ct. at 68. The plaintiff, Girling Health, argued that this language had created a contract between itself and the IRS, wherein the agency had

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Westlaw.

promised to notify the company of the acceptance or rejection of its election within sixty days of filing. Id. at 69. The company claimed further that it had accepted the government's offer, by submitting an application to change its election, and that the government had breached the contract by failing to notify Girling Health of its status until more than a year later. The plaintiff claimed that this breach had prevented it from timely altering its tax status, which led to increased tax liability. The company requested money damages as compensation for the breach.

The court rejected Girling's Health's theory of recovery. Examining the specific language at issue, the court agreed with the government that the use of the word "generally" in the phrase "[y]ou should generally receive determination on your election within 60 days" rendered the phrase too nonspecific to create a contractual relationship. Id. at 69-70. Further, the instruction to the applicant to follow up with the IRS if no notification was received was additional evidence that the IRS had made no specific promise regarding the timing of its response. Id. at 70. The court held that "the statement upon which plaintiff relies is not a definite promise and thus, as a matter of law, there is no mutual assent." Id. In addition, the court noted that the plaintiff had made no allegations regarding any personal interaction with an IRS official which could form the basis for a contractual relationship. Id.

When a comparison is drawn between the facts in Girling Health and those presented here, it is clear that the court cannot infer a contractual relationship from the wording of the IRS' mission statement. Id. Indeed, the language cited is even more ambiguous than that reviewed in Girling Health, because here, the government has not promised to perform any specific act, but instead, has only stated a general policy goal. In the court's view, there is no question that this statement, which is set forth in a general publication and which calls for no specific response by a plaintiff taxpayer, does not demonstrate a clear intent to contract on the part of the government. [FN13] Because no mutual assent has been established, the language of the IRS' mission statement cannot serve as the basis for a finding that plaintiff entered into a quasi-contract with the government. And, as in Girling Health, plaintiff has alleged no interaction with a government employee from which an intent to contract may be inferred.

See id. at 70. For all of these reasons, Ms. Minehan's quasi-contract claim fails, and it must be dismissed.

3. Statutory Waiver of Sovereign Immunity

*14 [9] Finally, plaintiff asks the court to grant to her a "Statutory Waiver of Sovereign Immunity," which she contends will provide her with "consent to sue the United States." See Pl.'s Mot. to Request a Statutory Waiver of Sovereign Immunity at 6. Plaintiff has filed a similar request with the IRS' Office of Chief Counsel. See Pl.'s Mot. for Leave to File an Out of Time Status Report at 3. Ms. Minehan states that "[p]laintiff recognizes that until a Statutory Waiver of Sovereign Immunity is obtained, the merits of her case cannot be accepted by the Court." Id. In response to this request, the United States argues that the Court of Federal Claims cannot grant a statutory waiver of sovereign immunity, as that power lies solely with the United States Congress. Def.'s Resp. to Pl.'s Mot. to Request a Statutory Waiver of Sovereign Immunity at 3 (citing United States v. Mitchell, 445 U.S. 535, 538, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980); 14 Charles Alan Wright, et al., Federal Practice and Procedure § 3654 (3d ed.1998)).

Defendant is undoubtedly correct that this court is not permitted to grant a waiver of sovereign immunity to plaintiff so that she may pursue a claim in this court. It is black letter law that, "[u]nder the doctrine of sovereign immunity the United States is immune from suit, unless it consents to be sued." Confidential Informant v. United States, 46 Fed.Cl. 1, 4 (2000) (citing Mitchell, 445 U.S. at 538, 100 S.Ct. 1349; United States v. Sherwood, 312 U.S. 584, 586, 61 S.Ct. 767, 85 L.Ed. 1058 (1941)). Further, there is no question that the power to grant such consent lies solely with the United States Congress, and that a "waiver of traditional sovereign immunity 'cannot be implied but must be unequivocally expressed.' " Sullivan, 46 Fed.Cl. at 485 (quoting Saraco v. United States, 61 F.3d 863, 864 (Fed.Cir.1995)); see also United States v. Testan, 424 U.S. 392, 399, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976) (quoting United States v. King, 395 U.S. 1, 4, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969)). Accordingly, Ms. Minehan's motion to request such a waiver must be denied.

The court appreciates the difficulty Ms. Minehan

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



has encountered in pursuing this case, especially given her pro se status. Unfortunately, however, that difficulty does not blunt the impact of this court's jurisdictional restrictions. Plaintiff's tax refund claim is clearly time-barred. Further, under the Tucker Act, the Court of Federal Claims may not entertain Ms. Minehan's tort or contract claims against the United States. Nor may this court grant a waiver of sovereign immunity to plaintiff so that she may pursue those claims.

According to her most recent filings, Ms. Minehan has contacted her Congressional Representative to request a statutory waiver of sovereign immunity from the United States Congress. Plaintiff does, of course, retain the ability to pursue this matter with her representatives in the federal legislature, and that avenue may ultimately provide her with relief. In this court, however, there is no question that Ms. Minehan's claims must be dismissed. Defendant's motion is therefore granted.

## CONCLUSION

*15 For the foregoing reasons, is it hereby ORDERED that
(1) Defendant's Motion of the United States to Dismiss the Complaint and Request for Oral Argument, filed April 3, 2006, is GRANTED, in part, with respect to the motion to dismiss and DENIED, in part as moot, with respect to the request for oral argument;
(2) Plaintiff's Motion To Request a Statutory Waiver of Sovereign Immunity, filed October 30, 2006, is DENIED;
(3) The Clerk's Office is directed to ENTER judgment in favor of the defendant DISMISSING this matter without prejudice; and
(4) Each party shall bear its own costs.

FN1. Plaintiff filed the return jointly with her husband, Charles Minehan.

FN2. Protective claims are used by taxpayers to avoid the statute of limitations bar by informing the IRS of future contingencies which may alter their tax liability, for example, if a taxpayer hopes to ultimately be awarded tax-exempt benefits in lieu of a taxable pension. See Sullivan v. United States, 46 Fed.Cl. 480, 490 n. 13 (2000); see also United States v. Kales, 314 U.S. 186, 195-96, 62 S.Ct. 214, 86 L.Ed. 132 (1941). Protective claims, in

other words, are used to "assert potential future rights associated with tax refunds." Sullivan, 46 Fed.Cl. at 491 (explaining that the plaintiffs "could have announced their intention to claim a greater exemption in the future, transforming the joint returns also into protective assertions of present rights, should the amounts of the forward-looking claim become a reality").

FN3. The Form 1040X also reported a credit in the amount of $824, but nothing in the record explains the basis for this newly claimed credit.

FN4. Plaintiff's attempt to secure counsel was ultimately unsuccessful, and she continues to pursue this lawsuit pro se.

FN5. In response to the United States' motion to dismiss her claims, Ms. Minehan filed a Motion to Request a Statutory Waiver of Sovereign Immunity. Although this motion was not technically designated as a response to defendant's motion, it includes detailed arguments in opposition to defendant's request. The court construes plaintiff's pro se pleading liberally and deems it a response to the government's motion. See and compare Ebert v. United States, 66 Fed.Cl. 287, 289 (2005) (treating a submission by pro se litigant in an income tax refund case as a cross-motion for summary judgment).

FN6. 26 U.S.C. § 6511(a) states as follows: § 6511. Limitations on credit or refund (a) Period of limitation on filing claim.--Claim for credit or refund of an overpayment of any tax imposed by this title in respect of which tax the taxpayer is required to file a return shall be filed by the taxpayer within 3 years from the time the return was filed or 2 years from the time the tax was paid, whichever of such periods expires the later, or if no return was filed by the taxpayer, within 2 years from the time the tax was paid. 26 U.S.C. § 6511(a) (2000).

FN7. Plaintiff's income tax refund claim must also be dismissed in light of 26 U.S.C. § 6511(b)(2)(A), a section of the IRC which "imposes a ceiling on the amount of credit or refund to which a taxpayer is entitled as compensation for an overpayment of tax." Baral v. United States, 528 U.S. 431, 432, 120 S.Ct. 1006, 145 L.Ed.2d 949 (2000); see also Commissioner v. Lundy, 516 U.S. 235, 240, 116



S.Ct. 647, 133 L.Ed.2d 611 (1996) (explaining that § 6511 contains two separate timeliness provisions: (1) § 6511(b)(1)'s filing deadline and (2) § 6511(b)(2)' s "look-back" periods); Wertz v. United States, 51 Fed.Cl. 443, 446 (2002). Section 6511(b)(2)(A) provides that, even in situations in which a refund claim is timely, because it was filed within three years of the initial return, "the amount of the credit or refund shall not exceed the portion of the tax paid within the period, immediately preceding the filing of the claim, equal to 3 years plus the period of any extension of time for filing the return." 26 U.S.C. § 6511(b)(2)(A) (2000). In other words, the statute "imposes limitations on the extent to which a taxpayer may look back in time and recover taxes paid in a prior taxable period." Wertz, 51 Fed.Cl. at 446. It mandates, specifically, that a claimant may only recoup taxes which were payed during the three calendar years (plus any extension of time) which immediately preceded his or her refund claim. Here, Ms. Minehan's claim was filed on July 14, 2003, and so, even if that claim were timely, plaintiff would only be able to recover taxes which were paid between July 14, 2000 and July 14, 2003. Ms. Minehan's 1998 taxes were deemed to have been paid, however, on April 15, 1999, which is clearly outside the window for recovery on her claim. See and compare Wertz, 51 Fed.Cl. at 447. Plaintiff has not alleged, nor is there any record of, an extension which would have extended that window of time. Because Ms. Minehan hopes to recoup funds which were paid outside the period of time for which recovery is allowable under the IRC, her refund claim undoubtedly fails.

FN8. The statute allows, for example, special limitations periods for bad debts and worthless securities, net operating losses and capital loss carrybacks, foreign tax credits, credit carrybacks, some self-employment taxes, and income recaptured under qualified plan terminations. See 26 U.S.C. § 6511(d)(1-7) (2000). Section 6511 also permits tolling of the statute of limitation in situations in which taxpayers are unable to manage their finances due to disability. Id. § 6511(h).

FN9. The United States argues that, although plaintiff has characterized her argument in this regard as a claim for money damages, it is essentially an additional request that the court equitably bar the government from relying on §

6511's limitations provisions. See Def.'s Mot. at

FN10. In United States v. Brockamp, the Supreme Court held that IRC § 6511 was not subject to equitable tolling. 519 U.S. 347, 348-49, 117 S.Ct. 849, 136 L.Ed.2d 818 (1997). In response to that decision, Congress amended the law, to permit tolling in some circumstances. John Doe 1 and John Doe 2 v. KPMG, LLP, 398 F.3d 686, 689 (5th Cir.2005). That amendment, however, reinforces rather than undermines the holding of Brockamp. As the United States Court of Appeals for the Fifth Circuit recently explained, Congress's decision to specify further exceptions to the statute of limitations--without adding a general equitable tolling provision--further justifies the Supreme Court's reading of the statute in Brockamp. Because Congress prefers to provide explicit tolling exceptions to the limitations periods contained in federal tax law, by implication, it does not intend courts to invoke equitable tolling to alter the plain text of the statutes at issue. John Doe 1 and John Doe 2, 398 F.3d at 689.

FN11. The government has presented extensive arguments to show that, even if equitable estoppel were permitted in tax refund cases, an equitable extension would not be appropriate on the facts of this particular case. See Def.'s Mot. at 14 et seq. Because the law is clear that no equitable estoppel is permitted under any circumstances, an extensive examination of those alternative arguments is not necessary. See and compare RHI Holdings, Inc. v. United States, 142 F.3d 1459, 1463 (Fed.Cir.1998) (stating that "since there clearly is no equitable exception in the statute, it is not necessary to decide if equitable estoppel would be enforced against the United States if an equitable exception were found in a tax refund statute of limitations"). Defendant is correct to point out, however, that "[a] party seeking to assert equitable estoppel against the government bears an extraordinarily high burden and must, at a minimum, show 'affirmative misconduct.' " Wertz v. United States, 51 Fed.Cl. 443, 450 (2002) (quoting Henry v. United States, 870 F.2d 634, 637 (Fed.Cir.1989)). Plaintiff has alleged no such affirmative misconduct on the part of the IRS or its employees. To be sure, the government's allegedly dilatory processing of Ms. Minehan's workers' compensation claim and its purported failure to advise taxpayers of the intricacies of federal income tax laws do not rise to

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



2007 WL 489224                                                                  **Page 134**
**(Cite as: 2007 WL 489224, \*15 (Fed.Cl.))**

the level of affirmative misconduct. See id. (citing Mukherjee v. I.N.S., 793 F.2d 1006, 1009 (9th Cir.1986) (in turn holding that a false statement did not constitute affirmative misconduct absent a showing of a "deliberate lie ... or a pattern of false promises")).

FN12. In addition, there is no evidence that IRS Publication 17 is indeed a regulation which creates a private cause of action for money.

FN13. It is also worth noting that, as with her putative tort claim, this contract claim is essentially an untimely tax refund claim. See Girling Health Sys., Inc. v. United States, 22 Cl.Ct. 66, 72 (1990) (citing Diebold, Inc. v. United States, 891 F.2d 1579 (Fed.Cir.1989), cert denied, 498 U.S. 823, 111 S.Ct. 73, 112 L.Ed.2d 47 (1990)) ("Basically, plaintiff's damages claim is shaped by the tax benefits to which it claims entitlement. The claim is for the amount of money plaintiff had to or would have to pay as a result of the IRS' failure to consent to a change in accounting method. This type of claim has been treated as a tax refund suit.").

2007 WL 489224 (Fed.Cl.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



TAB 5

Not Reported in A.2d
(Cite as: 2005 WL 3981740 (Del.Super.))

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Superior Court of Delaware,
Sussex County.

**SPANISH TILES, LTD. Terra Tile & Marble,
Steel Buildings, Inc. d/b/a Northern
Steel Buildings, Inc.
v.
Kurt HENSEY, Ken Hensey, et al.**

**C.A. No. 05C-07-025 RFS.**

Submitted: Dec. 1, 2005.
Decided: March 30, 2005.

Dear Counsel:

RICHARD F. STOKES, J.

**\*1** This is the Court's decision as to Defendants'
Motion to Dismiss and Motion for a More Definite
Statement. Defendant's motions are denied.

BACKGROUND

This case arises out of a dispute between Joss
Hudson, the owner of Plaintiff Steel Buildings, Inc.
d/b/a Northern Steel Buildings, Inc. ("NSB") and
defendants Kurt and Ken Hensey ("the Henseys").
According to Plaintiff, Hudson became an equal
partner with the Henseys in an entity known as
Northern Steel Commercial Systems, Inc.
("NSCS"), which was formed to sell and deliver
commercial warehouses on behalf of NSB.

NSB entered into a contract with Plaintiff Spanish
Tiles, Ltd. d/b/a Terra Tile and Marble ("Terra
Tiles") for the manufacture and delivery of a steel
warehouse. NSCS was the entity which handled this
contract. In March, 2004, Mr. Hudson and the
Henseys had a disagreement and Mr. Hudson was
removed as a partner in NSCS. As a result, NSCS
was to be wound down pursuant to Delaware law
and was no longer the entity overseeing NSB. As
NSCS was dissolved the clients of the entity were
divided between NSB and the Henseys. The Henseys
were to assume the Terra Tile contract. Terra Tile
was apparently never notified and still believed that

NSB was fulfilling its contract. Notwithstanding the
fact that NSB was no longer involved, Defendants
accepted the sum of $72,793.75 from Terra Tile as a
deposit for a steel warehouse. The building was to
be delivered in March of 2005. Defendants neither
supplied a warehouse, nor returned the money.
These are the basic facts and allegations which
underlie the complaint.

Stemming from them, Plaintiffs allege a host of
issues, including breach of contract, tortious
interference with contracts and prospective
contracts, violation of the Deceptive Trade Practices
Act, common law fraud, unlawful practice and
defamation.

STANDARD OF REVIEW

The Court must assume all well-pleaded facts or
allegations in the complaint as true when evaluating
a Motion to Dismiss under Rule 12(b)(6). [FN1]
The Court will not dismiss a claim unless the
Plaintiff would not be entitled to recover under any
circumstances that are susceptible to proof. [FN2]
The complaint must be without merit as a matter of
fact or law to be dismissed. [FN3] The Plaintiff or
complainant will have every reasonable factual
inference drawn in his favor. [FN4] "Dismissal is
warranted where the plaintiff has failed to plead
facts supporting an element of the claim, or that
under no reasonable interpretation of the facts
alleged could the complaint state a claim for which
relief might be granted." [FN5] "Where allegations
are merely conclusory, however (i.e., without
specific allegations of fact to support them) they
may be deemed insufficient to withstand a motion to
dismiss." [FN6]

FN1. RSS Acquisition, Inc. v. Dart Group Corp.,
1999 WL 1442009, * 2 (Del.Super.).

FN2. Id.

FN3. Id.

FN4. Ramunno v. Cawley, 705 A.2d 1029, 1036
(Del.1998).

FN5. Hedenberg v. Raber, 2004 WL 2191164, *1
(Del.Super.) citing Evans v. Perillo, 2000
Del.Super. Lexis 243, at *5-6.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in A.2d

(Cite as: 2005 WL 3981740, *1 (Del.Super.))

Page  4

FN6. Lord v. Souder, 748 A.2d 393, 398 (Del.2000) citing In re Tri-Star Pictures, Inc Litig., 634 a.2d 319, 326 (Del.1993).

Alternatively, Rule 12(e) states that:

If a pleading to which a responsive pleading is permitted is so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading, the party may move for a more definite statement before interposing a responsive pleading. The motion shall point out the defects complained of and the details desired.

*2 "If the complaint is found to be vague or ambiguous, the Plaintiff will be required to correct any defects with a more definite statement." [FN7]

FN7. Crowhorn v. Nationwide Mut. Ins. Co., 2001 WL 695542, *2 (Del.Super.).

DISCUSSION

Defendants have submitted a Motion for a More Definite Statement and Motion to Dismiss, asking this Court to dismiss all claims against the Hensey brothers as well as all counts stated in the complaint, due to failure to state a claim upon which relief can be granted. Alternatively, Defendants ask for an order from this Court directing Plaintiffs to submit a more definite statement for all counts.

Our Supreme Court has stated that "Rule 8 of the Superior Court Rules and the Federal Rules of Civil Procedure set forth the characteristics of good pleading. The intent and effect of this rule is to permit a claim to be stated in general terms and to discourage battles over the mere form of statement. United States v. Iroquois Apartments, Inc., D.C., 21 F.R.D. 151; Nagler v. Admiral Corp., 2 Cir., 248 F.2d 319. To the pleadings is normally assigned the task of general notice-giving. The task of narrowing and clarifying the basic issues and ascertaining the facts relative to other issues is the role of the deposition discovery process. Stitt v. Lyon, 9 Terry 365, 103 A.2d 332; Wiener v. Markel, 8 Terry 449, 92 A.2d 706. See, too, Clark, Special Pleading in the 'Big Case', 21 F.R.D. 45-54.

In Buchanan Service, Inc., v. Crew, 11 Terry 22, 122 A.2d 914, 917, this Court stated: As was stated in Pfeifer v. Johnson Motor Lines, Inc., 8 Terry 191, 89 A.2d 154, the discovery devices are designed to fulfill the function of issue formulation

as well as the function of fact revelation. Since pleading has been streamlined and restricted to the limited scope of notice-giving, the function of formulating and clarifying the issues has passed from the pleadings to the discovery devices and the pre-trial conference. There being nothing in the Rules to indicate otherwise, legal issues and the contentions of the parties as to what the facts are, as well as the facts themselves, are open to discovery." Delaware Valley Drug Co. v. Kline, 144 A.2d 403 (Del.1958).

The Supreme Court has further noted that "[a]n allegation, though vague or lacking in detail, is nevertheless "well-pleaded" if it puts the opposing party on notice of the claim being brought against it. Diamond State Tel. Co. v. University of Del., Del.Supr., 269 A.2d 52, 58 (1970)." Precision Air Inc. v. Standard Chlorine of Del. Inc., 654 A.2d 403 (Del.1995). In addition to the rulings of the Supreme Court, this Court noted in a case on a similar motion asking for more evidentiary facts, that "if the complaint contained these facts it would no longer be a 'short and plain statement of the claim' as is required by Rule 8(a). It would become prolix with allegations of evidence. The plaintiff will not be required to plead evidentiary facts and the defendant must exercise his rights under the discovery Rules in order to ascertain such of these facts as he may be entitled to obtain from the plaintiff." Bullock v. Maag, 94 A.2d 413 (Del.Super.Ct.1952.).

*3 In light of these rulings each of the counts alleged in the complaint will be discussed in turn, and reviewed according to the standard of review previously explained.

Count I--Breach of Contract

Our Supreme Court has ruled that there are three elements in a breach of contract case: the existence of a contract, the breach of an obligation imposed by that contract, and resulting damages to the plaintiff. [FN8]

FN8. Gutridge v. Iffland, 889 A.2d 283 (Del.2005). Quoting VLIW Tech., LLC v. Hewlett-Packard Co., 840 A.2d 606, 612 (Del.2003.).

In this case, Plaintiffs have alleged that there was a contract, that the contract was assumed by one of the defendants and later breached, resulting in

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in A.2d
(Cite as: 2005 WL 3981740, *3 (Del.Super.))

Page 5

damages to Terra Tile. As such, Plaintiffs have met the minimal requirements for a well pleaded complaint. [FN9]

> FN9. Although not explicitly stated, Plaintiffs' claims would support an allegation of breach of implied contract on the theory that Kurt Hensey accepted $72,793.27 under such circumstances that make retention unjust. "A contract implied in law permits recovery of that amount by which the defendant has benefited at the expense of the plaintiff in order to preclude unjust enrichment. Barrett Builders v. Miller, 576 A.2d 455 (Conn.1990); see also Lawrence v. DiBiase, 2001 Del.Super. LEXIS 368 (Feb. 27, 2001 Del.Super.). To claim restitution, the plaintiff must show that the defendant was unjustly enriched and secured a benefit that it would be unconscionable to allow her to retain. Midcoast Aviation v. General Electric Credit Corp. 907 F.2d 732 (7th Cir.1990). The essential elements of a quasi-contract are a benefit conferred upon the defendant by the plaintiff, appreciation or realization of the benefit by the defendant, and acceptance and retention by the defendant of such benefit under such circumstances that it would be inequitable to retain it without paying the value thereof. 66 Am Jur 2d Restitution and Implied Contracts, Sec. 11 (2001) (citations omitted)." Powell v. Powell, 2006 WL 136500 (Del.Com.Pl.). "This cause of action was developed at common law as one of the counts general assumpsit. 66 Am Jur 2d Restitution and Implied Contracts, Sec. 169; see also Ramunno v. Persimmon Lane Apts., 1976 Del. C.P. LEXIS 11 (July 8, 1976). It is founded on the principle that one should not enrich himself at the expense of another." Id.

Specifically, the allegations state that Kurt Hensey, for himself and the other defendants, breached a contract by accepting a payment of $72,793.75 from Terra Tile for a steel building that was never delivered. Damages are alleged by reason of the breach.

For the forgoing reasons, Defendants' Motion is denied as to Count I of the Complaint.

**1. Count II--Tortious Interference with Contractual Relations**

Our Supreme Court has clearly iterated the standard for a cause of action for tortious interference with contractual relations. "In order to prove a cause of action for interference with contractual relations, the claimant must show: (1) a contract; (2) of which the defendant was aware; (3) an intentional act by the defendant that is a significant factor in causing the breach of the contract; (4) without justification; and (5) that act causes injury or results in injury. Aeroglobal Capital Mgmt. v. Cirrus Indus., 871 A.2d 428 (Del.2005)" Murphy v. Bishop, 2005 WL 991400 (Del.Com.Pl.).

As in Count I, Plaintiff has alleged the existence of a contract of which the defendants were aware, that one or more of the defendants, without justification, did accept payment from Terra Tile for a building that was not delivered, thereby breaching the contract and causing injury to Terra Tile. Defendants respond that Counts II and III of Plaintiff's complaint are inconsistent and should therefore be dismissed. However, Superior Court Civil Rule 8(2) clearly states that:

"A party may set forth two or more statements of a claim or defense alternately or hypothetically, either in one count or defense or in separate counts or defenses. When two or more statements are made in the alternative and one of them if made independently would be sufficient, the pleading is not made insufficient by the insufficiency of one or more of the alternative statements. The party may also state as many separate claims or defenses as the party has, regardless of consistency." (emphasis added).

For the foregoing reasons, Defendants' Motion is denied as to Count II of the Complaint.

**2. Count III--Tortious Interference with Prospective Contractual Relations**

In Count III of the Complaint, Plaintiffs allege tortious interference with contractual relations. "The elements of that tort are: (1) the existence of a valid business relation or expectancy, (2) the interferer's knowledge of the relationship or expectancy, (3) intentional interference that (4) induces or causes a breach or termination of the relationship or expectancy and that (5) causes resulting damages to the party whose relationship or expectancy is disrupted. CPM Indus., Inc. v. Fayda Chemicals & Minerals, Inc., Del. Ch., C.A. No. 15996, Jacobs, V.C. (Nov. 26, 1997), and cases cited therein." In re Frederick's of Hollywood, Inc., 1998 WL 398244 (Del.Ch.).



**\*4** In their Compliant, Plaintiffs allege that one or more of the defendants has been intentionally interfering in the relations of NSB with its clients and prospective clients. The Complaint alleges that as one or more of the defendants was formerly employed by NSB and is now a competitor, the business relations and expectancies are known to the defendants. It further alleges that one or more of the defendants are interfering in such way as to cause the termination of these relations and expectancies, and that this intereference has resulted in damages to NSB.

For the foregoing reasons, Defendants' Motion is denied as to Count III of the Complaint.

3. Count IV--Violation of the Deceptive Trade Practices Act

6 Delaware Code § 2531 lays out the elements of the Deceptive Trade Practices Act. It states:

"(a) A person engages in a deceptive trade practice when, in the course of a business, vocation, or occupation, that person:

(1) Passes off goods or services as those of another;

(2) Causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services;

(3) Causes likelihood of confusion or of misunderstanding as to affiliation, connection, or association with, or certification by, another;

(4) Uses deceptive representations or designations of geographic origin in connection with goods or services;

(5) Represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have, or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have;

(6) Represents that goods are original or new if they are deteriorated, altered, reconditioned, reclaimed, used, or secondhand;

(7) Represents that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;

(8) Disparages the goods, services, or business of another by false or misleading representation of fact;

(9) Advertises goods or services with intent not to sell them as advertised;

(10) Advertises goods or services with intent not to supply reasonably expectable public demand, unless the advertisement discloses a limitation of quantity;

(11) Makes false or misleading statements of fact concerning the reasons for, existence of, or amounts of, price reductions; or

(12) Engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.

(b) In order to prevail in an action under this chapter, a complainant need not prove competition between the parties or actual confusion or misunderstanding."

In this case, Plaintiffs make nine separate allegations concerning violations of the Deceptive Trade Practices act. Plaintiffs first allege that the defendants, in the course of their business, have assumed contracts, including but not limited to the Terra Tile contract by, passing off their goods and/ or services as those of NSCS and/or NSB. The facts alleged in the complaint, incorporated by reference by numbered paragraph 60, make out a prima facie for this charge under 6 Del. C. § 2532.

**\*5** As previously noted, the purpose of the pleadings it so put the defendant on notice as to the elements of the complaints against it. In this case, as the first of the nine allegations of violations of the Deceptive Trade Practices Act has met Plaintiffs' burden at the pleading stage, the other eight allegations need not be addressed at this time. Further review of these allegations can be made during the deposition and discovery process.

Considering the forgoing, Defendants' Motion is denied as to Count IV of the Complaint.

4. Count V--Unlawful Practice

6 Delaware Code § 2513 lays out the elements of an unlawful practice claim. It states in pertinent part that:

"(a) The act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale, lease or advertisement of any merchandise,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in A.2d
(Cite as: 2005 WL 3981740, *5 (Del.Super.))

whether or not any person has in fact been misled, deceived or damaged thereby, is an unlawful practice."

In this case, Plaintiffs allege that the defendants' have violated 6 Del. C. § 2513 in their actions pertaining to the sale and non-delivery of a steel building to Terra Tile, including the obtaining of a down payment on the building in March, as well as the promise to deliver the building made in January.

The facts alleged in the Complaint, incorporated by reference in numbered paragraph 64, make out the elements of a prima facie case for unlawful practice. Considering the foregoing, Defendants' Motion is denied as to Count V of the Complaint.

### 5. Count VI--Common Law Fraud

"In order to plead common law fraud in Delaware, plaintiffs must aver facts supporting the following elements: (1) the defendant made a false representation, usually one of fact; (2) the defendant had knowledge or belief that the representation was false, or made the representation with requisite indifference to the truth; (3) the defendant had the intent to induce the plaintiff to act or refrain from acting; (4) the plaintiff acted or did not act in justifiable reliance on the representation; and (5) the plaintiff suffered damages as a result of such reliance. Albert v. Alex Brown Management Services, Inc., 2005 WL 2130607, at *7 (Del. Ch.)." Unisuper Ltd. v. News Corp., 2005 WL 3529317 (Del.Ch.).

"Fraud claims are subject to the heightened pleading standards of Rule 9(b). This means that the pleading must identify the "time, place and contents of the false representations, the facts misrepresented, as well as the identity of the person making the misrepresentation and what he obtained thereby." York Linings v. Roach, 1999 Del. Ch. LEXIS 160, at *25 (Del. Ch. July 28, 1999). (internal quotations and citations omitted)." Albert v. Alex Brown Management Services, Inc., 2005 WL 2130607 (Del.Ch.).

In this case, Plaintiffs' Complaint lays out all the requisite facts of an action for fraud. Plaintiff allege that on or about May 28, 2004, Kurt Hensey, acting on behalf of NSCS and/or BQ misrepresented to Terra Tile that he would be supplying them with a

steel building as per the terms of their original contract with NSB. As a result of this misrepresentation, Kurt Hensey induced Terra Tile to send him $72,793.75 a deposit check made out to him personally as "Kurt Hensey of NSCS." Kurt Hensey then accepted this check. On January 10, 2005, Kurt Hensey then fraudulently induced the defendant Terra Tile to refrain from acting against him by promising a steel building would be delivered on or before March 20, 2005. No steel building was ever delivered and Plaintiffs Terra Tile suffered economic damages as a result of their justifiable reliance on Kurt Hensey's representation.

*6 Considering the foregoing, Defendants' Motion is denied as to Count VI of the Complaint.

### 6. Count VII--Defamation

"A plaintiff must plead five elements in a defamation action: 1) the defamatory character of the communication; 2) publication; 3) that the communication refers to the plaintiff; 4) the third party's understanding of the communication's defamatory character; and 5) injury." [FN10] Special damages are required for slander (oral defamation) to be actionable. [FN11] However, slander per se is actionable without proving special damages. [FN12] Slander per se is made up of four general categories of statements. [FN13] The four types of statements are ones that: 1) malign one in a trade, business, or profession; 2) impute a crime; 3)imply one has a loathsome disease; or 4) impute unchastity to a woman. [FN14] Libel (written defamation) does not require special damages. [FN15]

> FN10. Read v. Carpenter, 1995 WL 945544, *2 (Del.Super.).

> FN11. Id.

> FN12. Id.

> FN13. Id.

> FN14. Id.

> FN15. Spence v. Funk, 396 A.2d 967, 971 (Del.1978).

In this case, Plaintiffs allege that one or more of

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in A.2d

**(Cite as: 2005 WL 3981740, \*6 (Del.Super.))**

the defendants, made statements about Joss Hudson and NSB during their competition with NSB which has diminished the esteem, respect, goodwill and/or confidence in which NSB and Joss Hudson are held within the professional community. These statements were made to customers and suppliers as well as members of the community. Plaintiffs have successful pled all the elements of defamation.

Considering the foregoing, Defendants' Motion is denied as to Count VII of the Complaint.

### CONCLUSION

For the foregoing reasons, defendants' Motion to Dismiss and the Motion for a More Definitive Statement are denied in their entirety. Sufficient notice is provided by the pleadings and the details can be flushed out through discovery.

IT IS SO ORDERED.

2005 WL 3981740 (Del.Super.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



TAB 6

Not Reported in F.Supp.2d
(Cite as: 2006 WL 2092636 (D.D.C.))

Page 364

Only the Westlaw citation is currently available.

United States District Court,
District of Columbia.

Christopher YOUNGBLOOD, Plaintiff,
v.
VISTRONIX, INC., Defendant.

Civil Action No. 05-21(RCL).

July 27, 2006.

Frazer Walton, Jr., Law Office of F. Walton,
Steven W. Teppler, Washington, DC, for Plaintiff.

Daniel Paul Westman, Morrison & Foerster,
L.L.P., McLean, VA, Christine N. Kearns,
Pillsbury Winthrop Shaw Pittman LLP,
Washington, DC, for Defendant.

MEMORANDUM OPINION

ROYCE C. LAMBERTH, District Judge.

*1 This matter comes before the Court on
defendant's Motion [26] for Partial Summary
Judgment. Having considered the motion, the
plaintiff's opposition, and the defendant's reply, the
Court will grant the defendant summary judgment
with regard to plaintiff's breach-of-contract claim,
and partial summary judgment with regard to
plaintiff's Fair Labor Standards Act claim. The
court will also grant the defendant summary
judgment with regard to plaintiff's slander claim. A
separate order will follow this opinion.

BACKGROUND

Defendant, Vistronix, Inc., employed plaintiff,
Christopher Youngblood, in the course of fulfilling
a contract with the Federal Communications
Commission ("FCC"). Vistronix terminated
Youngblood on February 26, 2004, after he was
implicated in the removal of data from a computer
belonging to the FCC.

Wytonia Abernathy, a former Vistronix employee
who also worked on the FCC contract, previously
used the computer in question and requested that
Youngblood copy her personal data from the
machine so that she could take it with her. On

January 6, 2004, after Abernathy left the building
for the final time, Youngblood--along with
coworkers Lauren Santiago and Luis Nino--accessed
Abernathy's computer and copied two folders
containing Abernathy's personal materials.
Youngblood alleges that the only activity he
performed was the copying of this data, but several
weeks later, the computer was found to have been
re-imaged, [FN1] its prior contents destroyed. The
FCC began an investigation to determine who may
have so tampered with Abernathy's machine, but
Vistronix alleges that the circumstantial evidence
they were given by the FCC was enough to
implicate Youngblood to an extent warranting his
termination.

> FN1. Re-imaging is a process through which the
> hard drive of one machine is made to look exactly
> like that of another. Typically this is done to make
> an entire group of computers contain exactly the
> same software running with exactly the same
> settings. In work environments, the process is often
> used to clear the slate of employees' computers
> when the computers are given to other employees
> or put to new uses.

Youngblood's complaint advances these claims.
Youngblood alleges that because he was not an at-
will employee, Vistronix's termination of his
employment breached an express or implied
contract. (Compl.¶ 58.) Further, Youngblood
claims that after terminating him, Barbara McNair,
the Vistronix Project Manager for the FCC contract,
held an "all-hands" meeting of Vistronix employees
on the FCC contract. At this meeting, Youngblood
alleges that McNair slanderously claimed that "all
evidence" in the destruction of the data on the
Abernathy computer pointed to Youngblood. (Id. ¶
43.) Lastly, Youngblood alleges that during his time
at Vistronix, he was periodically denied overtime
pay in violation of the Fair Labor Standards Act
("FLSA"), specifically 29 U.S.C.A. § 207 (West
1998 & Supp.2006), the D.C. Payment and
Collection of Wages Law, D.C.Code Ann. §§ 32-
1301-10 (LEXIS through D.C. Act 16-341), and the
D.C. Minimum Wage Act, D.C.Code Ann. §§ 32-
1001-15 (LEXIS through D.C. Act 16-341).

Vistronix seeks partial summary judgment on the
FLSA claims, contending that they are largely time-
barred. Further, Vistronix requests summary
judgment with respect to the breach-of-contract and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.2d
(Cite as: 2006 WL 2092636, *1 (D.D.C.))

Page 365

slander claims. The Court examines each claim in light of the legal standard for summary judgment.

## DISCUSSION

### I. Legal Standard for Summary Judgment

*2 Summary judgment is granted to a moving party when a question brought before a court by an opposing party can have but one reasonable answer-- typically not the answer sought by the opposing party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-51 (1986) (declaring equal the standard for summary judgment under Rule 56 and directed verdict under Rule 50); see also Fed.R.Civ.P. 50(a). A court must reach this conclusion without making credibility determinations or weighing evidence, and must give the opposing party the benefit of all reasonable inferences. Anderson, 477 U.S. at 255.

To obtain summary judgment on a claim, the moving party need only show that there is no genuine issue of material fact as to that claim. The movant need not entirely foreclose the possibility that there could exist an issue of material fact, he need only claim that the non-movant has failed, or by necessity will fail, to appropriately raise the issue. See Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).

The non-movant must show, without resting on only its earlier pleadings, that the claim under attack raises a genuine issue of material fact. Failure to do so will result in summary judgment in favor of the movant. Fed.R.Civ.P. 56(e). To contest summary judgment successfully, the issues raised in response to the motion must be material: opponents will not succeed by raising only trifling questions or questions irrelevant to the outcome of the dispute. See Anderson, 477 U.S. at 248-50.

Having outlined the burdens placed on a movant for summary judgment and on his opponent, the Court now applies the foregoing standard to the case at bar, beginning with Youngblood's breach-of-contract claim.

### II. Breach of Contract

As Vistronix acerbically notes in its reply brief, Youngblood has submitted a large volume of material to supplement his opposition to Vistronix's summary judgment motion. (Def.'s Reply 1.) While useful in buoying some of the plaintiff's claims, nowhere in the epic mound of paper can the Court find a good reason to deny Vistronix summary judgment as to the breach of contract issue. The Court will grant Vistronix summary judgment on that claim for the reasons outlined below.

### A. Youngblood's Intent to be Employed At-Will

Youngblood contends that provisions in Vistronix's employee handbook imply that he is something other than an at-will employee. There are several reasons to believe Youngblood had no such implied contract, but the Court begins with the simplest: it could not possibly be any clearer that neither party intended to form such a contract. Youngblood signed a "Pre-Employment Release" affirming that he understood any offer of employment at Vistronix to be at-will. (Youngblood Dep. Ex. 2, Oct. 27, 2005.) Further, Youngblood testified that he understood, at the time of his employment, that he was an at-will employee. (Youngblood Dep. 35:4-7.) The Court will take for granted that Vistronix intended Youngblood's employment to be at-will: all the forms Youngblood signed indicating that he understood his at-will status were Vistronix's forms.

*3 It is axiomatic that contracts should be construed to embody the parties' intent--clearly so when, as in the instant case, neither party disputes that intent. [FN2] Plaintiff does not deny that he intended to be employed at-will when he accepted his job, and as such, the Court sees no reason to construe Youngblood's employment as anything else.

FN2. Restatement (Second) of Contracts § 201 (1981); 11 Richard A. Lord, Williston on Contracts § 30:2 (4th ed.2006); see, e.g., U.S. v. Stuart, 489 U.S. 353, 368 (1989); Samra v. Shaheen Bus. & Inv. Group, Inc., 355 F.Supp.2d 483, 508 (D.D.C.2005) (Lamberth, J.); Jack Baker, Inc. v. Office Space Dev. Corp., 664 A.2d 1236, 1239 (D.C.1995).

### B. The Employee Handbook's Disclaimer

The plaintiff alleges that his employee handbook implies something beyond at-will employment, yet

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.2d
(Cite as: 2006 WL 2092636, *3 (D.D.C.))

that handbook is careful to ensure that no such inference be drawn from its pages. Youngblood cites the section on employee discipline as implying a contract by which he may not be terminated, save through the steps outlined therein. Yet, as the defendant notes, that section of the handbook also states that: "These guidelines do not constitute a contract or promise. Any individual employee can be terminated, at any time, with or without cause and without notice." (Pl.'s Opp'n Ex. J at 7 .) Further, the handbook contains a receipt, which Youngblood signed, that again affirms his status as an at-will employee and disclaims any implied contract that might suggest otherwise. (Pl.'s Opp'n Ex. I.)

Plaintiff may have intended to argue that language in the handbook conflicted with the disclaimer in such a way as to create an ambiguity requiring trial to a jury. (Pl.'s Opp'n 13.) Generally speaking, an employer may disclaim any implied contract an employee might deign to read into an employee handbook (subject to restrictions on unconscionability). Smith v. Union Labor Life Ins., 620 A.2d 265, 269 (D.C.1993) (citing Goos v. Nat'l Ass'n of Realtors, 715 F.Supp. 2, 4 (D.D.C.1989) (Hogan, C.J.). The legal effect of such a disclaimer is a question of law. Smith, 620 A.2d at 269. If the court finds the disclaimer is rationally at odds with some aspect of the parties' bargain, the ambiguity as to the parties' intention raises a question of fact for a jury. Strass v. Kaiser Found. Health Plan of Mid-Atl., 744 A.2d 1000, 1012-15 (D.C.2000) (citing Greene v. Howard Univ., 412 F.2d 1128, 1135 (D.C.Cir.1969)).

The Court finds no logical incongruity between Vistronix's disclaimer and the language contained elsewhere in the handbook, or in the parties' bargain. As noted above, it is abundantly clear that both parties intended for Youngblood to be an employee-at-will. Further, the permissive language in the disciplinary portion of the handbook is instructive: "employee may be notified," "Vistronix may take disciplinary steps," "Vistronix may terminate the employee." (Pl.'s Opp'n Ex. J at 7.) In Strass, the D.C. Court of Appeals found a rational opposition between the presence of a disclaimer and the use of the word "shall." Strass, 744 A.2d at 1013. If a party "shall" do something, it makes little sense for the party to elsewhere say that it might not do it. If a part "may" do something, however, it also

may not do it. Vistronix may disclaim an implied contract as to disciplinary measures on the grounds that the language describing those measures does not actually require that they be employed.

*4 Plaintiff also argues that Vistronix had an implied contract with Youngblood not to violate the law based on representations in the employee handbook. (Pl.'s Opp'n Ex. J at 13.) Specifically, plaintiff looks to the remark: "As a government contractor, Vistronix is required to comply with rigorous Federal government regulations with respect to recording and reporting time worked." (Id.) The Court will dispose of this assertion in two ways.

First and most simply, the Court notes that Vistronix has a pre-existing duty to abide by federal government regulations, whether it says so in its employee handbook or not. It is a general maxim of contract law that a party cannot offer as consideration a duty that the party is already obliged to perform. Restatement (Second) of Contracts § 73 (1981); 3 Richard A. Lord, Williston on Contracts § 7:41 (4th ed.2006); see, e.g., U.S. v. Bridgeman, 523 F.2d 1099, 1110 (D.C.Cir.1975) (noting rioting prisoners who had a pre-existing duty not to harm guards could not offer as consideration an agreement to forego violence against a guard).

Secondly, the Court believes that the damages to which Youngblood would be entitled, should he prevail on his FLSA claim, would constitute a double recovery should he be permitted to also collect damages for breach of contract. If Vistronix is found to have violated the FLSA, a fortiori it will also have breached an implied contract not to violate the law. The same failure to pay overtime grounds both claims, but the damages to which plaintiff would be entitled under the FLSA (lost overtime plus liquidated damages and attorney's fees), 29 U.S.C.A. § 216(b) (West 1998 & Supp.2006), should be greater. [FN3] Courts have an obligation to prevent double recovery by an individual, Gen. Tel. Co. v. EEOC, 446 U.S. 318, 333 (1980); however, as the pre-existing duty to uphold the law is dispositive of this issue, the Court will not proceed any further on this point. The Court also here ends its discussion of the issue of contracts implied by the employee handbook.

FN3. Plaintiff asks $120,000 in damages for breach

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.2d

**Page 367**

(Cite as: 2006 WL 2092636, *4 (D.D.C.))

of contract. This seems to be bottomed on the assertion that Youngblood would have continued his employment with Vistronix through the end of its contract with the FCC. (Compl.¶ 55.) However, because Youngblood was terminable at-will, the Court believes any damages premised on the longevity of his employment are speculative.

### C. Public Policy Exception to Termination of At-Will Employment

As the defendant noted in its reply brief, this Court will not allow plaintiffs' opposition briefs to be vehicles for after-the-bell amendment of complaints. Cronin v. FAA, 73 F.3d 1126, 1134 (D.C.Cir.1996). Therefore, the Court will cease its discussion of Youngblood's breach-of-contract claim, and for the reasons outlined above, the Court will grant Vistronix's motion for summary judgment as to that issue.

### III. Failure to Pay Overtime

Plaintiff fares better with the allegation that Vistronix failed to pay him overtime in violation of the Fair Labor Standards Act, the D.C. Payment and Collection of Wages Law, and the D.C. Minimum Wage Act. Youngblood asserts that from July 2001, until February 2004, he did not receive overtime pay for hours worked. He claims to have kept track of the hours, for at least a portion of this time, on a calendar on his desk, having been instructed by his supervisor to "bank" the hours and use them to take paid leave on other occasions (i.e., as "comp time").

*5 Defendant requests partial summary judgment as to the claims for failure to pay overtime, asserting that part of the time in question is beyond the statute of limitations (only as applies to the FLSA claim). Further, Vistronix contends that Youngblood was an overtime-exempt employee during another portion of time in question. Vistronix wishes to limit any recovery under the FLSA claim to the period between January 7, 2003 and March 1, 2003. The Court believes that there is a genuine issue of material fact, at this stage in the proceedings, as to the appropriate statute of limitations under the FLSA. The Court does not, however, find any such material issue with regard to Youngblood's exempt status. Accordingly, the Court will deny summary judgment to Vistronix as to the period between January 7, 2002 and January 7, 2003, and grant

summary judgment to Vistronix as to the period between between March 1, 2003 and Youngblood's termination. [FN4]

> FN4. Since defendant does not raise the statute of limitations as barring Youngblood's District of Columbia law claims, they will not be addressed further in this Memorandum Opinion.

### A. "Willfulness" and Extension of the FLSA's Statute of Limitations

Plaintiff argues that Vistronix's failure to pay him overtime was "willful," under 29 U.S.C.A. § 255(a) (West 1998). The FLSA's statute of limitations is extended to three years from the cause of action when the employer's violation of the FLSA is willful. Id. Vistronix contends that its behavior was not willful, and that the statute of limitations is therefore only two years. Id.

An employer willfully violates the FLSA when the employer either knows or shows reckless disregard as whether its conduct is prohibited by that Act. McLaughlin v. Richland Shoe Co., 486 U.S. 128, 133 (1988). Vistronix refers the Court to Phuong v. Nat'l Acad. of Scis., 901 F.Supp. 12 (D.D.C.1995) (Friedman, J.), in asking the Court to find a lack of willfulness. The Court believes the determination of willfulness to be very fact-specific, and consequently does not believe that Phuong ought to direct the outcome here.

In Phuong, the National Academy of Sciences was found not to have acted willfully in denying Phuong overtime. Phuong was aware of the defendant's overtime policies, never submitted timesheets for the overtime hours for which she then sought payment, was paid for all hours that she did record, and was later offered an opportunity to receive payment for the hours she failed to record. Vistronix asks the Court to rule against Youngblood on this issue because of the similarities between his case and Phuong--the notice of company overtime policy (see Youngblood Dep. Ex. 12), the failure to record the overtime hours on timesheets, and the payment for all hours that Youngblood did record (Youngblood Dep. 83:3-10). The Court must decline.

Phuong alleged that she was told she was not permitted to take overtime; however, her supervisor said that he would have paid her for the overtime

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Not Reported in F.Supp.2d
(Cite as: 2006 WL 2092636, *5 (D.D.C.))

she did take, and she was later offered a chance to claim those hours. The FLSA gives no limitation of the number of hours an employee may work in any week: "he may work as many hours a week as he and his employer see fit, so long as the required overtime compensation is paid him." 29 C.F.R. § 778.102 (2005) (emphasis added). It follows that it is possible for an employer not to see fit to have an employee work overtime hours, and consequently, as in Phuong, instruct the employee not to do so. Instructing an employee not to work overtime is quite different from instructing him not to record his overtime hours, and consequently not be paid for them. Vistronix does not deny that its supervisors did this, but claims, essentially, that its employees should have known better than to listen to their supervisors. (See Def.'s Mot. 5-6; Def.'s Reply 5-6.)

*6 Vistronix further claims that because "there is no evidence … that these supervisors intended to violate the FLSA," the supervisors could not have willfully violated it. This conclusion seems to require a specific intent to violate the Act. The Court does not believe that an individual can recklessly disregard the FLSA only if she was instructed of the exact letter of the statute and his obligation to comply with it. Vistronix's supervisors seem likely to have known that Vistronix was required to pay overtime for overtime hours worked. (See, e.g., Pl.'s Ex. F, ¶ 7.) The supervisors told the employees not to record hours for which the employees would be entitled to overtime. This prevented those employees from receiving, per the FLSA, "compensation for [their] employment in excess of [40 hours per workweek] at a rate not less than one and one-half times the regular rate at which [they are] employed." 29 U.S.C.A. § 207. That those supervisors knew that it was specifically the FLSA requiring the payment of overtime is immaterial--what matters is their knowledge that they had some legal obligation to pay overtime.

The Court is careful to note that it is not employing the discredited Coleman v. Jiffy June Farms, Inc., 458 F.2d 1139, 1142 (5th Cir.1972) standard, which would find the employer willful merely for being aware that the FLSA might apply. See McLaughlin, at 486 U.S. 133-34. Rather, the Court proclaims that when an employer does not pay its employees overtime, knowing that it ought to, the Court will not grant summary judgment to the

employer simply because the errant supervisors did not know the exact law they were contravening.

Moreover, the Court is not convinced that Youngblood's failure to report his supervisor's request to deviate from payroll procedures goes to the issue of whether Vistronix intended for Youngblood to violate those procedures. Vistronix's intent is the relevant question. It is hardly beyond the pale to imagine employers violating their own written instructions--even having a de facto policy of doing so--through subsequent oral commands. A reasonable jury could certainly find that this occurred at Vistronix vis- a-vis Youngblood, and as such, the Court reiterates its refusal to grant summary judgment on this issue. Vistronix's willfulness in violating the FLSA, and subsequently, the applicable statute of limitations for Youngblood's claims, will remain a question of fact for the jury.

B. Youngblood's FLSA Exemption

The Court is perplexed by plaintiff's argument that his categorization as an FLSA exempt employee is "unlawful." The relevant provision in the Code of Federal Regulations allows the exemption of employees involved with: "The application of systems analysis techniques and procedures, including consulting with users, to determine hardware, software, or system functional specifications ." 29 C.F.R. § 541.303(b)(1) (2002). [FN5] Youngblood participated in this sort of activity at Vistronix during the period in question; further, Youngblood admits that in performing substantially the same job at a subsequent place of employment, he was also classified as exempt. (Youngblood Dep. 125:14-126:14.) Would Youngblood's counsel contend that his classification as exempt by subsequent employers is also illegal? This strains credulity.

> FN5. This version of the regulation was in force during Youngblood's tenure as an exempt employee.

*7 Plaintiff further makes the conclusory statement, unsupported by the record, that his status did not change until February 17, 2004. (Pl.'s Mem. P. & A. 9.) This statement attempts to contravene Vistronix's claim that it made an administrative error in failing to exempt

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.2d                                      Page 369
(Cite as: 2006 WL 2092636, *7 (D.D.C.))

Youngblood when it promoted him nearly a year earlier. With no evidence to support that assertion, plaintiff merely wastes paper. Plaintiff would be required to produce Rule 56(e)-competent affidavits that it was not administrative error that led to the delay in his status change, but some malevolence on the part of Vistronix. The plaintiff has not done so. Accordingly, the Court grants Vistronix summary judgment as regards Youngblood's exemption, foreclosing Youngblood's recovery under the FLSA for the dates between March 1, 2003 and his termination on February 26, 2004.

IV. Slander

Finally, Youngblood claims that by telling his coworkers that all evidence of skullduggery in the Abernathy affair points to him, Vistronix committed slander. Vistronix contends that based on information orally communicated by the FCC, all evidence did point to Youngblood as the tamperer. Vistronix contends that FCC employees orally conveyed the finding that all signs pointed to Youngblood as the person who undertook the deletion process on the night of January 6-7. As Youngblood does not provide a refutation of this contention sufficient to meet the requirements for summary judgment (e.g., a sworn statement from an FCC employee contending nothing was communicated to Vistronix), there is no genuine issue of material fact as to whether Vistronix was told that all evidence pointed to Youngblood. Since Youngblood bears the burden of proving that he was defamed, and because there is no genuine issue of material fact as to the truth of the allegedly defamatory statement, the Court will grant summary judgment for Vistronix on Youngblood's defamation claim. See Lohrenz v. Donnelly, 223 F.Supp.2d 25, 59 (D.D.C.2002) (Lamberth, J.) (noting that the truth of a statement is an absolute defense to a charge of defamation).

A. The Truth of McNair's Statement Precludes a Slander Charge

To make a case for defamation, a plaintiff must satisfy four criteria. First, the defendant must have made a false and defamatory statement concerning the plaintiff. Second, the defendant must have published the statement, without privilege, to a third party. Third, the defendant must have been at least negligent in publishing the statement. Fourth, the

statement must have either caused the plaintiff special harm, or constitute defamation per se. Lohrenz, 223 F.Supp.2d at 39 (citing Klayman v. Segal, 783 A.2d 607, 612 n. 4 (D.C.2001)).

Youngblood alleges that McNair (the project manager for the FCC contract) made a false and defamatory statement when she claimed that all evidence regarding the deletion of data from Abernathy's computer pointed to Youngblood. In the District of Columbia, a defamatory statement is one that "tends to injure the plaintiff in his trade, profession, or community standing, or lower him in the estimation of the community." Lohrenz, 223 F.Supp.2d at 39 (citing Smith v. District of Columbia, 399 A.2d 213, 220 (D.C.1979)). Given the nature of Youngblood's employment, breaching a computer security policy is certainly an injurious accusation.

*8 However, as plaintiff in these proceedings, the burden falls on Youngblood to prove the elements of his claim. Vistronix contends that it received an oral communication that implicated Youngblood, and McNair said, based on that information, that the evidence pointed to Youngblood. In order to prevail against Vistronix on this motion, Youngblood would need to provide evidence showing that no such communication was made. Youngblood has only shown that materials--of which the defendant was unaware--raise doubts about the strength of the damning evidence. Had plaintiff deposed an employee of the FCC with knowledge of the oral communication made to Vistronix, perhaps he would have the evidence required to challenge Vistronix's motion. Absent evidence to challenge the defendant's claim that defendant was told by the FCC that all evidence in the computer matter pointed to Youngblood, the Court must grant summary judgment to the defendant.

CONCLUSION

For the foregoing reasons, the Court will grant partial summary judgment to Vistronix as to the date range for which it is liable under the FLSA. The Court will also grant Vistronix summary judgment as to Youngblood's breach of contract claim. The Court further grants Vistronix summary judgment as to Youngblood's slander and slander per se claims.

A separate Order will issue this date.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Westlaw.

Not Reported in F.Supp.2d
**(Cite as: 2006 WL 2092636, \*8 (D.D.C.))**

2006 WL 2092636 (D.D.C.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Westlaw.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| LAKEWOOD HEALTH SYSTEM and NORTHWEST MEDICAL CENTER, | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Civil Action No. 07-69-GMS |
| TRIWEST HEALTHCARE ALLIANCE CORP., | ) ) ) | |
| Defendant. | ) ) ) | |

**APPENDIX IN SUPPORT OF THE OPENING BRIEF
OF DEFENDANT TRIWEST HEALTHCARE
ALLIANCE CORP. IN SUPPORT OF ITS MOTION TO DISMISS**

OF COUNSEL

Robert S. Ryland
Robert R. Gasaway
Ashley C. Parrish
Scott M. Abeles
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W., Suite 1200
Washington, D.C. 20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200

MORRIS JAMES LLP
Lewis H. Lazarus (#2374)
Matthew F. Lintner (#4371)
Katherine J. Neikirk (#4129)
500 Delaware Avenue, Suite 1500
Wilmington, Delaware 19801-1494
302.888.6800
302.571.1750 (fax)
llazarus@morrisjames.com
mlintner@morrisjames.com
kneikirk@morrisjames.com

*Attorneys for Defendant
TriWest Healthcare Alliance Corp.*

Dated: March 16, 2007

<u>**TABLE OF CONTENTS**</u>

**Document**                                                                    **Page**

"TRICARE Management Activity (TMA)," DoD Directive 5136.12
    (May 31, 2001) ……………………………………………………………A1

"TRICARE Operations Manual," DoD Directive 6010.51-M (August 1, 2002) (Revised
    as of March 9, 2007)

    A.     Chapter 3, Section 6 …………………………………...………………A16

    B.     Chapter 13, Section 1 …………………………...………………...A18

    C.     Chapter 13, Section 2 ……………………………...……………...A25

    D.     Chapter 13, Section 3 …………………………...………………...A35

    E.     Chapter 12, Section 8 …………………………...………………...A53


Affidavit of Larry Haggerty …………………………………………………...A57

    A.     Exhibit A, Letter dated September 8, 2005 from Michael Tobin to
         David J. McIntyre …………………………………………………..A60

    B.     Exhibit B, Letter dated September 28, 2005 from David J. McIntyre
         to Bruce Mitterer …………………………………………………A66

    C.     Exhibit C, Letter dated December 21, 2005 from Bruce Mitterer
         to David J. McIntyre   …………………………………………A69

    D.     Exhibit D, Letter dated January 25, 2001 from Charles Blomberg
         to Scott Montplaisir …………………………………………A72

"TRICARE MANAGEMENT ACTIVITY (TMA),"
DOD DIRECTIVE 5136.12 (MAY 31, 2001)



Department of Defense
# DIRECTIVE

NUMBER 5136.12

May 31, 2001

Certified Current as of November 21, 2003

DA&M

SUBJECT:  TRICARE Management Activity (TMA)

References:  (a)  Title 10, United States Code
          (b)  DoD Directive 5136.11, "Defense Medical Programs Activity," October 26, 1992 (hereby canceled)
          (c)  DoD Directive 5105.46, "TRICARE Support Office," July 31, 1997 (hereby canceled)
          (d)  DoD Directive 5136.1, "Assistant Secretary of Defense for Health Affairs (ASD(HA))," May 27, 1994
          (e)  through (i), see enclosure 1

## 1. PURPOSE

Pursuant to the authority vested in the Secretary of Defense under reference (a) this Directive establishes the TRICARE Management Activity (TMA) with the mission, organization, responsibilities, functions, relationships, and authorities as described herein.  The TMA replaces the Defense Medical Programs Activity (reference (b)), and the TRICARE Support Office (TSO) (reference (c)), which are hereby disestablished. All references in DoD Directive 5136.1 (reference (d)) or any other DoD issuance (except the Defense Federal Acquisition Regulation Supplement (DFARS)) (reference (e)) to active functions or authorities of the "Office of CHAMPUS" or "OCHAMPUS" shall be understood to be references to functions and authorities of the TMA (successor to TSO, which was previously known as the Office of CHAMPUS).  All references in the DFARS to active functions or authorities of the "Office of CHAMPUS" shall be understood to be references to the functions and authorities of the TMA Directorate of Acquisition Management and Support.

1

**A2**

*DODD 5136.12, May 31, 2001*

## 2. APPLICABILITY

This Directive applies to the Office of the Secretary of Defense, the Military Departments, the Chairman of the Joint Chiefs of Staff, the Combatant Commands, the Office of the Inspector General of the Department of Defense, the Defense Agencies, the DoD Field Activities, and all other organizational entities within the Department of Defense (hereafter referred to collectively as "the DoD Components").  This Directive also applies to the Coast Guard when it is not operating as a Military Service in the Navy, the Commissioned Corps of the Public Health Service, and the National Oceanic and Atmospheric Administration under agreements with the Departments of Transportation and Health and Human Services.

## 3. DEFINITIONS

Terms used in this Directive are defined in enclosure 2.

## 4. MISSION

The mission of the TMA is to:

4.1.  Manage TRICARE;

4.2.  Manage and execute the Defense Health Program (DHP) Appropriation and the DoD Unified Medical Program; and

4.3.  Support the Uniformed Services in implementation of the TRICARE Program and the Civilian Health and Medical Program of the Uniformed Services (CHAMPUS).

## 5. ORGANIZATION

The TMA is hereby established as a DoD Field Activity of the Under Secretary of Defense for Personnel and Readiness (USD(P&R)) and shall operate under the authority, direction, and control of the Assistant Secretary of Defense for Health Affairs (ASD(HA)).  It shall consist of:

5.1.  A Director appointed by and reporting to the ASD(HA).

5.2.  The Directorate of Acquisition Management and Support (AM&S), which shall operate as the primary contracting activity in support of the TMA mission.

2

**A3**

*DODD 5136.12, May 31, 2001*

5.3. Such additional subordinate organizational elements as are established by the Director, TMA, within authorized resources.

## 6. RESPONSIBILITIES AND FUNCTIONS

6.1. The Assistant Secretary of Defense for Health Affairs, under the Under Secretary of Defense for Personnel and Readiness, in accordance with DoD Directive 5136.1 (reference (d)), shall:

6.1.1. Execute the Department's medical mission, which is to provide, and to maintain readiness to provide, medical services and support to members of the Armed Forces during military operations, and to provide medical services and support to members of the Armed Forces, their dependents, and others entitled to DoD medical care.

6.1.2. Exercise authority, direction, and control over all DoD medical and dental personnel, facilities, programs, funding, and other resources within the Department of Defense.

6.2. The Director, TMA, under the authority, direction, and control of the ASD(HA), shall:

6.2.1. Organize, direct, and manage the TMA and all assigned resources.

6.2.2. Manage the execution of policy issued by the ASD(HA), pursuant to reference (d), in the administration of all DoD medical and dental programs authorized by reference (a). Issue program direction for the execution of policy within the DoD Military Health System (MHS) to the Surgeons General of the Army, Navy, and Air Force. When issued to the Military Departments, program direction shall be transmitted through the Secretaries of those Departments.

6.2.3. Serve as the program manager for TRICARE health and medical resources, supervising and administering TRICARE programs, funding, and other resources within the Department of Defense. The Director, however, may not direct a change in the structure of the chain of command within a Military Department with respect to medical personnel and may not direct a change in the structure of the chain of command with respect to medical personnel assigned to that command.

6.2.4. Prepare and submit, together with and pursuant to policy guidance of the ASD(HA) and with Service input, for the Department's planning, programming, and

**A4**

budgeting system (PPBS), the DoD Unified Medical Program, and budget to provide resources for all health and medical activities within the Department of Defense. Support the ASD(HA)'s presentation and justification of the DoD Unified Medical Program, and budget throughout the PPBS process, including representations before the Congress.

6.2.5.  Manage and execute the DHP and DoD Unified Medical Program accounts, including Military Department execution of allocated funds, in accordance with instructions issued by the ASD(HA), fiscal guidance issued by the Under Secretary of Defense (Comptroller), and applicable law.

6.2.6.  Exercise oversight, management, and program direction of information management/information technology systems and programs, as necessary, to manage TRICARE and support the ASD(HA) in administration of all medical and dental programs authorized by reference (a).

6.2.7.  Develop such technical guidance, regulations, and instructions as required to manage TRICARE and to support the ASD(HA) in administration of all medical and dental programs authorized by reference (a).

6.2.8.  Support the conduct of studies and research activities in the healthcare area to assist the ASD(HA), and others, as necessary, in support of their responsibilities and to support the management and implementation of health policies for the MHS issued by the ASD(HA).

6.2.9.  Contract for managed care support, dental support, other health programs, claims processing services, studies and research support, supplies, equipment, and other services necessary to carry out the TRICARE and support the MHS.

6.2.10.  Collect, maintain, and analyze data appropriate for the preparation of budgets, fiscal planning, and as otherwise needed to carry out TRICARE.

6.2.11.  Provide beneficiary and customer support and information services.

6.2.12.  Exercise oversight and program direction over each TRICARE Regional Office (TRO), to include defining the roles, functions, and responsibilities of the Lead Agents, to ensure consistent implementation and management of MHS policies and the uniform health benefit.

*DODD 5136.12, May 31, 2001*

6.2.13. Issue, through the head of the contracting activity (HCA), administrative contracting officer warrants, as the HCA deems appropriate, to TRO staff pursuant to a memorandum of agreement entered into between the HCA and each TRO Lead Agent for administration of TRICARE contracts

6.2.14. Provide comments and recommendations to the appropriate official in the evaluation and rating of each TRO Lead Agent, consistent with applicable Service regulations.

6.2.15. Perform such other functions as the ASD(HA) may prescribe.

6.3. The <u>Secretaries of the Military Departments</u> shall:

6.3.1. Establish and staff a TRO for geographical areas designated by the ASD(HA). The TRO shall be provided the authority and staff necessary to ensure consistent implementation and management of MHS policies and the uniform health benefit within the geographical area.

6.3.1.1. The TRO shall be headed by a Lead Agent (a senior military officer) who shall be the focal point for health services within the geographical region with responsibility for development and execution of an integrated plan for the delivery of healthcare. While the Lead Agent shall be under the operational control of, and be responsible to, his/her respective Military Department, the Lead Agent shall be subject to the oversight and program direction of the TMA Director in the implementation and management of MHS policies and the uniform health benefit.

6.3.1.2. A Lead Agent Director, operating under the authority, direction, and control of the TRO Lead Agent, shall manage the TRO. The Lead Agent Director shall be responsible, in collaboration with Military Treatment Facility commanders, for development and execution of an integrated plan for the delivery of healthcare within the geographical region. Selection and appointment of each TRO Lead Agent Director shall be made in coordination with and approval of the Director, TMA.

6.3.2. Provide, on a reimbursable basis, such facilities, physical security, logistics, and administrative support as required for effective TMA operations. Reimbursements for inter-Service support and services shall be made in accordance with DoD Instruction 4000.19 and DoD Directive 1400.16 (references (f) and (g)).

6.4. The <u>Director, Defense Legal Services Agency</u>, shall provide legal advice and services for the TMA.

**A6**

*DODD 5136.12, May 31, 2001*

7. RELATIONSHIPS

    7.1.  The Director, TMA, shall:

        7.1.1.  Ensure that the DoD Components are kept fully informed concerning TMA activities with which they have collateral or related functions.

        7.1.2.  Use established facilities and services of the Department of Defense and other Federal Agencies, whenever practicable, to avoid duplication and to achieve an appropriate balance of modernization, efficiency, and economy of operations.

        7.1.3.  Maintain appropriate liaison, consultation and coordination with other governmental and non-governmental agencies, as required, to exchange information and advice on programs in the fields of assigned responsibility.

        7.1.4.  Work collaboratively with the Military Departments, through the Surgeons General, to ensure an integrated and standardized TRICARE healthcare delivery system.

    7.2.  The Heads of DoD Components shall coordinate with the Director, TMA, as appropriate, on matters relating to TMA operations, functions, and responsibilities.

8. AUTHORITIES

    8.1.  The Director, TMA, is specifically delegated authority to:

        8.1.1.  Obtain from other DoD Components, consistent with the policies and criteria of the DoD Directive 8910.1 (reference (h)), information, advice, and assistance necessary to carry out TMA programs and activities.

        8.1.2.  Communicate directly with appropriate representatives of the DoD Components, other Executive Departments and Agencies, and members of the public, as appropriate, on matters related to TMA programs and activities.  Communications to the Commanders of the Combatant Commands shall be transmitted by the ASD(HA), through the Chairman of the Joint Chiefs of Staff.

        8.1.3.  Exercise oversight and management of Executive Agents designated to perform TRICARE activities.  Exercise oversight, program direction, and funding execution of Executive Agents designated to perform activities related to TRICARE activities.

**A7**

*DODD 5136.12, May 31, 2001*

8.1.4. Exercise the administrative authorities contained in enclosure 3.

9. <u>ADMINISTRATION</u>

9.1. The Secretaries of the Military Departments shall assign military personnel to the TMA in accordance with approved authorizations and established procedures for assignment to joint duty.

9.2. Administrative support for Headquarters, TMA and the TMA field elements may be provided by the DoD Components through inter-Service support agreements in accordance with DoD Instruction 4000.19 and DoD Directive 1400.16 (references (f) and (g)).

10. <u>EFFECTIVE DATE</u>

This Directive is effective immediately.

Paul Wolfowitz
Deputy Secretary of Defense

Enclosures - 3
    E1. Reference, continued
    E2. Definitions
    E3. Delegations of Authority

**A8**

E1.  <u>ENCLOSURE 1</u>

<u>REFERENCES</u>, continued

(e)  Defense Federal Acquisition Regulation Supplement (current edition)

(f)  <u>DoD Instruction 4000.19</u>, "Interservice and Intergovernmental Support," August 9, 1995

(g)  <u>DoD Directive 1400.16</u>, "Inter-departmental Civilian Personnel Administration Support," October 30, 1970

(h)  <u>DoD Directive 8910.1</u>, "Management and Control of Information Requirements," June 11, 1993

(i)  Title 32, Code of Federal Regulations, Part 199, "Civilian Health and Medical Programs of the Uniformed Services (CHAMPUS)"

*DODD 5136.12, May 31, 2001*

## E2.  ENCLOSURE 2

### DEFINITIONS

E2.1.1.  <u>Civilian Health and Medical Program of the Uniformed Services (CHAMPUS)</u>.  The DoD civilian sector healthcare program operated under the authority of 32 CFR Part 199 (reference (i)).

E2.1.2.  <u>TRICARE</u>.  The DoD medical and dental programs operating pursuant to chapter 55 of 10 U.S.C. (reference (a)), under which medical and dental services are provided to DoD healthcare beneficiaries.  (The term "TRICARE" includes all activities described in the definition of the term "TRICARE Program" at 10 U.S.C. 1072(7) (reference (a)).

E2.1.3.  <u>Armed Forces</u>.  The Army, the Navy, the Air Force, the Marine Corps, and the Coast Guard.

E2.1.4.  <u>Uniformed Services</u>.  Includes the Armed Forces, the Commissioned Corps of the National Oceanic and Atmospheric Administration, and the Commissioned Corps of the Public Health Service.

E2.1.5.  <u>DoD Military Health System (MHS)</u>.  The DoD medical and dental programs, personnel, facilities, and other assets operating pursuant to chapter 55 of 10 U.S.C. (reference (a)), by which the Department of Defense provides:

E2.1.5.1.  Healthcare services and support to the Armed Forces during military operations, and

E2.1.5.2.  Healthcare services and support under TRICARE to members of the Armed Forces, their family members, and others entitled to DoD medical care.

E2.1.6.  <u>Defense Health Program (DHP) Appropriation</u>.  A single appropriation consisting of operation and maintenance and other procurement funds designed to finance the non-military personnel requirements of the MHS.

E2.1.7.  <u>DoD Unified Medical Program</u>.  A combination of the DHP appropriation, the medical military construction appropriation, and the military personnel funds to reimburse the military personnel appropriations of the three Military Departments for military personnel supporting the MHS.

*DODD 5136.12, May 31, 2001*

E2.1.8.  <u>TRICARE Regional Office (TRO)</u>.   The office charged with ensuring consistent implementation and management of MHS policies and the uniform health benefit within a geographical area designated by the ASD(HA).

E2.1.9.  <u>Director, TMA</u>.  The official appointed by, and reporting to, the ASD(HA), with responsibilities, functions, and authorities set forth in this Charter.   The term "Director" includes any other recognized organizational title, such as "Executive Director."

## E3. ENCLOSURE 3

## DELEGATIONS OF AUTHORITY

E3.1.1. Pursuant to the authority vested in the Secretary of Defense, and subject to the authority, direction, and control of the Secretary of Defense, the USD(P&R), the ASD(HA), and in accordance with DoD policies, Directives, and Instructions, the Director, TMA, or in the absence of the Director, the person acting for the Director, is delegated authority as required in the administration and operation of the TMA to:

E3.1.1.1. Exercise the powers vested in the Secretary of Defense by 5 U.S.C. 301, 302(b), 3101, 4103, 4302, and 5107 on the employment, direction, and general administration of TMA civilian personnel.

E3.1.1.2. Fix rates of pay of wage-rate employees exempted from the Classification Act of 1949 by 5 U.S.C. 5102 on the basis of rates established under the Federal Wage System. In fixing such rates, the Director, TMA, shall follow the wage schedule established by the DoD Wage Fixing Authority.

E3.1.1.3. Administer oaths of office to those entering the Executive Branch of the Federal Government or any other oath required by law in connection with employment therein, in accordance with 5 U.S.C. 2903, and designate in writing, as may be necessary, officers and employees of the TMA to perform this function.

E3.1.1.4. Establish a TMA Incentive Awards Board, and pay cash awards to, and incur necessary expenses for, the honorary recognition of civilian employees of the Government whose suggestions, inventions, superior accomplishments, or other personal efforts, including special acts or services, benefit or affect the TMA, in accordance with 5 U.S.C. 4503, Office of Personnel Management (OPM) regulations, and DoD 1400.25-M, Chapter 400, Subchapter 451.

E3.1.1.5. Maintain an official seal and attest to the authenticity of official TMA records under that seal.

E3.1.1.6. Establish advisory committees and employ temporary or intermittent experts or consultants, as approved by the Secretary of Defense, for the performance of TMA functions consistent with 10 U.S.C. 173; 5 U.S.C. 3109(b); and DoD Directive 5105.4.

E3.1.1.7. In accordance with Executive Order 10450, "Security Requirements for Government Employment," April 27, 1953; Executive Order 12333, "United States

*DODD 5136.12, May 31, 2001*

Intelligence Activities," December 4, 1981; and Executive Order 12968, "Access to Classified Information," August 4, 1995; and DoD Directive 5200.2, as appropriate:

E3.1.1.7.1.  Designate any position in the TMA as a "sensitive" position.

E3.1.1.7.2.  Authorize, in case of emergency, the appointment of a person to a sensitive position in the TMA for a limited period of time and for whom a full field investigation or other appropriate investigation, including National Agency Check, has not been completed.

E3.1.1.7.3.  Initiate personnel security investigations and, if necessary, in the interest of national security, suspend a security clearance for personnel assigned, detailed to, or employed by the TMA.  Any action under this paragraph shall be taken in accordance with procedures prescribed in DoD 5200.2-R.

E3.1.1.8.  Act as the agent for the collection and payment of employment taxes imposed by Chapter 21 of the Internal Revenue Code of 1954, as amended; and, as such agent, make all determinations and certifications required or provided for under the Internal Revenue Code of 1954, as amended (26 U.S.C. 3122), and the "Social Security Act," as amended (42 U.S.C. 405(p)(1) and 405(p)(2)), with respect to TMA employees.

E3.1.1.9.  Authorize and approve:

E3.1.1.9.1.  Temporary duty travel for military personnel assigned or detailed to the TMA in accordance with Joint Federal Travel Regulations, Volume 1.

E3.1.1.9.2.  Travel for TMA civilian personnel in accordance with Joint Travel Regulations, Volume 2.

E3.1.1.9.3.  Invitational travel to non-DoD personnel whose consultative, advisory, or other highly specialized technical services are required in a capacity that is directly related to, or in connection with, TMA activities, in accordance with Joint Travel Regulations, Volume 2.

E3.1.1.9.4.  Overtime work for TMA civilian personnel in accordance with 5 U.S.C. Chapter 55, Subchapter V, and applicable OPM regulations.

E3.1.1.10.  Approve the expenditure of funds available for travel by military personnel assigned or detailed to the TMA for expenses incident to attendance at meetings of technical, scientific, professional, or other similar organizations in such instances when the approval of the Secretary of Defense, or designee, is required by 37 U.S.C. 412, and 5 U.S.C. 4110 and 4111.

ENCLOSURE 3

**A13**

*DODD 5136.12, May 31, 2001*

E3.1.1.11. Develop, establish, and maintain an active and continuing Records Management Program, pursuant to 44 U.S.C. 3102 and DoD Directive 5015.2.

E3.1.1.12. Utilize the Government Purchase Card for making micro-purchases of material and services, other than personal services, for the TMA, when it is determined more advantageous and consistent with the best interests of the Government.

E3.1.1.13. Authorize the publication of advertisements, notices, or proposals in newspapers, magazines, or other public periodicals, as required for the effective administration and operation of the TMA, consistent with 44 U.S.C. 3702.

E3.1.1.14. Establish and maintain, for the functions assigned, an appropriate publications system for the promulgation of common supply and Service regulations, instructions, and reference documents, and changes thereto, pursuant to the policies and procedures prescribed in DoD 5025.1-M.

E3.1.1.15. Enter into support and service agreements with the Military Departments, other DoD Components, or other Government Agencies, as required, for the effective performance of TMA functions and responsibilities.

E3.1.1.16. Enter into and administer contracts, through the TMA Directorate of Acquisition Management and Support or through a Military Department, a DoD contract administration services component, or other Federal Agency, as appropriate, for supplies, equipment, and services required to accomplish the mission of the TMA. The Director, AM&S, shall be the head of the contracting activity. To the extent that any law or Executive order specifically limits the exercise of such authority to persons at the Secretarial level of the Department, such authority shall be exercised by the appropriate Under Secretary or Assistant Secretary of Defense.

E3.1.1.17. Establish and maintain appropriate property accounts for the TMA and appoint Boards of Survey, approve reports of survey, relieve personal liability, and drop accountability for TMA property contained in the authorized property accounts that has been lost, damaged, stolen, destroyed, or otherwise rendered unserviceable, in accordance with applicable laws and regulations.

E3.1.1.18. Promulgate the necessary security regulations for the protection of property and places under the jurisdiction of the Director, TMA, pursuant to DoD Directive 5200.8.

**A14**

E3.1.1.19.  Lease property under the control of the TMA, under terms that will promote the national defense or that will be in the public interest, pursuant to 10 U.S.C. 2667.

E3.1.1.20.  Exercise the authority delegated to the Secretary of Defense by the Administrator of the General Services Administration for the disposal of surplus personal property.

E3.1.2.  The Director, TMA, may redelegate these authorities as appropriate, with the approval of the ASD(HA) and in writing, except as otherwise specifically indicated above or as otherwise provided by law or regulation.

**A15**

"TRICARE OPERATIONS MANUAL,"
DOD DIRECTIVE 6010.51-M (AUGUST 1, 2002)
(REVISED AS OF MARCH 9, 2007)

CHAPTER 3, SECTION 6

CHAPTER 3
SECTION 6

# PAYMENTS TO BENEFICIARIES/PROVIDERS

**1.0.    CHECKS**

When issuing checks for payments to beneficiaries and providers, the contractor shall use the following formats/statements:

- The check shall be dated the same date the contractor received authorization from TMA, CRM Budget Office to release checks.

- The words "TRICARE Payment" shall be printed in at least 18-point font at the top of the check.

- The TRICARE logo and the contractor's name and address shall be on the check.

- The following endorsement statement shall be printed using 4 or 5 point type in the 1.5 inches allotted on the reverse side of the check. This will comply with Federal Reserve Bank Regulation CC regarding check endorsements. The endorsement shall read as follows:

  "This payment is made with Federal funds. Fraud in procuring, forging of signature or endorsement, or materially altering this check is punishable under the U.S. Criminal Code. IF PAYABLE TO A PARTICIPATING PROVIDER OF SERVICES - By endorsing this check, the undersigned payee agrees that he/she is subject to the terms of the participating agreement (assignment) as set forth in the TRICARE regulation."

- A statement that the check must be negotiated within 120 calendar days.

**2.0.    ELECTRONIC FUNDS TRANSFER (EFT)**

Payments may be made by EFT to beneficiaries and providers. EFTs shall be done under the same guidelines as checks other than situations unique to EFT type transactions (i.e., EFTs do not staledate since an EFT is accepted or returned almost immediately).

**A17**

"TRICARE OPERATIONS MANUAL,"
DOD DIRECTIVE 6010.51-M (AUGUST 1, 2002)
(REVISED AS OF MARCH 9, 2007)

CHAPTER 13, SECTION 1

CHAPTER 13
SECTION 1

# GENERAL

## 1.0. PURPOSE OF APPEAL PROCESS

An appeal under TRICARE is an administrative review of program determinations made under the provisions of law and regulation. An appeal cannot challenge the propriety, equity, or legality of any provision of law or regulation. This chapter sets forth the policies and procedures for appealing decisions made by *TRICARE* and the National Quality Monitoring Contractor (NQMC) that adversely affect the rights and liabilities of beneficiaries and participating providers, and providers denied the status of an authorized provider under TRICARE.

## 2.0. AUTHORITY

Title 32, Code of Federal Regulations (CFR), Part 199 authorizes the appeal process. It established the appeals and hearing process effective April 4, 1977. The procedures and principles included in this chapter are based on the requirements of 32 CFR 199.10. For additional information regarding the appeal process refer to Chapter 12, Section 6, "Provider Exclusions, Suspensions and Terminations"; and the TRICARE Policy Manual, Chapter 1, Section 4.1, "Waiver of Liability".

## 3.0. CONTRACTOR RESPONSIBILITIES

It is the responsibility of the contractor to ensure that the rights of appealing parties are protected at all levels of the appeal process in which the contractor participates. The contractor's responsibility begins with the initial determination and does not end until a final resolution is reached, including, where appropriate, timely payment following a reversal.

## 3.1. Initial Determinations

The contractor shall develop a written plan and implement a formal appeal process that incorporates the requirements for initial medical necessity and factual determinations set forth below. The contractor shall issue a dated initial determination in the form of an Explanation of Benefits (EOB) or a letter. The initial determination shall contain sufficient information to enable the beneficiary or provider to understand the basis for the denial. The initial determination shall state with specificity what services and supplies are being denied and for what reason. The contractor shall retain a legible hardcopy or microcopy of the initial determination or be able to produce a duplicate EOB from electronic records upon request. The initial determination shall include adequate notice of appeal rights and requirements. If a request for authorization for services or supplies is denied and a claim is later submitted for the services or supplies, both the denial of authorization and the claim denial are considered initial determinations and, therefore, either may be appealed. Suggested notices are at paragraph 3.6. and paragraph 3.7. below.

**3.2.    Medical Necessity Initial Determinations**

The appeal process applicable to medical necessity initial denial determinations is addressed in Chapter 13, Section 4. A flow chart diagramming the appeal process relating to medical necessity denials is at Chapter 13, Addendum A, Figure 13-A-5.

**3.3.    Factual Initial Determinations**

The appeal process applicable to factual initial denial determinations is addressed in Chapter 13, Section 5. A flow chart diagramming the appeal process relating to factual denials is at Chapter 13, Addendum A, Figure 13-A-6.

**3.4.    TRICARE/Medicare Dual Eligible - Initial Determinations**

Services and supplies denied payment by Medicare will not be considered for coverage by TRICARE if the Medicare denial of payment is appealable under the Medicare appeal process. If, however, a Medicare appeal results in some payment by Medicare, the services and supplies covered by Medicare will be considered for coverage by TRICARE. Services and supplies denied payment by Medicare will be considered for coverage by TRICARE, if the Medicare denial of payment is not appealable under the Medicare appeal process. The appeal procedures set forth in this chapter are applicable to initial denial determinations by TRICARE under the TRICARE Dual Eligible Fiscal Intermediary Contract. *A flow chart diagramming the appeal process relating to TRICARE/Medicare dual eligible appeals is at Chapter 13, Addendum A, Figure 13-A-7.*

**3.5.    Written Notice Of Initial Determination (Not EOB)**

Suggested wording for a nonexpedited written appeal notice (including factual determinations):

"An appropriate appealing party (i.e., (1) the TRICARE beneficiary, (2) the non-network participating provider of care, or (3) a provider of care who has been denied approval under TRICARE or the appointed representative of an appropriate appealing party who is dissatisfied with the initial determination has the right to request a reconsideration. To avoid a possible conflict of interest, an officer or employee of the United States, such as an employee or member of a Uniformed Service, including an employee or staff member of a Uniformed Service legal office, or a Health Benefits Advisor, subject to the exceptions in Title 18, United States Code, Section 205, is not eligible to serve as a representative. An exception usually is made for an employee or member of a Uniformed Service who represents an immediate family member. The request must be in writing, must be signed, and must be postmarked or received by (insert name of contractor, postal address, e-mail address, and fax number), within 90 calendar days from the date of this decision and must include a copy of this decision. For purposes of TRICARE, a postmark is a cancellation mark issued by the United States Postal Service. If the

postmark on the envelope is not legible, then the date of receipt is deemed to be the date of filing."

"Additional documentation in support of the appeal may be submitted; however, because a request for reconsideration must be postmarked or received within 90 calendar days from the date of this decision, a request for a reconsideration should not be delayed pending the acquisition of additional documentation. If additional documentation is to be submitted at a later date, the letter requesting the reconsideration must include a statement that additional documentation will be submitted and the expected date of submission."

"Upon receiving your request, all TRICARE claims related to the entire course of treatment will be reviewed."

**3.6.    Suggested Modified Wording For An Appeal Of A Preadmission/Preprocedure Initial Denial Determination**

"A TRICARE beneficiary, or the appointed representative of the beneficiary, who is dissatisfied with the initial determination, may request an expedited reconsideration. The request must be in writing, must be signed, must be received by (insert contractor name, postal address, e-mail address, and fax number) within three (3) calendar days after receipt of this denial determination, and must include a copy of this denial determination. A request for an expedited reconsideration which is received after the expedited reconsideration filing deadline will be addressed as a nonexpedited reconsideration. We recommend that you submit any additional documentation with the request for an expedited reconsideration. Upon receiving your request, all TRICARE claims related to the entire course of treatment will be reviewed."

**3.7.    Suggested Modified Wording For An Appeal Of A Concurrent Review Initial Denial Determination**

"A TRICARE beneficiary, who is an inpatient in the facility, or the appointed representative of the beneficiary who is dissatisfied with the initial determination, may request a reconsideration. The request must be in writing, must be signed, and must be sent to (insert contractor name, postal address, e-mail address, and fax number). To ensure expedited processing of a request for reconsideration, the beneficiary must submit the request by noon of the day following the day of receipt of this denial determination; however, a request for reconsideration which is received after the reconsideration filing deadline, but which is postmarked or received within 90 calendar days from the date of this denial determination, will be accepted. A request for reconsideration must include a copy of the denial determination. We recommend that you submit any additional documentation with

the request for reconsideration. Upon receiving your request, all TRICARE claims related to the entire course of treatment will be reviewed."

**3.8.    Submission Of Reconsideration Requests**

The contractor shall establish unique post office boxes or addresses for submission of reconsideration requests.

**4.0.    WAIVER OF LIABILITY**

If applicable, waiver of liability as it applies to the beneficiary and non-network provider for services found not to be medically necessary, at an inappropriate level, custodial care, or other reasons relative to reasonableness, necessity or appropriateness of care, shall be addressed in the initial determination. Refer to Chapter 13, Section 4, paragraph 4.0. for additional information relating to the applicability of waiver of liability.

**5.0.    UNDELIVERABLE INITIAL DETERMINATIONS**

If the notice of initial determination is returned as undeliverable, the contractor shall follow the procedures set forth in *Chapter 8, Section 6, paragraph 6.0.*

**6.0.    NOTICE TO PROVIDER SEEKING AUTHORIZED PROVIDER STATUS**

When a provider has requested approval as a TRICARE provider, the contractor shall mail the initial notice of approval or disapproval to the last known address of the provider.

**7.0.    FINALITY OF INITIAL DETERMINATION**

The initial determination is final and binding unless the initial determination is reopened by the contractor or revised upon appeal.

**8.0.    PROVIDING ASSISTANCE**

**8.1.    To Appealing Parties**

The contractor shall ensure that the rights of appealing parties are protected. In discharging this responsibility, the contractor shall:

- Issue initial and reconsideration determinations which clearly explain appeal rights when an adverse decision is made.

- Explain to inquirers the procedures for requesting a reconsideration, a formal review or a hearing.

- Complete the file documentation when necessary, e.g., provide an EOB copy when an appeal is filed without a copy, or develop for additional information

when the appealing party's statements indicate a need for added support or the file indicates added development is appropriate.

- When requested to do so, provide the appealing party a copy of the appeal file.

### 8.2. To The TRICARE Management Activity (TMA)

When an appealing party files for a formal review or hearing with TMA, the contractor shall provide a complete file record to TMA on a timely basis. (See Chapter 13, Section 6 for requirements.)

### 9.0. REPROCESSING OF CLAIMS AND PREADMISSION/PREPROCEDURE REQUESTS FOLLOWING ISSUANCE OF RECONSIDERATION DETERMINATIONS, FORMAL REVIEW DETERMINATIONS AND HEARING FINAL DECISIONS

TMA will provide the appropriate contractor with a copy of the formal review determination and hearing final decision. All contractor determinations reversed in whole or in part by the contractor's or the NQMC's reconsideration determination, the TMA formal review determination, or by a hearing final decision, shall be reprocessed by the contractor in accordance with the standards set forth in *Chapter 1, Section 3*. For the purposes of *Chapter 1, Section 3*, the date of receipt is considered the date the NQMC's reconsideration determination, the formal review determination or the hearing final decision is received by the contractor. The contractor must return to the TMA Appeals and Hearings Division, any formal review determinations or hearing final decisions misdirected to the contractor.

### 10.0. QUALITY OF CONTRACTOR RECONSIDERATION CASES

The contractor shall implement a process to ensure that 90 percent of contractor reconsideration cases demonstrate accurate contractor processing of the appeal, consistent with the TOM requirements and the documentation in the case file.

### 11.0. TIMELINESS OF CONTRACTOR RECONSIDERATION DETERMINATIONS

Timeliness of contractor reconsideration determinations is addressed in Chapter 13, Sections 4 and 5.

### 12.0. SERVICES AND SUPPLIES AUTHORIZED IN ERROR

If a contractor authorizes services or supplies, and the beneficiary obtains the services or supplies in reliance on the authorization, and the services or supplies are later determined not to be a benefit under TRICARE, Government funds cannot be used to pay for the services or supplies.

Case 1:07-cv-00069-GMS    Document 12-3    Filed 03/16/2007    Page 26 of 76

**13.0.    DOCUMENTATION**

The contractor shall deliver to TMA, Appeals and Hearings Division, one complete set of its processing guidelines, desk instructions, and reference materials covering all tasks required in Chapter 13 and *Chapter 12, Section 9*, no later than 60 calendar days prior to the start of health care delivery.

"TRICARE OPERATIONS MANUAL,"
DOD DIRECTIVE 6010.51-M (AUGUST 1, 2002)
(REVISED AS OF MARCH 9, 2007)

CHAPTER 13, SECTION 2

CHAPTER 13
SECTION 2

# GOVERNING PRINCIPLES

**1.0.  APPEALING PARTY**

**1.1.  Proper Appealing Party**

Persons or providers who may appeal are limited to:

- The TRICARE beneficiary (including minors),

- The participating provider of services (except network providers whose recourse is through the contractual provision for appeal or the state court system), or

- A non-network provider appealing a preadmission/preprocedure denial (when services have not been rendered), or

- A provider that has been denied approval as an authorized TRICARE provider or who has been terminated, excluded, suspended, or otherwise sanctioned.

**1.2.  Appeals From More Than One Party**

An appeal may be accepted from more than one *proper* appealing party. If more than one party appeals, the contractor and the NQMC shall mail separately addressed appeal determination letters to each appealing party (or representative, if a representative has been appointed).

**1.3.  Appealing Party/Representative**

**1.3.1.  Appeals On One's Own Behalf**

An appealing party is entitled to file an appeal on his or her own behalf.

**1.3.2.  Minors And Incompetent Beneficiaries As Appealing Parties**

**1.3.2.1.**  A minor beneficiary is a proper appealing party.

**1.3.2.2.**  Generally, the *custodial* parent of a minor beneficiary and the legally appointed guardian of an incompetent or minor beneficiary shall be presumed to have been appointed representative without specific designation *by the beneficiary. The parent of a minor beneficiary shall be presumed to be the custodial parent unless there is evidence to the contrary.* If a parent or guardian is pursuing the appeal on behalf of a minor beneficiary and the minor reaches 18 years of age during the appeal, the parent or guardian will be presumed to be authorized to continue the appeal on behalf of the beneficiary unless the beneficiary provides a written

statement of his or her desire to pursue the appeal in his or her own behalf, *in which case the appeal decision will be mailed to the beneficiary.* Once the contractor issues the appeal determination, the beneficiary who reached 18 years of age during the appeal must request all subsequent levels of appeal or appoint a representative to do so. (Refer to paragraph 1.3.3.1. for additional information relating to parents and guardians as representatives.)

**1.3.3.      Representative**

If the proper appealing party cannot or does not wish to pursue the appeal personally, or wishes to have another person directly assist in pursuing an appeal, the appealing party may appoint a representative to act in his or her behalf at any level of the appeal process. The appointment of a representative must be in writing and must be signed by the proper appealing party or an individual must be appointed to act as representative by a court of competent jurisdiction.

**1.3.3.1.    Parents Or Guardians As Representatives**

The sponsor or *custodial* parent of a beneficiary under 18 years of age or the guardian of an incompetent beneficiary cannot be an appealing party; however, such persons may represent the appealing party in an appeal. The *custodial* parent of a minor beneficiary and the legally appointed guardian of an incompetent beneficiary shall be presumed to have been appointed representative without specific designation by the beneficiary; however, this presumption shall not apply if the claim was signed by a minor and the claim is related to abortion, alcoholism, substance abuse, venereal disease, or AIDS. (Refer to paragraph 1.3.2. for additional information relating to minors as appealing parties.) A suggested format for "Appointment of Representative and Authorization to Disclose Information" is included at Chapter 13, Addendum A, Figure 13-A-1.

**1.3.3.2.    Conflict Of Interest**

To avoid possible conflict of interest, an officer or employee of the United States, such as an employee or member of a Uniformed Service, including an employee or staff member of a Uniformed Service legal office, or a Health Benefits Advisor, subject to the exceptions in Title 18, United States Code, Section 205, is not eligible to serve as a representative. An exception usually is made for an employee or member of a Uniformed Service who represents an immediate family member.

**1.3.4.      Appeal Filed By Attorney**

If an attorney files an appeal on behalf of a *proper* appealing party, the contractor shall assume, absent any evidence to the contrary, that the attorney has been duly authorized to act as the appealing party's representative in the appeal. Care shall be taken to ensure that the attorney is representing a *proper* appealing party (e.g., an appeal filed by an attorney as the representative of a nonparticipating provider or as the representative of the spouse of a beneficiary, or parent of an adult beneficiary, shall not be accepted).

TRICARE OPERATIONS MANUAL 6010.51-M, AUGUST 1, 2002
CHAPTER 13, SECTION 2
GOVERNING PRINCIPLES

**1.3.5.    Appeal Filed By Provider On Behalf Of Beneficiary**

Managers or administrators of facilities or individual providers, may enter appeals only as participating providers, acting in their own behalf. A participating provider is not authorized to enter an appeal for a beneficiary unless the provider has been designated by the beneficiary, in writing, to act as his/her representative in the appeal process. A desire to assist the beneficiary is not, in itself, sufficient reason to permit others to act for the beneficiary without specific appointment by the beneficiary.

**1.3.6.    Appeal Filed For Deceased Beneficiary**

An appeal may be filed for a deceased beneficiary by a person authorized to sign TRICARE claims on behalf of the deceased beneficiary under the provisions of *Chapter 8, Section 4, paragraph 5.0.*

**1.3.7.    Inquiries Made By Members Of Congress On Behalf Of Beneficiaries**

Inquiries submitted by Members of Congress regarding a specific appealing party's claim or claims are not considered requests for a reconsideration. If the letter from the Member of Congress is postmarked or received by the contractor or NQMC before the expiration of the appeal filing deadline and is accompanied by a letter from the appealing party which meets the requirements of a request for reconsideration, the appealing party's letter to the Member of Congress may be accepted as an appeal. The Member of Congress and the appealing party shall be advised that a reconsideration will be conducted and that the appealing party will be notified of the results. If the congressional inquiry is not accompanied by a letter from the appealing party which contains all the elements of a request for a reconsideration, the contractor shall explain the procedure for filing an appeal so that the Member of Congress may advise the appealing party. Response to Congressional inquiries are subject to the provisions of the Privacy Act of 1974 (see Chapter 1, Section 5, paragraph 4.0.). Once an appeal has been accepted, the contractor may tell a Member of Congress inquiring on behalf of an appealing party only that an appeal has been filed and that it would be inappropriate for the contractor to comment on the case unless the appealing party has authorized the Member of Congress, in writing, to receive information on behalf of the beneficiary.

**1.4.    Participating Providers**

A non-network participating provider is entitled to file an appeal of those claims in which the provider participated. For the purposes of filing an appeal of a preadmission/preprocedure denial, a non-network provider is considered a participating provider and is entitled to file an appeal. The non-network participating provider may file an appeal instead of, or in addition to, the beneficiary or beneficiary's representative. When denial of payment for claimed services is being appealed, a non-network nonparticipating provider is not a party to the determination and would not receive any information regarding the claim or claim determination without the signed authorization of the beneficiary or the beneficiary's representative.

**EXCEPTION:**    Peer reviewer's comments may be released to non-network nonparticipating providers without the patient's permission, since these comments are directed toward the

provider and the provider's ability to document treatment. In order for the non-network nonparticipating provider to provide additional information on behalf of the patient, it is necessary for the provider to be aware of the peer reviewer's comments.

NOTE:    In those cases in which a non-network participating provider files an appeal and the care also involves a network provider (e.g., a non-network participating professional provider renders care to a beneficiary in a network hospital), the non-network participating provider would be considered a proper appealing party. Although the network provider's input, claims history, medical records, etc., may be used in adjudicating the appeal, a network provider is never a proper appealing party. (A network provider's disputes are handled under the provisions of the provider's contract or the state court system.)

## 1.5.    Providers Denied Approval

A non-network provider who has been denied certification as an authorized provider under TRICARE is entitled to appeal the initial determination made by either the contractor or TMA. These initial determinations are considered factual initial determinations (see Chapter 13, Section 5). When the denial is based on the exclusion of the provider by another Federal or Federally funded program, e.g., Medicare or Medicaid, because of fraud or abuse, the issue is not appealable through the TRICARE appeal system. Unlike beneficiaries or providers who appeal denial of a claimed benefit, providers denied approval are deemed to have met any required amount in dispute at all levels of appeal. A contractor determination denying network provider status to an authorized provider is not appealable. Additional information relating to the appeal process is included in Chapter 14, Section 6, "Provider Exclusions, Suspensions and Terminations".

## 2.0.    APPEAL PROCESSING JURISDICTION

## 2.1.    Jurisdiction

The contractor who made the adverse initial determination shall be responsible for the initial steps of the appeal process. A contractor receiving a request for reconsideration of an initial determination not within its jurisdiction shall send the request to the correct contractor within five working days of receipt and shall notify the appealing party of this action. The contractor shall make no comments on the merits of an appeal not within its jurisdiction and shall direct the appealing party to send any further correspondence relating to the appeal to the appropriate contractor.

## 2.2.    More Than One Jurisdiction

Appeals may be received involving more than one jurisdiction. For example, a case may involve services processed by both the outgoing contractor and the incoming contractor in a period of transition and will require separate review. The contractor receiving the appeal shall notify the appealing party that the services will be reviewed separately by the outgoing contractor and the incoming contractor. The notification shall also include the name and address of each contractor performing the reviews. The contractor shall photocopy the written appeal request, the notification to the appealing party of the referral, and other relevant information and forward the photocopies to the other contractor with an

4

A29

explanation of the action taken within 21 calendar days of the stamped date of receipt of the appeal in the mailroom.

## 3.0.    APPEAL REQUIREMENTS

For all appeals at all levels:

### 3.1.    Must Be Filed In A Timely Manner

The appealing party must comply with the "allowed time to file" requirements established by 32 CFR 199.10 and 199.15 (see Chapter 13, Section 3, paragraph 1.4.).

### 3.2.    Must Be An Appealable Issue

*Services or supplies must have been rendered by a TRICARE authorized provider, the denial of which raises a* disputed question of fact which, if resolved in favor of the appealing party, would result in an extension of TRICARE benefits or approval as a TRICARE-authorized provider. *Examples of nonappealable issues may be found at* Chapter 13, Section 3, paragraph 1.3.2.

### 3.3.    Must Be An Amount In Dispute

There must be an amount in dispute before an appeal can be accepted (see paragraph 4.0.). This involves the following requirements:

- In a case involving an appeal of denial of authorization in advance of the actual services, the amount in dispute will be the estimated allowable charge for the services requested.

- There must be a legal obligation on the part of the beneficiary, parent, guardian, or sponsor to pay for the service or supply.

- Payment or authorization of TRICARE benefits for the service or supply must have been denied in whole or in part.

- When the episode of care involves the services of both network and non-network providers, only the claims submitted by the non-network providers will be considered in determining the amount in dispute.

NOTE:    A non-network provider appealing a denial of its authorized TRICARE provider status will be deemed to have met any required amount in dispute. Also, the amount in dispute will be considered to have been met in an appeal of a request for authorization of benefits for obtaining services or supplies unless the estimated allowable charge involved in such a request would be less than the required amount in dispute.

EXAMPLE:    A TRICARE beneficiary who had been hospitalized for ten days was notified by the contractor that benefits would terminate on the 15th day. The beneficiary left the hospital on the 15th day and filed an appeal on the basis that continued hospitalization was medically necessary. In this case, there would be no basis for

the appeal. The beneficiary left the hospital on the day TRICARE benefits terminated and expenses were no longer incurred; therefore, there was no amount in dispute. The beneficiary would be advised that there could be no appeal since there was no amount in dispute.

**3.4.    Must Be A Proper Appealing Party**

See paragraph 1.0.

**3.5.    Must Be In Writing**

All appeal requests must be in writing and submitted by a proper appealing party. A signature is not required if a determination can be made that the request was submitted by a proper appealing party. If it cannot be determined that the appeal request was submitted by a proper appealing party, the proper appealing party shall be instructed by the contractor that a proper appeal, must be filed within 20 calendar days of the contractor's letter or by the appeal filing deadline, whichever is later. A verbal request for a reconsideration cannot be accepted. When telephone calls are received or personal visits occur which relate to an adverse initial determination, the contractor shall make every effort to satisfy the inquirer's complaint, inquiry, or question, including advising the inquirer of his or her right to appeal, if applicable. If an appropriate appealing party or representative submits a letter which includes both an appealable issue and a grievance, the appeal and grievance shall be processed separately under the appropriate appeal and grievance provisions of the Operations Manual.

**4.0.    AMOUNT IN DISPUTE**

An amount in dispute is required for an adverse determination to be appealable. Although some amount must be in dispute for a reconsideration, unless specifically waived (e.g., the appeal involves denial of certification as a TRICARE authorized provider), there is no established minimum dollar amount. Fifty dollars or more shall be in dispute for a formal review request to be accepted at TMA. Three hundred dollars or more, shall be in dispute for the case to be accepted as a hearing. The determination of "amount in dispute" affects the appealing party's rights and must be carefully evaluated, including, when appropriate, multiple claims for the same service and related claims. Under TRICARE Prime, if the beneficiary has no liability, other than a nominal per visit copayment, there is no amount in dispute (this does not preclude a Prime enrollee from appealing a preadmission/ preprocedure denial determination). If the services at issue are not a benefit under TRICARE, and the provider is a network provider, the Prime or Extra beneficiary shall be held harmless by the network provider, unless the beneficiary is properly informed that the care is not covered (or probably is not covered) and agrees in advance to pay for the care. An agreement to pay can be evidenced by, e.g., a progress note in the beneficiary's medical record, entered contemporaneously with the occurrence of the event. (Refer to Chapter 5, Section 1, paragraph 2.5. for additional information regarding "hold harmless".)

**4.1.    Calculating The Amount In Dispute**

The "amount in dispute" is calculated as the actual amount the contractor would pay if the services and/or supplies involved in the dispute were determined to be payable.

### 4.1.1.     Examples Of Excluded Amounts

**EXAMPLE 1:**     Amounts in excess of the TRICARE-determined allowable charge or cost are excluded.

**EXAMPLE 2:**     The beneficiary's TRICARE deductible and cost-share amounts are excluded.

**EXAMPLE 3:**     Amounts which the TRICARE beneficiary, parent, guardian, or other responsible person has no legal obligation to pay are excluded.

**EXAMPLE 4:**     Amounts under the double coverage provisions of the TRICARE Reimbursement Manual, Chapter 4 are excluded.

### 4.1.2.     Amounts For Preadmission/Preprocedure Appeals

When the dispute involves denial of a request for authorization in advance of actual care or service, the amount in dispute shall be the estimated allowable charge or cost for the service requested.

### 4.1.3.     Amounts For Provider Status Appeals

If the dispute involves the denial of a provider's request for approval as an authorized TRICARE provider or the determination to terminate a provider as an authorized TRICARE provider, there is no requirement for an amount in dispute. Initial determinations in provider status appeals are considered factual initial determinations (Refer to Chapter 13, Section 5).

### 4.2.     Combining Claims

Individual claims may be combined to meet the required amount in dispute for referral of the appeal to TMA if all of the following exist:

- Claims involve the same beneficiary (When the episode of care involves the services of both network and non-network providers, only the claims submitted by the non-network providers will be considered in determining the amount in dispute),

- Claims involve the same issue, and

- At least one of the claims, so combined, has had a reconsideration determination issued by a contractor.

### 4.3.     Related Claims

When the contractor receives an appeal on a claim which has been denied, the contractor shall retrieve and examine all claims related to the specific service or supply or episode of care received by the beneficiary to determine if the claim in dispute was properly denied and if related claims were properly processed. All claims which relate to the same incident of care or the same type of service to the beneficiary shall be processed in the same

A32

manner *and shall be readjudicated and resolved along with the denied claim in the same reconsideration determination.* If one claim which relates to an excluded procedure is denied, all claims which relate to the same procedure shall also be denied. If a procedure is covered and one claim involving that procedure and episode of care is paid, other claims relating to the same procedure and/or period of care which have been denied should be examined in conjunction with the paid claim to see if the other claims may be paid or whether all the claims should be uniformly denied. The contractor shall take action in accordance with paragraph 4.4.2. to determine if any claim for the services or supplies was improperly paid or denied. All related claims shall be made part of the appeal file. The file shall contain full documentation pertaining to the issue and the care in dispute, to include a record of actions taken by the contractor on all claims involving the same issue.

**EXAMPLE 1:**  The contractor receives claims for hospitalization, testing, physician services, and the purchase of a cerebellar stimulator implant device for a TRICARE beneficiary. These claims involve the surgical implant of the cerebellar stimulator in the patient's skull. The claims for the hospital care, physician's services, and the stimulator device are denied by the contractor on the basis that the procedure is unproven. The claims for testing are paid. Upon appeal, the contractor shall retrieve all the claims for the episode of care. The contractor shall find that the charges for the testing were erroneously paid because they relate to the denied unproven procedure. The contractor shall take action in accordance with paragraph 4.4.2.

**EXAMPLE 2:**  A beneficiary with out-of-control diabetes is hospitalized, during which she receives nutrition counseling, an eye examination and insulin therapy. On the last day of the hospitalization, an M.D. performs an abortion. The initial determination denies cost-sharing for all services and the hospital requests a reconsideration. All services must be reviewed to determine which are related to the covered hospitalization for diabetes and which are related to the noncovered abortion.

**EXAMPLE 3:**  Outpatient psychotherapy sessions are provided to a beneficiary and cost-shared by the contractor for a period of twelve months. All claims for the thirteenth month are denied due to lack of an adequate treatment plan. Upon appeal of the denial of the claim, all previously paid claims shall be retrieved and examined to determine whether all the claims should be paid, all denied, or whether denial is proper for some of the claims.

**EXAMPLE 4:**  The contractor denies a claim for physical therapy on the basis that the services were not medically necessary. At reconsideration, the contractor discovers that previous claims for the same services and condition were paid in error. Because the erroneously paid claims involve the same issue - medical necessity of the physical therapy - the contractor shall add the erroneously paid claims to the reconsideration and review all claims together.

**4.4.**  **Erroneous Payments**

In considering an issue under appeal, questions may arise concerning previous payment of services or claims not under appeal. Possible erroneous payments will be

reviewed in depth, including medical review if necessary, to determine if, at the time the initial determination was made, there existed any basis for the payment. If the reviewer concludes there was a basis for payment at the time the claim was processed, the payment may stand. When the evidence indicates a payment was erroneous and not supported by law or regulation, the following action will be taken.

**4.4.1.    Recoupment Involving Separate Issues**

The contractor may request a refund and treat the recoupment action as an initial determination. Appeal rights shall be offered to the next level of appeal. Any new appeal must address itself to the benefit issue in dispute and not the fact that a refund has been requested.

**4.4.2.    Recoupment Involving Issues Under Appeal**

When the contractor examines claims which are related to the claim in dispute and determines that one or more of the related claims were improperly paid, the contractor shall explain the erroneous payment in detail and advise the appealing party of any recoupment. If the contractor determines recoupment is appropriate, the amount of the erroneously paid claim(s) will be added to the amount in dispute, and the reconsideration review will consider both the claim(s) in dispute and the erroneously paid related claim(s) which involve the same issue. If the total amount in dispute permits a higher level appeal, the appealing party will be so advised.

"TRICARE OPERATIONS MANUAL,"
DOD DIRECTIVE 6010.51-M (AUGUST 1, 2002)
(REVISED AS OF MARCH 9, 2007)

CHAPTER 13, SECTION 3

**A35**

CHAPTER 13
SECTION 3

# RECONSIDERATION PROCEDURES

**1.0.    REQUIREMENTS FOR REQUESTING A RECONSIDERATION**

**1.1.    Must Be In Writing**

**1.2.    Must Be Made By A Proper Appealing Party**

A network provider is never a proper appealing party. Disputes between a network provider and the contractor concerning authorization of services are not subject to the appeal process. Network provider disputes are addressed under the provider contract provisions, the contractor's administrative procedures, or through the state courts. Because non-network, nonparticipating providers are not proper appealing parties, non-network, nonparticipating provider disputes regarding waiver of liability determinations are addressed as allowable charge reviews rather than reconsideration reviews. If the contractor or the NQMC receives a timely appeal request for reconsideration from a person who is not authorized to participate in the appeal, before the expiration of the appeal filing deadline, the contractor or the NQMC shall treat the request as routine correspondence, and add the request to the claim file. The contractor or the NQMC shall advise the proper appealing party in writing (see Chapter 13, Addendum A, Figure 13-A-4) with a copy to the improper appealing party. A blank "Appointment of Representative," form shall be enclosed with the letter to the proper appealing party (see Figure 13-A-1). The proper appealing party shall be told that an appeal must be filed within 20 calendar days of the date of the contractor's or the NQMC's letter or by the expiration of the appeal filing deadline, whichever is the later.

**1.3.    Must Include An Appealable Issue**

**1.3.1.    Appealable Issues**

**1.3.1.1.**    A TRICARE Prime enrollee, a TRICARE Extra user or a TRICARE Standard beneficiary making use of the authorization process who requests authorization to receive services and such authorization is denied by the contractor, may appeal even though no care has been provided and no claim submitted. (Refer to *paragraph 7.2.* and Chapter 13, Section 4, paragraph 3.1.2., for additional information relating to preadmission/preprocedure denials). |

**1.3.1.2.**    The decision by the contractor to cost-share services under the Point-of-Service Option is not appealable; with the exception of the issue of whether services were related to an emergency and, therefore, exempt from the requirement for referral and authorization. Whether services were related to an emergency is a factual determination and is appealable. The TRICARE Prime enrollee must demonstrate that the care would qualify as an emergency under the criteria for emergency care set forth in 32 CFR 199.4. Should the beneficiary prevail in the appeal, the amount cost-shared would be the difference between the amount cost-shared under the Point of Service option and the amount that would have been cost-shared

had the beneficiary received the care from a network provider. A determination by the contractor that services received under the point-of-service option are not a TRICARE benefit would be appealable as a medical necessity or factual denial determination.

**1.3.1.3.**    The decision by a contractor to deny a request by the Primary Care Manager (PCM) to refer a beneficiary to a specialist is an appealable issue, if the reason for the denial is a determination by the contractor that a referral is not needed.

**1.3.1.4.**    Concurrent review authorizations granting 48 hours or less of additional services beyond the previous authorization when the provider has requested more than 48 hours of additional services. If the concurrent review authorization grants more than 48 hours of additional services beyond the previous authorization, but less than the period requested by the provider, an appeal does not exist. In such a case, the letter authorizing the additional period would inform the provider that a subsequent concurrent review will be conducted within 48 hours prior to the expiration of the newly authorized period.

**1.3.2.**    **Nonappealable Issues**

The following issues are not appealable and shall not be accepted for reconsideration. They should be counted as correspondence for both workload report and processing purposes.

**1.3.2.1.**    **Allowable Charge**

The amount of the TRICARE-determined allowable cost or charge for services or supplies is not appealable, since the methodology for determining allowable costs or charges is established by regulation. One example involving an allowable charge issue would be the contractor's decision to pay benefits under the Point of Service option (absent any claim that the care was emergency in nature and was, therefore, exempt from the requirement for referral and authorization). In cases involving contractor cutbacks or downcoding of diagnoses or procedure codes, there is no issue with respect to the medical necessity of the services provided and therefore, no appealable issue (i.e., the contractor does not determine that the services are not a benefit under TRICARE). The sole issue in these cases is the level of payment for the medically necessary services - an allowable charge issue. If, however, the contractor cutback or downcoding results in the noncoverage of a furnished service, then an appealable issue would exist. See Chapter 12, Section 9.

**1.3.2.2.**    **Eligibility**

Determination of a person's eligibility as a TRICARE beneficiary is not appealable since this determination is the responsibility of the Uniformed Services. See the TRICARE Policy Manual, Chapter 10, Section 1.1.

**1.3.2.3.**    **Denial of NAS Issuance**

Determinations relating to the issuance of a Nonavailability Statement (NAS) (DD Form 1251) based on the availability of care at the MTF are not appealable since these determinations are the responsibility of the Uniformed Services. For *non-enrolled* beneficiaries, when the issuance of an NAS is denied based on a medical necessity or a

TRICARE OPERATIONS MANUAL 6010.51-M, AUGUST 1, 2002
CHAPTER 13, SECTION 3
RECONSIDERATION PROCEDURES

factual determination (including a determination that the facts of the case do not demonstrate *an* emergency for which an NAS is not required), the beneficiary and/or civilian participating provider has the right to reconsideration. Refer to the TRICARE Policy Manual, Chapter 1, Section 6.1.

**1.3.2.4.    Provider Sanction**

If the decision is to disqualify or exclude a provider because of a determination against that provider resulting from abuse or fraudulent practices or procedures under another federal or federally-funded program is not appealable, the provider is limited to exhausting administrative appeal rights offered under the federal or federally-funded program that made the initial determination. However, a determination to sanction a provider because of abuse or fraudulent practices or procedures under TRICARE is an initial determination which is made by the contractor and is appealable under 32 CFR 199. See Chapter 14. A sanction imposed pursuant to 32 CFR 199.15(m) is appealable as described in 32 CFR 199.15(m)(3).

**1.3.2.5.    Network Provider/Contractor Disputes**

Disputes between a network provider and the contractor concerning payment for services provided by the network provider are not appealable.

**1.3.2.6.    Provider Not Authorized**

The denial of services or supplies received from a provider not authorized to provide care under TRICARE is not appealable.

**1.3.2.7.    Denial Of A Treatment Plan**

The denial of a treatment plan when an alternative treatment plan is selected is not appealable. Peer to peer dialogue resulting in selection and approval of another treatment option is not a denial of care.

**1.3.2.8.    Denial Of Services By A Primary Care Manager**

The refusal of a PCM to provide services or to refer a beneficiary to a specialist is not an appealable issue. A beneficiary who has been refused services or a referral by a PCM may file a grievance under Chapter 12, Section 10, paragraph 1.0. The decision by the contractor to deny a PCM's request to refer a beneficiary to a specialist is an appealable issue and is addressed in paragraph 1.3.1.3.

**1.3.2.9.    Designation Of Providers**

The contractor's designation of a particular network or non-network provider to perform requested services is not appealable.

**1.3.2.10.  *Point Of Service***

*The decision by the contractor to cost-share services under the Point of Service option is not appealable, with the exception of the issue of whether the services were related to an emergency and are therefore exempt from the requirement for referral and authorization.*

**1.4.     Must Be Filed Timely**

An appeal must be filed before the expiration of the appeal filing deadline or within 20 *calendar* days of the date of the contractor's letter, referenced in paragraph 1.2. In calculating the number of days elapsed, the day following the date of the previous determination is counted as day "one" with the count progressing through actual calendar days including the date the request is filed. The contractor or NQMC shall treat an untimely request for reconsideration as routine correspondence, and add the request to the claim file.

**1.4.1.     By Mail**

If the appeal is not filed timely, the contractor shall advise the appealing party that the appeal cannot be accepted since the time limit for filing was exceeded, based on the receipt date of the appeal request or the postmark date on the envelope. For the purposes of TRICARE, a postmark is a cancellation mark issued by the United States Postal Service (i.e., private mail carriers do not issue postmarks). If there is no postmark or the date of the postmark is illegible, the date of receipt by the contractor shall be used to determine timeliness of filing.

**1.4.2.     By Facsimile**

A request for reconsideration submitted by facsimile transmission (fax) is considered filed on the date the fax is received by the contractor.

**1.4.3.     By Electronic Mail**

A request for reconsideration submitted by electronic mail (e-mail) is considered filed on the date the e-mail is received by the contractor.

**1.5.     Must State The Issue In Dispute And Include Previous Determination**

The request should state the specific issue in dispute and be accompanied by a copy of the previous denial determination notice. If a contractor or the NQMC receives a request for reconsideration which otherwise satisfies the requirements as stated above, the request shall be accepted notwithstanding the failure of the appealing party to provide a copy of the previous denial determination notice or to state the specific issue in dispute. In such cases, the contractor or the NQMC shall accept the request for reconsideration and shall supply a copy of the previous denial determination notice from its files or shall initiate communication with the appealing party to clarify the specific issue in dispute, as appropriate.

**2.0.    EXTENSION OF APPEAL FILING DEADLINE**

If the appeal is untimely the appealing party shall be told that if it can be shown to the satisfaction of the contractor or the NQMC, that timely filing of the request was not possible due to extraordinary circumstances over which the appealing party had no practical control, an extension of the appeal filing deadline may be granted. A determination by the contractor or the NQMC that extraordinary circumstances do not exist is not appealable.

**2.1.    Extraordinary Circumstances Are Limited To:**

**2.1.1.    Administrative Error**

**2.1.1.1.**    Administrative error (misrepresentation, mistake or other accountable action) of an employee of the contractor performing functions under TRICARE and acting within the scope of that individual's authority. For example, an administrative error would occur when a request for reconsideration was filed with the contractor after the expiration of the appeal filing deadline but the envelope containing the reconsideration request was misplaced by the contractor. In such a case, the misplacement of the envelope by the contractor would constitute an extraordinary circumstance over which the appealing party had no practical control, thereby permitting late filing of the appeal, unless it could be determined that:

- The appealing party used a means other than the United States Postal Service to deliver the reconsideration request to the contractor, or

- The letter requesting the reconsideration was dated after the reconsideration filing deadline, or

- Other circumstances would lead to the conclusion that the reconsideration request could not have been postmarked on or before the reconsideration filing deadline (for example, the reconsideration request was received by the contractor 30 days after the reconsideration filing deadline).

**2.1.2.    Mental Incompetency**

Mental incompetency of the appealing party (this includes the inability to communicate as a result of physical disabilities).

**2.2.    Requests For Extension**

There must have been a denial of an appeal, due to lack of timely filing, before an extension can be considered. Contractors and the NQMC shall return all requests for extension of the appeals filing deadline to the requesting party if an appeal has not been denied due to lack of timely filing. The contractor and the NQMC shall inform the requesting party that the request for extension may not be considered until a request for reconsideration has been received.

TRICARE OPERATIONS MANUAL 6010.51-M, AUGUST 1, 2002
CHAPTER 13, SECTION 3
RECONSIDERATION PROCEDURES

**3.0.    RECEIPT AND CONTROL OF APPEALS**

**3.1.    Date Stamp**

All reconsideration requests shall be stamped with the actual date of receipt within three workdays of receipt by the contractor.

**3.2.    Control**

The contractor shall establish a single centralized appeals department and establish and maintain a single automated system for the control, location, and aging of appeals received. Appeals may be processed at more than one location but all appeals shall be managed and controlled by the centralized appeals department. The contractor's ability to respond to inquiries on a timely basis shall be measured from the actual date of receipt of the inquiry by the contractor, rather than from the date the inquiry was received in the appropriate responding department or from the date the inquiry was imaged by the contractor. The contractor is responsible for ensuring issuance of complete and accurate determinations on all reconsiderations within the time frames set forth in the *TRICARE Operations Manual*.

**3.3.    Acknowledgment Of Receipt Of Request For Reconsideration**

The contractor shall provide an interim written response for all reconsiderations not processed to completion by the date required, advising the appealing party of the estimated date of issuance of the reconsideration determination. A preprinted postcard may be used if information covered by the Privacy Act is not disclosed. Electronic mail may be used to respond to the appealing party, provided the contractor first obtains written permission from the appealing party to use electronic mail for communicating information regarding his or her appeal.

**3.4.    Timeliness Standards**

Chapter 13, Sections 4, 5, and 6 include standards relating to timely issuance of reconsideration determinations and timely submission of appeal case files to the NQMC and to the Appeals and Hearings Division. Standards are expressed in either calendar days or working days. To determine whether timeliness has been met relating to a standard expressed in working days, the first working day following receipt by the contractor or NQMC of the request for reconsideration, or request for the appeal file, is counted as day one of the timeliness requirement. To determine whether timeliness has been met relating to a standard expressed in calendar days, the first calendar day following receipt by the contractor or NQMC of the request for reconsideration is counted as day one of the timeliness requirement.

**4.0.     RECONSIDERATION REVIEWER QUALIFICATIONS AND ADMINISTRATIVE REQUIREMENTS**

**4.1.     Reviewer Qualifications**

*If the reconsideration determination is based on lack of medical necessity or other reason relative to reasonableness, necessity or appropriateness, the* reconsideration reviewer must be someone who is, (1) qualified under Chapter 7, Section 1, paragraph 3.0. to make an initial determination, (2) not the individual who made the initial denial determination, and (3) a specialist in the type of services under review. *Exception: A reconsideration determination fully overturning the initial denial determination can be made by the reviewer who issued the initial denial determination.*

**4.2.     Administrative Requirements**

Each review shall be dated and include the signature, legibly printed name, clinical specialty, and credentials of the reviewer. Each reviewer shall include rationale for his or her decision (i.e., a complete statement of the evidence and the reasons for the decision). In addition, the name and title of the individual issuing the reconsideration determination shall be included in the Appeal Summary Log (Figure 13-A-2). If the appeal file is forwarded to TMA, a completed "Professional Qualifications" form (Figure 13-A-3) must be included in the file for each reviewer.

**4.3.     Additional Documentation**

The contractor and the NQMC shall request and make every reasonable effort to obtain any documentation required to arrive at a proper reconsideration determination. This includes follow-up letters or documented telephone calls if requested information is not received. An appeal involving inpatient admission or length of stay may require obtaining the entire hospital record. Whenever records are required, the contractor or the NQMC shall request such records directly from the provider. Written or verbal statements made by beneficiaries regarding their medical conditions are not a substitute for medical records. If there are no extenuating circumstances alleged and no added information furnished or referenced, the contractor or the NQMC may make the determination on the information available in its records. Improperly developed or incomplete appeal files received by TMA may be returned to the contractor or the NQMC for additional development, completion, and, if appropriate, issuance of a revised reconsideration determination. Due to the time constraints involved in expedited preadmission/preprocedure appeals, fully documenting a case file may not be possible. Requirements for documenting case files for expedited preadmission/preprocedure appeals is addressed in Chapter 13, Section 4.

**4.4.     File Documentation (In Other Than Provider Termination Cases)**

The contractor and the NQMC shall carefully review the initial determination and all pertinent evidence and documentation obtained at reconsideration in light of the applicable provisions of 32 CFR 199, the TOM, the Policy Manual, the TRICARE Reimbursement Manual and all other relevant guidelines and instructions issued by TMA. The reconsideration determination shall be based on the facts of the case as shown in the

A42

evidence and shall be supported by appropriate citations from 32 CFR 199, which shall be cited in the reconsideration determination.

**4.5.    File Content, Requirements, And Structure**

**4.5.1.**    The contractor and the NQMC shall document all determinations made at the reconsideration level in sufficient detail so that, if the next level of appeal is pursued, a subsequent reviewer shall be provided with a clear and complete picture of all actions taken on the case to that point. All material related to the reconsideration shall be made part of the permanent claim file. The copy of the appeal file provided by the contractor to the NQMC or TMA must be complete, including the Appeal Summary Log (Figure 13-A-2) and the Professional Qualifications form (Figure 13-A-3). Likewise, the copy of the appeal file provided by the NQMC to TMA must be complete and include the file received by the NQMC from the contractor. In addition, the NQMC must complete and include its portion of the Appeal Summary Log.

**4.5.2.**    The contractor and the NQMC shall retain and completely document the file or files for all claims involved in the appeal. The contractor can either establish a separate appeal file containing all documents related to the appeal, or can gather all documents related to the appeal, including the completed Appeal Summary Log and Professional Qualifications Statement, into an appeal file when the file is requested by the NQMC or TMA. Irrespective of the method, the contractor and the NQMC shall be responsible for furnishing the required appeal file to the entity performing the next level of appeal within required time periods, if an appeal request is filed. The contractor is not required to submit to the NQMC, the professional qualifications of the medical reviewers referenced in paragraph 4.5.3.

**4.5.3.**    Contractors and the NQMC shall organize the appeal file so that the claim(s) and associated EOBs shall be the last section in the file and all additional documentation shall be arranged in front of it, in order of receipt. Attachments should not be separated from the transmitting document. Examples of documents that are part of the appeal file are:

- Claim(s) with attachments, including, when appropriate, all related claims,

- Explanation of Benefits (EOB) forms,

- Request for Preadmission/Preprocedure Authorization(s),

- Preadmission/Preprocedure Authorization(s),

- Request for medical and/or other documentation received or obtained by the contractor prior to making the initial determination,

- Medical and/or other documentation received or obtained by the contractor prior to making the initial determination,

- Initial determination,

- Written request(s) for reconsideration, including the envelope in which it was mailed,

- Request for additional evidence submitted by the appealing party,

- Additional evidence submitted by the appealing party,

- Written and signed opinion of the reviewer(s) referenced in paragraph 4.1.,

- Reconsideration determination(s),

- Professional qualifications of the medical reviewer(s) (see Figure 13-A-3),

- Appeal Summary Log (see Figure 13-A-2).

## 4.6.    File Documentation For A Provider Termination Case

For file documentation requirements in provider termination cases, see Chapter 14, Section 6, paragraph 4.4.

## 5.0.    APPEAL SUMMARY LOG

The contractor and the NQMC (when appropriate) shall complete the Appeal Summary Log (Figure 13-A-2).

## 6.0.    NOTICE TO APPEALING PARTY OF RESULTS OF RECONSIDERATION

The contractor and the NQMC shall inform the appealing party (or the representative if a representative has been appointed) of the reconsideration determination in writing in accordance with the timeliness standards set forth in Chapter 13, Sections 4 and 5. The reconsideration determination shall be typewritten in its entirety. Handwritten notices shall not be sent. At the request of the appealing party, a reconsideration determination may be sent by facsimile transmission (fax) or by electronic mail (e-mail), followed by mailing of the determination by means of the United States Postal Service. All claims that relate to the same incident of care or the same type of service to the beneficiary shall be addressed in a single reconsideration determination. If the appealing party is a non-network participating provider, a copy of the reconsideration determination shall be furnished to the beneficiary. Conversely, the non-network participating providers shall be furnished copies of the determination if the beneficiary filed the appeal. The notice shall include a caption identifying the beneficiary (including whether the beneficiary is Standard, *an* Extra user, or a Prime enrollee), the beneficiary's date of birth, the sponsor, the sponsor's social security number, the type of care (e.g., RTC care, outpatient psychotherapy, mammography, substance abuse, dental, etc.), the date(s) of service, the date(s) of service in dispute, whether the appeal was processed as a preauthorization, concurrent review, or retrospective review; and the providers (identifying each provider as network or non-network participating, or non-network nonparticipating). The notice shall include the following headings:

**6.1.    Statement Of Issues**

The contractor and the NQMC shall summarize the issue or issues under appeal and shall be clear and concise. All issues shall be addressed; for example, a reconsideration determination in all cases requiring preadmission authorization shall address the requirement for preadmission authorization of the care as well as whether the requirement was met.

**6.2.    Applicable Authority**

The contractor and the NQMC shall briefly discuss the provision of law, regulation, TRICARE policy or TRICARE guidelines on which the determination was made. Include pertinent specific citations and quotations of applicable text. The contractor should omit authority that is not applicable to the case under review (e.g., when citing cosmetic surgery policy, the contractor need not include a listing of all procedures considered by TRICARE to constitute cosmetic surgery, but should quote only the procedure(s) applicable to the case under review).

**6.3.    Discussion**

The contractor and the NQMC shall discuss the original and any added information relevant to the issue(s) under appeal, clearly and concisely, and shall state the patient's condition, including symptoms. Usually one or two paragraphs will suffice unless the issues are complex. The contractor and the NQMC shall include a discussion of any secondary issues raised by the appealing party or which may have been discovered during the reconsideration process.

**6.4.    Decision**

The contractor and the NQMC shall state the decision and whether the reconsideration upholds or reverses the original decision in whole or in part, and clearly and concisely state the rationale for the decision; i.e., fully state the reasons that were the basis for the approval or denial of TRICARE benefits. If applicable TRICARE criteria must be met, the patient's medical condition must be related to each criterion and a finding made concerning whether each criterion is met. The contractor and the NQMC shall state the amount in dispute remaining as a result of the decision and how the amount in dispute was determined (calculated). Also state whether payments are to be recouped.

**6.5.    Waiver Of Liability**

Waiver of Liability provisions are only applicable to denials as described in Chapter 13, Section 4. For applicable cases, the contractor and the NQMC shall include a statement explaining waiver of liability determination as applied *to* the beneficiary and to each provider, including the rationale for each decision. A beneficiary found not to be liable for the entire episode of care will not be offered further appeal rights. Refer to the TRICARE Policy Manual, Chapter 1, Section 4.1 for information relating to waiver of liability.

TRICARE OPERATIONS MANUAL 6010.51-M, AUGUST 1, 2002
CHAPTER 13, SECTION 3
RECONSIDERATION PROCEDURES

**6.6.    Hold Harmless**

Hold harmless provisions are applied only to care provided by a network provider. In applicable cases, the contractor and the NQMC shall include a statement explaining hold harmless, including how the provision is waived, the beneficiary's right to a refund, the method by which a beneficiary can request a refund, and must provide information regarding from what entity a refund can be requested. (See Chapter 5, Section 1, paragraph 2.5.)

**6.6.1.**    Suggested wording for inclusion in a reconsideration determination in which a provider is a network provider is:

"If you decide to proceed with the service or it has already been provided, and the service is provided by a network provider *who was aware of your TRICARE eligibility,* you may be held harmless from financial liability despite the service having been determined to be non-covered by TRICARE. A network provider cannot bill you for non-covered care unless you are informed in advance that the care will not be covered by TRICARE and you waive your right to be held harmless by agreeing in advance (which agreement is evidenced in writing) to pay for the specific non-covered care. If the service has already been provided when *you* receive this letter and it was provided by a network provider *who was aware of your TRICARE eligibility,* and if there was no such agreement and you have paid for the care, you *may* seek a refund for the amount you paid. This can be done by requesting a refund from [insert contractor name and address].

Include documentation of your payment for the care, by writing to the above address. If you have not paid for the care and have not signed such an agreement, and a network provider is seeking payment for the care, please notify the TRICARE Management Activity, Beneficiary and Provider Services Directorate, 16401 East Centretech Parkway, Aurora, CO 80011-9066.

Under hold harmless provisions, the beneficiary has no financial liability and, therefore, has no further appeal rights. If, however, you agree(d) in advance to waive your right to be held harmless, you will be financially liable and the appeal rights outlined below would apply. Similarly, the appeal rights outlined below apply if you have not yet received the care or if you received the care from a non-network provider and there is $50.00 or more in dispute."

**6.7.    Point-of-Service**

The Point-of-Service option is available to TRICARE Prime beneficiaries who seek or receive non-emergency specialty or inpatient care, either within or outside the network which is neither provided by the beneficiary's Primary Care Manager or referred by the Primary Care Manager, nor authorized by the contractor. The contractor and the NQMC shall provide beneficiaries who enroll in TRICARE Prime full and fair disclosure of any

restrictions on freedom of choice that may be applicable to enrollees, including the Point-of-Service (POS) option. Therefore, the contractor and the NQMC must explain the right of the beneficiary to exercise the POS option and its effect on the payment of benefits for services determined to be medically necessary (Additional information about the POS option can be found in the TRICARE Reimbursement Manual, Chapter 2, Section 3).

**6.7.1.**     Suggested language to be included in a reconsideration determination where the beneficiary has been identified as a TRICARE Prime enrollee is:

> "Should you, as a TRICARE Prime enrollee, elect to proceed with this service and the service is provided by a non-network provider, and provided the service is found upon appeal to have been medically necessary, benefits will be payable under the deductible and cost-share amounts for Point-of-Service claims and your out-of-pocket expenses will be higher than they would be had you received the service from a network provider. No more than 50% of the allowable charge can be paid by the government for care provided under the Point-of-Service option."

## 6.8.     Appeal Rights

The contractor and the NQMC shall state whether further appeal rights are available if the determination is less than fully favorable.

### 6.8.1.     Medical Necessity Contractor Reconsideration Determinations

If the contractor reconsideration determination is less than fully favorable, the contractor shall include a statement explaining the right of the beneficiary (or representative) and the non-network participating provider to request an appeal to the NQMC for a second reconsideration. Timeframes to file an appeal of the contractor reconsideration determination are as follows:

#### 6.8.1.1.     Expedited Preadmission/Preprocedure Reconsiderations

The beneficiary shall file the appeal request with the NQMC within three calendar days after the date of receipt of the initial reconsideration determination. The date of receipt of the appeal request by the NQMC shall be considered to be five calendar days after the date of mailing, unless the receipt date is documented. A request for reconsideration filed with the NQMC by the beneficiary more than three calendar days after the date of receipt but within 90 calendar days from the date of the initial reconsideration determination will be addressed as a nonexpedited reconsideration.

#### 6.8.1.2.     Nonexpedited Reconsiderations

The beneficiary or non-network participating provider shall file the appeal request with the NQMC within 90 calendar days after the date of the initial reconsideration determination.

NOTE:     Refer to Chapter 13, Section 4, paragraph 2.6.2. for the appeal process in concurrent review cases.

**6.8.2.     Factual Reconsideration Determination**

If the reconsideration is less than fully favorable and $50 or more remains in dispute, the contractor shall include a statement explaining the rights of the beneficiary (or representative) and the non-network participating provider to request a formal review with TMA. A request for formal review must be postmarked or received by TMA within 60 calendar days from the date of the notice of the reconsideration determination issued by the contractor.

**6.8.3.     Reconsideration Determinations Issued By The NQMC**

If the reconsideration determination issued by the NQMC is less than fully favorable and $300 or more remains in dispute, the contractor shall include a statement explaining the right of the beneficiary (or representative) and the non-network participating provider to file a request for hearing with TMA. A request for hearing must be postmarked or received by TMA within 60 calendar days from the date of the notice on the reconsideration determination issued by the NQMC. Refer to paragraph 7.2. regarding hearings in preadmission/preprocedure cases in which the requested service(s) have not commenced.

**6.8.4.     When the Amount Required to File an Appeal Remains in Dispute**

The following wording is suggested if the amount required to file an appeal remains in dispute. (See Chapter 13, Section 2, paragraph 4.0. for required amount in dispute):

**6.8.4.1.     Nonexpedited Reconsideration Determination**

"An appropriate appealing party (i.e., (1) the TRICARE beneficiary, (2) the non-network participating provider of care or (3) a provider of care who has been denied approval under TRICARE), or the appointed representative of an appropriate appealing party, has the right to request a (insert level of appeal). The request must be in writing, be signed, and postmarked or received by **(insert the NQMC name, postal address, e-mail address, and fax number or the Appeals and Hearings Division, TMA, 16401 East Centretech Parkway, Aurora, Colorado 80011-9066)**, within **(insert number of calendar or working)** days from the date of this decision and must include a copy of this reconsideration determination. For the purposes of TRICARE, a postmark is a cancellation mark issued by the United States Postal Service.

Additional documentation in support of the appeal may be submitted. However, because a request for **(insert level of appeal)** must be postmarked or received within **(insert number)** days from the date of the reconsideration determination, a request for **(insert level of**

**appeal)** should not be delayed pending the acquisition of any additional documentation. If additional documentation is to be submitted at a later date, the letter requesting the **(insert level of appeal)** must include a statement that additional documentation will be submitted and the expected date of submission.

Upon receiving your request, all TRICARE claims related to the entire course of treatment will be reviewed."

**6.8.4.2.    Expedited Preadmission/Preprocedure Reconsideration Determination (include in addition to the suggested wording above)**

"The TRICARE beneficiary, or the appointed representative of the beneficiary, has the alternative of requesting an expedited reconsideration. The request must be in writing, be signed and must be received by **(insert the NQMC name, postal address, e-mail address, and fax number)** within three working days after the receipt of this denial determination, and must include a copy of this denial determination. A request for an expedited reconsideration filed after the three day appeal filing deadline will be accepted as a nonexpedited request for reconsideration. It is recommended that any additional documentation you may wish to submit be submitted with the request for expedited reconsideration. Upon receiving your request, all TRICARE claims related to the entire course of treatment will be reviewed."

**6.8.5.    Amount In Dispute Less Than The Amount Required To File An Appeal**

For those cases in which the amount in dispute is less than the amount required to file an appeal (refer to Chapter 13, Section 2, paragraph 4.0. for Required Amount in Dispute), the contractor or the NQMC shall notify the appealing party or representative that the reconsideration determination is final and no further administrative appeal is available. The following is suggested wording:

"Because the amount in dispute is less than **(insert required amount in dispute)**, this reconsideration determination is final and there are no further appeal rights available."

**7.0.    EFFECT OF THE RECONSIDERATION DETERMINATION**

**7.1.**    The reconsideration determination is final and binding upon all parties unless:

**7.1.1.**    The amount in dispute meets the jurisdictional requirements required to file an appeal (Refer to Chapter 13, Section 2, paragraphs 3.3. and 4.0. regarding requirements for an amount in dispute.), appeal rights were offered in the notice of denial at the reconsideration (or second reconsideration) level, and a request for a second reconsideration, formal review, or hearing, as applicable, is either postmarked or received by the appeal filing deadline, or

**7.1.2.**    The contractor's reconsideration (or NQMC's second reconsideration) decision is reopened and revised by the contractor or the NQMC, either on its own motion or at the request of a party, within one year from the date of the reconsidered determination, or

**7.1.3.**    The contractor's reconsideration (or the NQMC's second reconsideration) is reopened and revised by the contractor or the NQMC, after one year but within four years, because: new and material evidence is received; a clerical error in the reconsideration determination is discovered; the contractor or the NQMC erred in an interpretation or application of TRICARE coverage policy; or an error is apparent on the face of the evidence upon which the reconsideration (or second reconsideration) determination was based, or

**7.1.4.**    The contractor's reconsideration (or the NQMC's second reconsideration) is reopened and revised by the contractor or the NQMC at any time, if the reconsideration (or second reconsideration) determination was obtained through fraud or an abusive practice, e.g., describing services in such a way that a wrong conclusion is reached; or

**7.1.5.**    The contractor's reconsideration (or the NQMC's second reconsideration) is reversed upon appeal at a hearing in accordance with the provisions of 32 CFR 199.10 and 199.15.

**7.1.5.1.**    Beneficiaries may appeal an NQMC reconsideration determination to TMA and obtain a hearing on such appeal to the extent allowed under the procedures in 32 CFR 199.10(d).

**7.1.5.2.**    A non-network participating provider may appeal an NQMC reconsideration determination to TMA and obtain a hearing on such appeal to the extent allowed under the procedures in 32 CFR 199.10(d). The issue in a hearing requested by a provider is limited to waiver of liability (i.e., whether the provider knew or could reasonably have been expected to know that the services were excludable) (refer to paragraph 4.0.). Because waiver of liability applies only to services retrospectively determined to be potentially excludable, waiver of liability will not apply in concurrent review or preadmission/preprocedure cases (i.e., non-network participating providers may request hearings only in cases involving retrospective determinations with the issue being limited to waiver of liability.)

**7.2.**    Further appeal of a preadmission/preprocedure denial to the hearing level is not permitted unless the requested services have commenced. An appeal to a hearing where the services have not commenced is not allowed because there would not be an adequate remedy should the hearing final decision hold in favor of the beneficiary. This is because the issue at hearing would be whether the medical documentation at the time of the request for preadmission/preprocedure demonstrated medical necessity for the services requested. A final decision issued as a result of the hearing process (which may take several months to complete) holding that the beneficiary met the requirements for preadmission/preprocedure on the date the preadmission/preprocedure request was made could not be implemented as the circumstances that warranted the services at the time of the initial request would unquestionably have changed.

**8.0.    CASES RETURNED WITHOUT TMA REVIEW**

At the discretion of TMA, certain cases appealed may be returned to the contractor for processing without the issuance of a formal review or hearing decision. These cases will normally involve instances in which a processing error has resulted in a denial or partial denial of a claim; instances in which the contractor has failed to obtain additional documentation as required by paragraph 4.3.; instances in which the contractor has failed to address the entire episode of care; instances in which the contractor has erroneously identified a medical necessity issue as a factual issue and visa-versa; instances in which the contractor has failed to complete the Appeal Summary Log; and instances in which the contractor has failed to offer appropriate appeal rights. Also, TMA, in doing normal development associated with the appeal process, may obtain information that resolves the issues without further review by TMA. If the case is returned for reprocessing, for record purposes the case will be treated as a new request for reconsideration (i.e., Chapter 1, Section 3, paragraph 4.0., will apply and the returned case will be reported for workload purposes). Development for additional documentation, if necessary, will be performed as it would in any reconsideration case. The contractor shall issue a revised reconsideration determination based on the merits of the claim. If applicable, additional appeal rights shall be offered by the contractor.

**9.0.    RECORD OF RECONSIDERATION**

The contractor shall ensure maintenance of records incorporating the following requirements:

**9.1.**    The contractor shall maintain the record of its reconsideration determinations in accordance with the requirements of Chapter 2, Section 2, paragraph 1.20.

**9.2.**    The record of the reconsideration shall include:

- The initial determination.

- The basis for the initial determination.

- Documentation of the date of receipt of the request for reconsideration (include the envelope in which the request for reconsideration was received if the request was made by letter posted with the United States Postal Service).

- Record(s) of telephone contacts with provider(s).

- Evidence submitted by the parties or obtained by the contractor.

- Legible dated copies of medical (Peer) reviews with accompanying "professional qualifications" forms.

- A copy of the notice of the reconsideration determination that was provided to the parties.

- Documentation of the delivery or mailing and, if appropriate, the receipt of the notice of the reconsideration determination by the parties.

- Claims and Explanations of Benefits (EOB) forms.

- Appeal Summary Log.

- Request for preauthorization.

- Response to request for preauthorization.

**10.0.    CONTRACTOR PARTICIPATION IN THE FORMAL REVIEW AND HEARING**

**10.1.**    Contractor participation in the formal review and hearing is limited to submission of written documentation to TMA to be considered in the adjudication of the appeal. TMA will notify the contractor, by requesting the contractor's appeal file, when a request for formal review or hearing is received. The contractor shall advise TMA within ten calendar days of receiving notification that a formal review or hearing request has been received, that it intends to participate in the formal review or hearing through submission of additional documentation. The additional documentation shall be received by TMA within 20 calendar days following the notice to the contractor of the receipt of the formal review or hearing request.

**10.2.**    The contractor may appear at the hearing as a witness and offer testimony in such capacity. TMA will notify the contractor when a request for hearing is received by requesting the contractor's appeal file. The contractor shall advise TMA, within ten calendar days of receiving notification that a hearing request has been received, that it intends to appear at the hearing as a witness. If the contractor has advised TMA that it intends to appear at the hearing as a witness, TMA will advise the contractor of the time and place of the hearing.

**10.3.**    If, after receiving notice from TMA that a formal review or hearing request has been submitted, the contractor and the NQMC receive additional claims or documentation related to the formal review or hearing, the contractor and the NQMC shall notify TMA of the receipt of the additional claims or documentation and submit copies of the claims or documentation to TMA, as well as copies of any written response the contractor or NQMC may have issued resulting from the receipt of additional claims or documentation.

"TRICARE OPERATIONS MANUAL,"
DOD DIRECTIVE 6010.51-M (AUGUST 1, 2002)
(REVISED AS OF MARCH 9, 2007)

CHAPTER 12, SECTION 8

CHAPTER 12
SECTION 8

# ALLOWABLE CHARGE REVIEWS (INCLUDES DRGS)

## 1.0.    GENERAL

Beneficiaries and providers have the right to question the amount allowed for services received or rendered for non-network care. (Network providers should have complaint procedures included in their contracts or the administrative procedures established with the TRICARE contractor.) The amount of the allowance is not an appealable issue under the appeals procedures and regulations of the program. When a complaint is received, the accuracy of the application of the reimbursement methodology, including the procedure code and the profile development must be verified. The rights of the beneficiaries and providers must be protected by careful review of each case. For allowable charge complaints related to reimbursement based on the TRICARE National Allowable Charge System, see paragraph 4.0., below.

## 2.0.    ALLOWABLE CHARGE REVIEW CRITERIA

### 2.1.    Requirements

The allowable charge inquiry must be received or postmarked within 90 days from the date of the EOB or it may be denied for lack of timeliness. If the inquiry is in writing and the issue is not clearly a question of allowable charge, any doubt must be resolved in favor of handling the case as an appeal. Allowable charge complaints shall be reported on the workload report as required by Chapter 15, Section 4. The contractor shall respond only to a person entitled to the information; i.e., beneficiary, parent/guardian, participating provider, other TRICARE contractors, or to TMA.

### 2.2.    Allowable Charge Complaint Procedures

An allowable charge complaint need not be submitted in writing. Oral inquiries (complaints) shall be documented on a contact report, by contractor staff. The handling requirements for timeliness of contractor processing are the same as for routine or priority correspondence. Upon receipt of an allowable charge complaint, the contractor shall recover the claim and related documents, including the "Beneficiary History and Deductible File", to completely review the case and establish accuracy of processing. The following checklist is suggested:

### 2.2.1.    Was the correct procedure code used?

### 2.2.2.    Were there other clerical errors, such as wrong type of service code, which may have caused the difference?

### 2.2.3.    Did the case go to medical review?

1

TRICARE OPERATIONS MANUAL 6010.51-M, AUGUST 1, 2002
CHAPTER 12, SECTION 8
ALLOWABLE CHARGE REVIEWS (INCLUDES DRGs)

**2.2.4.**    Was all needed medical documentation present to make a completely accurate determination?

**2.2.5.**    Should the case be further documented and referred to medical review?

**2.2.6.**    Was the profiled fee calculated correctly?

NOTE:    Contractors need not routinely validate the fee calculation; however, if the difference between billed and allowed is 20% or more, the dollar value of the difference is significant and all other factors appear to be correct, there is reason to question the validity of the fee.

**2.3.**    **Responses To Allowable Charge Complaints**

A written response to allowable charge complaints is preferred, but the inquiry can be handled by documented telephone call, as may other correspondence. The beneficiary or provider must be offered a written response. If the complaining party indicates dissatisfaction with the contractor's oral explanation of an adverse determination, the contractor will send a detailed letter advising of the results. Occasionally the allowable charge complaint or inquiry will be sent directly to the TMA instead of the contractor. When this occurs, the complaint/inquiry will be forwarded to the contractor for response.

**2.3.1.**    **Adverse Determination**

If the processing and payment were correct, the inquirer shall be told of the outcome and advised of the methodology for determining allowable charges. The explanation should clearly indicate that the determination was based on the information presented and, if more complex procedures were involved or if the case was unusually complex, whether additional information could change the determination. If such information is available to the inquirer, it should be submitted to the contractor for further review. If, after the contractor's review, it is determined that the original amount is still correct, the inquirer shall be informed that this is the final determination.

**2.3.2.**    **Additional Payment Due**

If it is found that an error has occurred, or if added information is secured which changes the determination, an adjustment shall be made. The notice of the determination shall explain the reason for the adjustment, e.g., correction of clerical error, added claim information provided, correction of information provided on the claim, etc. Adjustments shall be prepared in accordance with instructions in Chapter 11.

**3.0.**    **EXCESS CHARGES BILLED IN PARTICIPATING PROVIDER CLAIM CASES**

If an allowable charge inquiry/complaint indicates a participating provider is improperly billing for more than the allowable charge, refer to Chapter 14.

2

**A55**

## 4.0.  CHAMPUS MAXIMUM ALLOWABLE CHARGE SYSTEM

**4.1.**    For allowable charge complaints involving reimbursement based on the CHAMPUS Maximum Allowable Charge System, the contractor shall adhere to the limitations stated in paragraph 2.1. In addition, the contractor will follow the instructions stated in paragraph 2.2., including paragraphs 2.2.1. through 2.2.5. The contractor will have no responsibility for determining whether or not the profiled fee for any given Medicare locality was calculated correctly. Once the contractor verifies that the correct procedure code was used, no data entry errors were made (including determination of where the service was rendered), and that referral to second level or medical director review was appropriate, the contractor shall respond to the inquiry stating that the payment calculation was correctly computed.

**4.2.**    If it is determined that an error was made by the contractor in calculating the correct payment, the contractor shall follow the procedures in paragraph 2.3., above.

**4.3.**    In the event the TMA, B&PS is notified by the contractor computing the CHAMPUS Maximum Allowable Charge (CMAC) that an error was made in the basic calculations, the contractor will receive a letter from TMA with the corrected CMAC directing the contractor to replace the incorrect CMAC as soon as possible but no later than ten working days after receipt of the TMA letter. Contractors are not required to adjust all the claims processed with the incorrect CMACS; however, contractors shall adjust any claims which were processed using the incorrect CMAC when a provider or beneficiary requests that adjustment.

## 5.0.    DRG REVIEWS

The request from a hospital for reclassification of a claim to a higher DRG must be received or postmarked within 60 days from the date of the EOB; otherwise, the request will be denied for lack of timeliness. The contractor review is the final determination; there is no further review.

3

**A56**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| LAKEWOOD HEALTH SYSTEM AND NORTHWEST MEDICAL CENTER, )<br><br>Plaintiffs, )<br><br>v. )<br><br>TRIWEST HEALTHCARE ALLIANCE CORP., )<br><br>Defendant. ) | Civil Action No. 07-69-GMS |

**AFFIDAVIT OF LAWRENCE J. HAGGERTY**

STATE OF ARIZONA )
                            )    S.S.:
COUNTY OF MARICOPA )

Lawrence J. Haggerty, being duly sworn according to law, deposes and says as follows:

1.      I am the Executive Vice President and Chief Financial Officer of TriWest Healthcare Alliance Corp., the defendant in the above-captioned matter. I am submitting this declaration in order to authenticate the attached four documents for consideration by the Court in connection with TriWest's Motion to Dismiss on grounds of lack of jurisdiction and failure to join a necessary party. I am familiar with the record-keeping system used by TriWest to send, receive and maintain correspondence, including the documents at Exhibits A through D.

**A57**

2.      The attached documents are copies of correspondence between TriWest Healthcare Alliance Corp. ("TriWest"), Wescott Healthcare LLC ("Wescott") and the Department of Defense TRICARE Management Activity ("TMA").

3.      Exhibit A is a true and correct copy of a letter dated September 8, 2005, from Michael Tobin (President and CEO of Wescott) to David J. McIntyre (President and CEO of TriWest) that was received by TriWest in the ordinary course of its business. Attached to that letter was a list of "Non-Contracted Sole Community Hospitals" that includes one of the plaintiffs in this lawsuit, Northwest Medical Center of Thief River Falls, Minnesota.

4.      Exhibit B is a true and correct copy of a letter dated September 28, 2005, from David J. McIntyre to Bruce Mitterer (TMA's Contracting Officer for the TriWest West Region Contract). That letter was provided to Mr. Mitterer by TriWest in the ordinary course of its business in order to seek guidance and direction from TRICARE Management Activity regarding the issues raised by the September 8, 2005 letter from Wescott.

5.      Exhibit C is a true and correct copy of a letter dated December 21, 2005, from Bruce Mitterer to David J. McIntyre providing TMA's guidance and direction regarding the issues raised by the September 8, 2005 letter from Wescott. In this letter, TMA's Contracting Officer stated in unambiguous terms that "we disagree with the argument put forth by [the hospitals] and believe that TriWest has paid the hospitals in question appropriately, as required by 32 CFR 199 and the TRICARE Manuals." This letter was received by TriWest in the ordinary course of its business.

**A58**

6.    Exhibit D is a true and correct copy of a letter dated January 25, 2001,

from Charles Blomberg (TMA's Contracting Officer Representative) to Scott Montplaisir

(TriWest's Director of Contract Management and Compliance) providing TMA's

guidance and direction on similar subjects as in the letters at Attachments A through C.

This letter was received by TriWest in the ordinary course of its business.

7.    The documents at Exhibits A through D are authentic copies of the items

of correspondence between TriWest, Wescott and TMA, as indicated in Paragraphs

3 through 6, above, and were maintained by TriWest in the ordinary course of its

business.


_____
Lawrence J. Haggerty
Executive Vice President and CFO
TriWest Healthcare Alliance Corp.

SWORN TO AND SUBSCRIBED
before me this *15th* day of March, 2007.

_____
Notary Public


**KAREN McLOUGHLIN**
Notary Public - Arizona
Maricopa County
Expires 10/15/2010

**A59**

EXHIBIT A

# Wescott
## Healthcare LLC

1180 West Peachtree Street, Suite 700
Atlanta, GA 30309-3448
phone: 404.253.6961
fax: 404.253.6901
www.wescotthealthcare.com

**VIA CERTIFIED MAIL,**
**RETURN RECEIPT REQUESTED**

September 8, 2005

David J. McIntyre, Jr.
President and CEO
TriWest Healthcare Alliance
2444 W. Las Palmaritas Drive
Phoenix, AZ 85021

RE: Demand for Payment

Dear Mr. McIntyre:

Wescott Healthcare, LLC writes to you on behalf of the thirty-eight (38) non-contracted, sole community hospitals (the "Hospitals") it represents in the West region. A list of the represented Hospitals is set forth on Exhibit A. The Hospitals have recently determined that they have been underpaid for certain outpatient services they provided to Champus/TRICARE beneficiaries during the period of time in the last six years in which they have respectively been recognized as a sole community hospital pursuant to 42 U.S.C. §1395ww(d)(5)(D)(iii). The applicable dates during which each of the Hospitals was recognized as a sole community hospital, and was not contracted with Champus/TRICARE, is set forth on Exhibit A.

Specifically, it is our position, as more fully set forth below, that the Hospitals were, and are, entitled to be paid their billed charges for all outpatient services rendered by the Hospitals, with the exception of certain facility costs for surgery services governed by 32 C.F.R. §199.14(d) ("Ambulatory Surgical Services"). The Hospitals are not, at this time, asserting any claims relative to the appropriate payment of the professional fees paid to physicians.

Pursuant to the Code of Federal Regulations and the applicable TRICARE manuals, outpatient services provided at non-contracted, sole community hospitals should be paid, with the exception of Ambulatory Surgical Services, at billed charges. 32 C.F.R. §199.14 sets forth the manner in which hospitals must be reimbursed by TRICARE.

Subsection (a) of 32 C.F.R. §199.14 states "[t]he CHAMPUS-determined allowable cost for reimbursement of a hospital shall be determined on the basis of one of the following methodologies." (emphasis added) Because the Hospitals are exempt from

*Innovative Healthcare Solutions*

the DRG–based payment system (see 32 C.F.R. §199.14(a)(1)) and from the CHAMPUS mental health per diem payment system (see 32 C.F.R. §199.14(a)(2)) and the Hospitals have not entered into contracts voluntarily agreeing to a lower reimbursement level (see 32 C.F.R. §199.14(a)(4)), they are required to be paid pursuant to subsection 199.14(a)(3), which states:

> Billed charges and set rates. The allowable costs for authorized care in all hospitals not subject to the CHAMPUS DRG-based payment system or the CHAMPUS mental health per diem payment system shall be determined on the basis of billed charges or set rates.

See 32 C.F.R. §199.14(a)(3).

Moreover, although 32 C.F.R. §199.14(a)(5) addresses the payment methodology to be applied to certain outpatient services, it is our position that in addition to not being properly promulgated, this provision does not apply to non-contracted, sole community hospitals, but rather to hospitals that are reimbursed for inpatient services on the basis of subsections 199.14(a)(1) or (a)(2). Unlike subsections 199.14(a)(1) and (a)(2), which address only the payment methodology to be used with respect to inpatient care, and therefore necessitate the application of the outpatient reimbursement methodology set forth under subsection 199.14(a)(5), subsection 199.14(a)(3) governs the manner in which **all** services, both inpatient and outpatient (with the exception of Ambulatory Surgical Services), delivered at hospitals falling within this provision must be paid. Similarly, hospitals that have contracted with Champus/TRICARE will be governed by their contracted rates as required by 32 C.F.R. §199(a)(4), and not by the methodology set forth under subsection 199.14(a)(5). Consequently, the Code of Federal Regulations require that non-contracted, sole community hospitals, such as the Hospitals, be paid their billed charges for all outpatient services, excluding Ambulatory Surgical Services.

Consistent with this directive, TRICARE manuals provide that the Hospitals should be paid charges for the outpatient services rendered. Specifically, the TRICARE Policy Manual, June 25, 1999, 6010.47-M, Ch. 13 §6.9 (III)(A), stated that "[s]ince there is not a payment reimbursement system developed for outpatient hospital services, billed charges are used in the payment of such services." Further, this payment methodology of billed charges was reaffirmed in the March 2002 TRICARE Reimbursement Manual, March 15, 2002, 6010.53-M, Ch. 1 §25(III)(C), which states that "[f]or hospital outpatient facility services, payment shall be paid as billed," and again reaffirmed in the Reimbursement Manual, August 1, 2002, 6010.55-M, Ch. 1 §24(III)(B), which states "[o]ther services without allowable charges, such as facility charges, shall be paid as billed." Therefore, each of the Hospitals is entitled to be immediately reimbursed for all underpayments due to them for the period each was a non-contracted sole community hospital during the past six years.

Notwithstanding each Hospital's right to file appropriate claims demanding resolution of this matter, the Hospitals would prefer to amicably resolve this matter with TriWest, if possible. To that end, and reserving all of the Hospitals' rights to take any

**A62**

and all legal action that may be necessary, we will be calling you on or before September 16, 2005 to determine if it would be productive to schedule a meeting in September to discuss a cost effective agreed upon resolution of this matter without the need for expensive and protracted litigation. In the interim, if you have any questions regarding this matter, please address all of your inquiries to either myself at 404.253.6969 (or MCTobin@wescotthealthcare.com), or Jim Askew at 404.253.6970 (or JEAskew@wescotthealthcare.com).


Sincerely,

Michael C. Tobin
President and CEO


cc: James E. Askew, Vice President

**A63**

Exhibit A.
Non-Contracted Sole Community Hospitals in West Region

| STATE | HOSPITAL | CITY | SCH CLAIMS RANGE [1] |
|---|---|---|---|
| NM | Alta Vista Regional Hospital | Las Vegas | 4/1/2000 - 8/31/2005 |
| IA | Burgess Health Center | Onawa | 9/1/1999 - 8/31/2005 |
| MO | Carroll County Memorial Hospital | Carrollton | 9/1/1999 - 8/31/2005 |
| IA | Cass County Memorial Hospital | Atlantic | 9/1/1999 - 8/31/2005 |
| NV | Churchill Community Hospital | Fallon | 9/1/1999 - 3/31/2004 |
| NM | Eastern New Mexico Medical Center | Roswell | 9/1/1999 - 8/31/2005 |
| WY | Evanston Regional Hospital | Evanston | 11/1/1999 - 8/31/2005 |
| AK | Fairbanks Memorial Hospital | Fairbanks | 9/1/1999 - 1/3/2001 |
| CA | Fallbrook Hospital [2] | Fallbrook | 9/1/1999 - 8/31/2005 |
| OR | Grande Ronde Hospital | La Grande | 9/1/1999 - 8/31/2005 |
| MO | Hannibal Regional Hospital | Hannibal | 9/1/1999 - 8/31/2005 |
| KS | Herington Municipal Hospital [3] | Herington | 9/1/1999 - 8/31/2005 |
| KS | Hodgeman County Health Center | Jetmore | 9/1/1999 - 8/31/2005 |
| CA | Lassen Community Hospital | Susanville | 9/1/1999 - 8/31/2005 |
| KS | Lawrence Memorial Hospital | Lawrence | 1/1/1999 - 11/30/2000 |
|  |  |  | 12/1/2002 - 9/30/2004 |
| CO | Lincoln Community Hospital & Nursing Home | Hugo | 9/1/1999 - 8/31/2005 |
| CA | Mendicino Coast District Hospital | Fort Bragg | 9/1/1999 - 8/31/2005 |
| NM | Mimbres Memorial Hospital | Deming | 9/1/1999 - 8/31/2005 |
| MO | Moberly Regional Medical Center | Moberly | 3/1/2003 - 8/31/2005 |
| CA | Modoc Medical Center | Alturas | 9/1/1999 - 8/31/2005 |
| MO | Northeast Regional Medical Center | Kirksville | 12/1/2000 - 8/31/2005 |
| MN | Northwest Medical Center | Thief River Falls | 9/1/1999 - 8/31/2005 |
| MO | Northwest Medical Center | Albany | 3/16/2002 - 8/31/2005 |
| NV | Nye Regional Medical Center | Tonopah | 9/1/1999 - 8/31/2005 |
| IA | Ottumwa Regional Health Center | Ottumwa | 11/1/2003 - 8/31/2005 |
| AZ | Payson Regional Medical Center | Payson | 9/1/1999 - 8/31/2005 |
| MO | Phelps County Regional Medical Center | Rolla | 9/1/1999 - 8/31/2005 |
| TX | Reeves County District Hospital | Pecos | 9/1/1999 - 8/31/2005 |
| CA | Ridgecrest Regional Hospital | Ridgecrest | 9/1/1999 - 3/31/2000 |
| AZ | Sierra Vista Regional Health Center | Sierra Vista | 9/1/1999 - 10/31/2001 |
| KS | Southwest Medical Center | Liberal | 9/1/1999 - 9/30/2000 |
|  |  |  | 10/1/2002 - 8/31/2005 |
| MT | St. James Healthcare | Butte | 9/1/1999 - 8/31/2005 |
| ND | St. Joseph's Hospital & Health Center | Dickinson | 9/1/1999 - 8/31/2005 |
| CO | Sterling Regional MedCenter | Sterling | 9/1/1999 - 8/31/2005 |
| CA | Tahoe Forest Hospital | Truckee | 9/1/1999 - 8/31/2005 |
| WY | Washakie Medical Center | Worland | 9/1/1999 - 8/31/2005 |
| AZ | White Mountain Regional Medical Center | Springerville | 9/1/1999 - 8/31/2005 |
| AZ | Yavapai Regional Medical Center | Prescott | 4/1/2003 - 8/31/2005 |
|  |  |  |  |
| 1 | The information in this chart is based on information the hospitals provided to us. |  |  |
| 2 | The TriWest provider directory identifies Fallbrook Hospital as a network provider, but the hospital believes it has not entered into any Champus/TRICARE contracts. |  |  |

**A64**

Exhibit A.
Non-Contracted Sole Community Hospitals in West Region

| STATE | HOSPITAL | CITY | | SCH CLAIMS RANGE |
|---|---|---|---|---|
| 3 | The TriWest provider directory identifies Herington Municipal Hospital as a network provider, but the hospital believes it has not entered into any Champus/TRICARE contracts. | | | |

**A65**

EXHIBIT B



PO Box 42049
Phoenix, AZ 85080-2049
602-584-2050

www.triwest.com

Office of the President

September 28, 2005

Mr. Bruce Mitterer
Contracting Officer
TRICARE Management Authority
TRICARE Regional Office, West
401 West A Street, Suite 2100
San Diego, CA 92101-7908

RE:    Outpatient Reimbursement for Sole Community Hospitals

Dear Mr. Mitterer:

Enclosed for your review please find correspondence dated September 8, 2005
that TriWest Healthcare Alliance received from Mr. Michael C. Tobin, President
and CEO of Wescott Healthcare LLC. Mr. Tobin represents the interests of
thirty-eight hospitals, which he indicates are all recognized by Medicare as sole
community hospitals and have all provided outpatient facility services to
TRICARE beneficiaries in the past six years.

Mr. Tobin argues that outpatient services provided to TRICARE beneficiaries by
these sole community hospitals, with the exception of ambulatory surgical
services, should be reimbursed at billed charges. While Mr. Tobin's letter
discusses various provisions of the Code of Federal Regulations (CFR) and the
TRICARE Reimbursement Manual, his conclusion is largely based upon the
language in 32 C.F.R. §199.14(a)(3) which states, in part:

> Billed charges and set rates. The allowable costs for
> authorized care in all hospitals not subject to the
> CHAMPUS DRG-based payment system or the
> CHAMPUS mental health per diem payment system shall
> be determined on the basis of billed charges or set rates.

I am forwarding this correspondence to your attention in order to obtain an
interpretation from TMA on the reimbursement issue raised in Mr.

Mr. Bruce Mitterer
Contracting Officer
September 28, 2005
Page 2


Tobin's letter. Please contact me if you have any questions or wish to discuss this matter.

Best Regards,

David J. McIntyre, Jr.
President and Chief Executive Officer

cc.    Tom Griffin, TMA, Contracting Officer
       Karl Hansen, TMA, Associate General Counsel
       Janet Kornblatt, General Counsel, TriWest Healthcare Alliance
       Bill Vandenbosch, Executive Vice President and Chief
       Operating Officer, TriWest Healthcare Alliance
       Larry Haggerty, Executive Vice President and Chief Financial
       Officer, TriWest Healthcare Alliance

**A68**

# EXHIBIT C



**OFFICE OF THE ASSISTANT SECRETARY OF DEFENSE**
**HEALTH AFFAIRS**

16401 EAST CENTRETECH PARKWAY
AURORA, COLORADO 80011-9066

TRICARE
MANAGEMENT ACTIVITY

05-TROW-010628                                   December 21, 2005

Mr. David McIntyre, Jr.
President and Chief Executive Officer
TriWest Healthcare Alliance
16425 North 28th Ave
Phoenix, AZ 85023

Reference:  Contract Number MDA906-03-C-0009
            TriWest Letter of September 28, 2005

Subject: Outpatient Reimbursement of Sole Community Hospitals

Dear Mr. McIntyre:

Your September 28, 2005, letter asked for a technical interpretation of the contract regarding the correct TRICARE reimbursement methodology for outpatient care provided by non-contracted, Medicare-recognized, sole community hospitals.  This was in response to a letter to TriWest from Wescott Healthcare LLC, asserting that TriWest should pay billed charges for all outpatient services provided by sole community hospitals.  This is my interpretation:

32 CFR 199.14.a(5) addresses TRICARE payments for hospital outpatient services. Under that section, certain outpatient services are subject to the allowable charge methodology set forth by regulation.  Outpatient hospital services subject to the allowable charge methodology include laboratory services, rehabilitation therapy services, venipunctures, radiology services, diagnostic services, ambulance services, durable medical equipment, oxygen, drugs administered other than orally, and professional provider services.  Other facility charges may be paid as billed.

32 CFR 199.14.a(5) does not exempt any category of hospital.  This differs, of course, from the regulatory issuance on inpatient services – under which Medicare-recognized sole community hospitals are specifically exempted from the Diagnosis-related Group (DRG) payment methodology.

The TRICARE Reimbursement Manual Chapter 1, Section 24, reiterates the regulatory requirements regarding payment of outpatient hospital services, including the payment of technical components of diagnostic services.  The Manual does allow one exception – for

**A70**

outpatient services provided by hospitals in the State of Maryland – but also does not exempt outpatient services provided by sole community hospitals.

As noted above, we disagree with the argument put forth by Wescott Healthcare LLC and believe that TriWest has paid the hospitals in question appropriately, as required by 32 CFR 199 and the TRICARE Manuals.

If you have any questions regarding this letter, please contact your Contracting Officer's Representative.

Sincerely,

Contracting Officer

Cc:
Kathryn McGuire, ACO, TRICARE Regional Office - West
Charles Blomberg, TMA-Aurora
Forrest Curtis, TMA-Aurora
Scott Montplaisir, TriWest

**A71**

# EXHIBIT D

01 '25/01  THU 12:53 FAX 3036763935          TMA OPERATIONS          →→→ TRIWEST          ⌀001



**OFFICE OF THE ASSISTANT SECRETARY OF DEFENSE**
**HEALTH AFFAIRS**
16401 EAST CENTRETECH PARKWAY
AURORA, COLORADO 80011-9066



TRICARE
MANAGEMENT ACTIVITY
**MCSO**

January 25, 2001
In Reply Refer to:  1CMB025B

Mr. Scott Montplaisir
Director Contract Management and Compliance
TriWest Healthcare Alliance
15451 North 28th Avenue
Phoenix, AZ  85023

      Subject: DRG Exemption and Outpatient Services under Contract Number MDA906-96-C-0004

Dear Mr. Montplaisir:

      A member of TriWest's staff recently asked for confirmation that exemption from the Diagnosis Related Group (DRG) payment methodology does not carry over to outpatient services paid under other reimbursement methodologies (for example, the ambulatory surgical center (ASC) payment system or the CHAMPUS Maximum Allowable Charge (CMAC) system).  As requested, our Office of Medical Benefits and Reimbursement Systems confirms that a hospital that is exempt from the DRG payment system is not exempt from CMAC or ASC rates.

      As stated in the TRICARE Policy Manual, Chapter 13, Section 6.1, hospitals that are exempt from the Medicare Prospective Payment System are also exempt from the TRICARE DRG system for inpatient charges.  Exempt hospitals include long-term hospitals, community hospitals, and cancer hospitals.  However, the policy on ambulatory surgical center reimbursement in Chapter 13, Section 9.1, states, "The (ASC) payment system is to be used regardless of where the ambulatory surgery procedures are provided -- that is, in a freestanding ambulatory surgery center, in a hospital outpatient department, or in a hospital emergency room."  There is no exception for hospitals that are DRG-exempt.

      The Policy Manual Chapter 13, Section 6.9, describes hospital reimbursement for other (non-surgical) outpatient services.  Again, the policy does not make an exception for DRG-exempt hospitals.  For outpatient services, billed charges are used except when a claim has sufficient HCPCS coding information to process using existing allowable charges.

**A73**

01/25/01  THU 12:54 FAX 3036763935        TMA OPERATIONS        →→→ TRIWEST        ☒002

I hope that this is helpful.  Please call me at (303) 676-3575 if you have any questions regarding this letter.

Sincerely,

*Charles M. Blomberg*

Charles M. Blomberg
Contracting Officer's Representative

Cc:
Joe Chiacchieri, CMW
Charlotte Dodgson, ACO, Central Region
Mike Talisnik, TMA Falls

**A74**